UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.; CLUB QUARTERS FRANCHISE NETWORK, L.L.C.; CLUB QUARTERS MEMBERSHIP NETWORK, L.L.C.; and SHARED OPERATING SERVICES, L.L.C.,<br><br>Plaintiffs,<br><br>- against -<br><br>CQ DC ACQUISITION LLC<br>Defendant. | Case No. 1:26-cv-09393 |

**DECLARATION OF JOHN PAUL NICHOLS IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**JOHN PAUL NICHOLS** declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2. I am Chief Executive Officer of plaintiff Club Quarters Management Company, L.L.C. ("CQMC"). As such, I am fully familiar with the facts set forth herein.

3. I respectfully submit this declaration in support of the motion ("Motion") by Club Quarters Management Company, L.L.C. ("CQMC"), Club Quarters Franchise Network, L.L.C. ("CQFN"), Club Quarters Membership Network, L.L.C. ("CQMN"), and Shared Operating Services, L.L.C. ("SOS") (collectively, "Club Quarters" or "Plaintiffs") pursuant to Fed. R. Civ. P. 65 for a temporary restraining order and preliminary injunction (i) tolling the cure period set forth in the purported Notice of Default (the "Notice of Default") sent by defendant CQ DC Acquisition LLC ("Owner" or "Defendant"); (ii) preventing Owner from terminating the Management Agreement (the "Management Agreement") with CQMC, the License and Royalty Agreement (the "License and Royalty Agreement") with CQFN, the Customer List/Network

Agreement (the "Customer List/Network Agreement") with CQMN, and the Services Agreement (the "Services Agreement") with SOS on any of the grounds set forth in the Notice of Default pending the resolution of the action on the merits; and (iii) for such other and further relief as the Court deems just and proper.

4. Club Quarters is a boutique hotel brand principally designed to serve business travelers.

5. Club Quarters' distinctive membership-oriented model gives its corporate clients access to a network of strategically located hotels at negotiated rates, in exchange for recurring room nights and long-term relationships.

6. Due to this unique membership model, Club Quarters focuses on generating repeat business from corporate members, government personnel, law firms, universities, non-profits, and other organizations with recurring travel needs. Indeed, many Club Quarters members have maintained relationships with Club Quarters for decades.

7. By cultivating repeat business and efficiently utilizing hotel space, Club Quarters is able to achieve strong margins and profitability, notwithstanding rates that may be lower than what its competitors charge.

8. The success of the Club Quarters model depends not only on the performance of an individual hotel, but on the strength and consistency of the Club Quarters system as a whole.

9. Through a network of interrelated agreements, Club Quarters provides participating hotels with access to proprietary operating methods, customer-acquisition tools, customer lists, membership-network benefits, centralized reservation and support services, proprietary development, marketing, and operating formulae developed over decades of experience in the hospitality industry.

10. The system includes the Club Quarters Development Formula, Marketing Formula, Operating Formula, Customer Lists, Membership Network, and a range of centralized operational services. Collectively, these assets form the core of the Club Quarters brand and business model.

11. Equally critical are the Club Quarters Standards, governed by the Management Agreement, which are intended to ensure that guests receive a consistent experience at every hotel within the Club Quarters system.

12. The Club Quarters Standards are key aspects of the Club Quarters brand that its members can expect to receive when they stay at any Club Quarters property, such as a restaurant and bar, meeting rooms, room service, and a fitness facility.

13. To maintain these standards, hotel owners are required, under each owner's License and Royalty Agreement, to "strictly comply" with the quality standards applicable to Club Quarters, under the Customer List/Network Agreement, to participate in the Customer Network, and under the Management Agreement, to fund the capital improvements necessary to keep the property in compliance with Club Quarters Standards.

14. However, Club Quarters cannot deliver a hotel experience tailored to modern business travelers if the hotel owner allows the property and its amenities to physically deteriorate. For example, two Club Quarters–branded hotels in London recently renovated their properties and those hotels immediately realized increased memberships and business that greatly exceeded the increases at similar, unrenovated hotels.

15. This action concerns the Club Quarters Hotel White House, a 161-room hotel located blocks from the White House at 839 17th Street N.W., Washington, D.C. (the "Hotel").

16. For more than thirty years, the Hotel has been a vital component of the Club Quarters network. It is the only Club Quarters–branded hotel in the Washington, D.C. area and

provides a strategically located home base in our nation's capital for government employees and those doing business with the federal government to convene, network, and rest.

17. On or about October 28, 2005, Plaintiffs entered into a series of related agreements with the then-owner of the Hotel, RCQ Hotel DC, LLC ("Former Owner"), which provided Former Owner with full access to the Club Quarters system.

18. Those agreements included: (i) the License and Royalty Agreement between Former Owner and CQFN governing the Hotel's use of the Club Quarters name, trademarks, Development Formula, Marketing Formula, Operating Formula, and related proprietary rights; (ii) the Customer List/Network Agreement between Former Owner and CQMN governing access to the Club Quarters Customer Lists and participation in the Customer Network; (iii) the Management Agreement between Former Owner and CQMC to manage the day-to-day operations of the Hotel; and (iv) the Services Agreement between Former Owner and SOS governing centralized accounting, reservation, information technology and related operational services (collectively, the "Club Quarters System Agreements"). True and correct copies of the License and Royalty Agreement, the Customer List/Network Agreement, the Management Agreement and the Services Agreement are attached hereto respectively as **Exhibits A–D**.

19. The Club Quarters System Agreements provide for an initial twenty-five-year term through 2030, and the Management Agreement provided CQMC the right to extend the relationship for an additional ten years, through 2040, with the related agreements providing for corresponding extensions. Ex. C § 3(A), (B).

20. Together, the Club Quarters System Agreements created an integrated contractual structure through which the Hotel would participate in and receive the benefits of the Club Quarters

system. The agreements expressly reference one another and define each of the others as "Related Club Quarters Agreements."

21. The parties thus did not contract for mere management of a hotel; they contracted for the Hotel's participation in the broader Club Quarters system, including the Club Quarters brand, proprietary formulae, Customer Lists, Customer Network, and centralized services.

22. Consistent with that structure, Owner agreed to pay separate fees for separate benefits: 2.75% of Gross Revenue plus an incentive fee to CQMC for management; 3.25% to CQFN for Club Quarters' intellectual property; 3.75% to CQMN for access to the Customer Network and Customer Lists; and cost-based fees to SOS for centralized services. *See* Ex. A § 4(B); Ex. B § 4(B); Ex. C § 4(B).

23. Thus, Owner paid separate entities for distinct rights and services under separate agreements.

24. Finally, the parties agreed that the Management Agreement could be terminated only in limited circumstances and only in accordance with specified notice-and-cure procedures. Ex. C § 9. The Management Agreement contains separate provisions for termination based on Club Quarters' failure to meet specific performance tests, but Owner does not attempt to satisfy those conditions, and does not threaten termination based on the performance test provisions. Ex. C § 3(D).

25. Article 9 of the Management Agreement requires written notice that specifically identifies the alleged default and gives the recipient an opportunity to cure. If a claimed default cannot be cured within thirty days, no Default exists if the recipient timely begins cure efforts and diligently prosecutes them to completion within the contractual cure period. Ex. C § 9(A)(2).

26. Each of the other Club Quarters System Agreements contained cross-termination provisions, permitting their termination in the event the Management Agreement was terminated. Ex. A § 3(C)(2); Ex. B. § 3(C)(2); Ex. D § 3(B)(2).

27. In July 2016, approximately ten years after the Club Quarters System Agreements were signed, Defendant CQ DC Acquisition LLC ("Owner") acquired the Hotel and assumed the rights and obligations of Former Owner under each of the Club Quarters System Agreements. When a new owner purchases a hotel, it is typical for that owner to infuse new capital into the physical property. In 2016, this Hotel needed significant re-investment. Yet, in a harbinger of what was to come, Owner refused to make those necessary capital expenditures over its first few years of ownership.

28. In fact, since it acquired the Hotel, Owner has engaged in a sustained pattern of underinvestment that left the property unable to meet the Club Quarters Standards and increasingly incapable of competing as a business-class hotel in the D.C. market.

29. Club Quarters repeatedly advised Owner of the capital projects necessary to keep the Hotel in compliance with the Club Quarters Standards (as required by the Management Agreement), and to preserve its competitiveness in the Washington, D.C. hospitality market. Still, Owner consistently refused to fund those improvements.

30. The capital projects Club Quarters identified included guestroom and bathroom renovations, modernization of the lobby and public areas, furniture, fixture, and equipment replacements, corridor and building-system improvements, restaurant-related investments, food-and-beverage infrastructure, and other work necessary to maintain the Hotel in compliance with contractual Club Quarters Standards.

31. Despite Club Quarters' repeated warnings about the consequences of Owner's continued inaction, Owner repeatedly deferred, postponed, underfunded or rejected those projects instead of seeking to invest in the Hotel's long-term competitiveness.

32. The numbers confirm Owner's years of chronic underinvestment. From 2019 through 2025, Owner spent only approximately $600,000 in total on capital projects at the 161-room Hotel. This averaged to approximately $86,000 per year, with annual spending falling below $50,000 in four consecutive years from 2019 through 2022. In 2026, through June, Owner had only spent another $3,387, notwithstanding Club Quarters' longstanding and repeatedly identified needs for substantial renovations and improvements to the Hotel.

33. As a result, the Hotel's physical state steadily deteriorated, while competing properties only continued to improve. For example, the Hotel's bathrooms are approximately thirty years old and outdated. In addition, the mattresses are well beyond their recommended life. However, rather than refresh them, Owner chose to spread the cost over three years, starting in 2025. The Hotel's public areas still remain substantially unrenovated, the guest-facing facilities are increasingly outdated, and numerous recommended improvements have not been undertaken.

34. Owner has performed, at most, limited cosmetic work and piecemeal repairs that failed to address the Hotel's fundamental competitive deficiencies. Such deficiencies render the Hotel uncompetitive in the D.C. hospitality market.

35. And even after Owner approves an annual capital budget, it often refuses to approve the individual expenditures contemplated by that budget. For example, Owner recently approved a refresh of the Hotel's gym in the annual capital budget, only to refuse approval when Club Quarters sought to proceed with the project.

36. The Hotel's food-and-beverage offerings are a particularly stark example. A majority of Club Quarters' clientele are business travelers who expect on-site dining throughout the day. As such, Club Quarters Standards require each Club Quarters-branded hotel to maintain a restaurant and bar. Ex. C (Ex. A).

37. In fact, dining facilities are so essential to the Club Quarters system that the Management Agreement explicitly reinforces this requirement:

> **Restaurant**. The current Club Quarters Standards provide that space at each Club Quarters will be leased for use as a restaurant and bar. It is anticipated that at all times during the Term, ***there shall be a restaurant and bar at the Club Quarters***. The quality of the restaurant and bar therein shall be subject to Manager's reasonable satisfaction that the restaurant is consistent with the Club Quarters Standards. ***Owner shall not discontinue use of such space as a restaurant and bar or enter into any other arrangements for the use of such space without Manager's Approval***.

Ex. C § 6(F) (emphasis added).

38. For years, however, the Hotel did not operate a restaurant on the premises, as required by the Management Agreement, because Owner repeatedly refused to fund the renovations or tenant-improvement allowances necessary to attract a restaurant operator.

39. Owner's decisions deprived the Hotel of an amenity that the Club Quarters Standards require and that many of its business-traveler clients expect from a Club Quarters-branded hotel.

40. Owner's noncompliance with the Club Quarters System Agreements has caused the Hotel to consistently lose business to local competitors that offer the food and beverage options that the Hotel does not possess.

41. Corporate accounts expect hotel guests to have access to on-site food-and-beverage options throughout the day. The absence of a restaurant at the Hotel put the property at a significant competitive disadvantage to its neighboring properties.



89020340;4

42. In addition, the Hotel lacked a liquor license for extended periods (and still fails to maintain one to this day), which further diminished its attractiveness to both Club Quarters' members and potential new business-traveler clientele.

43. Club Quarters repeatedly notified Owner that these conditions were impairing the Hotel's competitiveness and reducing its ability to attract and retain corporate members, repeat business travelers, and other high-value customers.

44. Indeed, corporate travel managers, existing members, prospective member organizations, and other business travelers began to view the Hotel as physically inferior to newer or recently renovated competing properties.

45. As a result, the Hotel became increasingly dependent on lower-value third-party booking channels and less capable of generating the kind of recurring member business that the Club Quarters model depends on.

46. The Hotel was also impacted by extraordinary market forces affecting its core customer base. The COVID-19 pandemic devastated business travel starting in early 2020, leading to steep losses in occupancy and revenue at the Hotel (and all other Club Quarters properties).

47. Following the pandemic, the Hotel's performance recovered under Club Quarters' management, and that recovery occurred more quickly than that experienced by Club Quarters hotels in other markets.

48. However, in 2025, the Washington market faced another setback: the extended federal government shutdown and drastic reduction in government spending under the Department of Government Efficiency (DOGE). Government-related travel dropped sharply, agencies that had historically generated significant lodging demand disappeared, and one of the Hotel's largest

member organizations—the International Visitor Leadership Program—dramatically reduced its travel into the United States.

49. Because the Hotel's customer base was predominantly government-related, the Hotel faced a disproportionate loss of room nights in 2025. As a result, the Hotel failed to meet budget.

50. This failure to meet budget led to an agreed-upon remedy: pursuant to the Club Quarters System Agreements, Club Quarters decreased its management, licensing, and network fees.

51. So, although Owner claims to be paying inordinate fees for Club Quarters' membership model, it in fact paid *no* fees for access to the Club Quarters Membership Network in 2025, while Club Quarters worked to restore the Hotel's traditional customer base on its behalf. Owner made this task exponentially more difficult due to its continued refusal to fund the property and comply with Club Quarters Standards, despite several newly constructed and renovated competitors entering the market.

52. These unfavorable circumstances are of no surprise to Owner. Months before serving the Notice of Default, Club Quarters expressly told Owner that the Hotel's competitiveness had been materially impaired because of market conditions and Owner's own failure to approve capital expenditures. Club Quarters specifically identified the condition of the Hotel's bathrooms and the lack of a restaurant as reasons for the Hotel's inability to compete effectively in the Washington market.

53. Club Quarters further warned that declining member contributions, increased reliance on online travel agencies, and related performance challenges were foreseeable consequences of Owner's continued refusal to fund necessary improvements.

54. Because the Hotel is a crucial location within the integrated Club Quarters system, the harm from Owner's non-compliance extends far beyond the Hotel itself. The Hotel's deteriorated physical condition has damaged customer perceptions of the Club Quarters experience, reduced the attractiveness of the Membership Network, and impaired Club Quarters' ability to attract and retain members throughout the system.

55. On October 31, 2025, Club Quarters timely submitted a proposed Annual Operating Plan that reflected its assessment of the actual conditions in the Washington, D.C. hospitality market. The proposed budget incorporated the reduced demand for government-related travel, the loss of significant member business, and other adverse market conditions to produce a projected EBITDA less replacement reserve of approximately $1.2 million.

56. The budget also reflected the unique challenges that were specific to the Hotel, including the condition of its approximately thirty-year-old bathrooms, the absence of a restaurant, and Owner's continued refusal to fund necessary repairs and renovations, while neighboring competitors continued to renovate and evolve.

57. Consistent with the concerns Club Quarters had repeatedly expressed to Owner, the proposed budget reflected the Hotel's reality: its competitiveness had been impaired by years of deferred capital investment and the dramatic market shift away from government business.

58. Owner rejected the proposed budget.

59. Over the ensuing months, Club Quarters attempted, in good faith, to reach a compromise. They met repeatedly with Owner, responded to comments, revised portions of the proposed budget, and increased projected revenues.

60. Despite those efforts, Owner still refused to approve the Annual Operating Plan because it did not produce the financial results Owner wanted.

61. Owner candidly told Club Quarters that the hotel was scheduled for refinancing. As such, in November 2025, Owner demanded a minimum EBITDA target of $3 million so the Hotel could portray a robust cash-flow position to satisfy its lender requirements. A true and correct copy of an email string among Owner, Owner's asset manager, JLL, and Club Quarters detailing this discussion is attached hereto as **Exhibit E**.

62. Owner further stated on December 17, 2025 that its lender would decrease the loan amount by $10 million based on the Hotel's then-current NOI and that, as a result, Owner needed an NOI of at least $2.4 million to maintain the existing loan amount. A true and correct copy of an email string among Owner, JLL and Club Quarters is attached hereto as **Exhibit F**.

63. Club Quarters advised Owner that its targets were not supported by current market conditions and could not reasonably be achieved based on the then-available information. Nevertheless, Owner continued to reject the proposed budget because it did not satisfy Owner's refinancing objectives.

64. When the parties reached an impasse, Club Quarters proceeded with the dispute-resolution procedure prescribed by the Management Agreement for budget disputes. Ex. C § 5. On April 10, 2026, Club Quarters commenced an arbitration proceeding seeking a declaration that Owner had unreasonably withheld approval of the Annual Operating Plan (the "Budget Arbitration").

65. In that proceeding, Club Quarters alleged that Owner's refusal was driven by its refinancing objectives rather than a legitimate disagreement concerning market conditions or Hotel operations.

66. Club Quarters further explained that the Hotel's competitiveness had been impaired by Owner's years of deferred capital investment. Club Quarters specifically described the above-

mentioned conditions and how they limited the Hotel's ability to effectively compete for important customer segments, while depriving Club Quarters of the tools it needed to improve the Hotel's performance.

67. The Budget Arbitration is pending. Owner appeared in the proceeding, denied Club Quarters' claims, and asserted affirmative defenses.

68. On or about September 29, 2026, just days before the initial Budget Arbitration conference, Owner sent a Notice of Default claiming that CQMC was in default under the Management Agreement and simultaneously threatening to terminate the Club Quarters System Agreements pursuant to their cross-termination provisions. A true and correct copy of the Notice of Default is attached hereto as **Exhibit G.**

69. The Notice alleges that Club Quarters materially abandoned the proprietary Club Quarters business model and formulae that formed the basis of the parties' contractual relationship, and thereby failed to provide the benefits for which Owner agreed to pay substantial management, licensing, and network fees. Ex. G.

70. Specifically, Owner contends: Club Quarters' creation of Altus Hospitality and its rebranding, or potential rebranding, of certain hotels owned by Club Quarters' affiliates "reduced [the] brand footprint"; that Club Quarters failed to "cultivat[e] the 'Membership Network' embodied by the proprietary 'Customer Network' and 'Customer Lists'"; and that the resulting decline in Member contribution, increased reliance on online travel agencies, and deterioration in Hotel performance "evidence[] Manager's complete departure from the Club Quarters Standards." Ex. G.

71. The Notice, however, conflates distinct entities and agreements. The proprietary Development, Marketing and Operating Formulae invoked by Owner belong to CQFN and are

licensed under the License and Royalty Agreement, while the Customer Lists and Customer Network belong to CQMN and are made available under the Customer List/Network Agreement. None of those agreements guarantee any particular level of Member contribution or future financial success. In fact, the Customer List/Network Agreement expressly disclaims any guarantee as to the Hotel's future financial success. Ex. B § 9(J).

72. The alleged defaults also do not constitute any breach of Sections 2(A), 2(B)(1)(f), or 2(B)(1)(a) of the Management Agreement—the three provisions the Notice expressly identifies as the obligations that CQMC supposedly breached. Exs. C, G.

73. Specifically: Section 2(A) requires Manager to use "commercially reasonable efforts" to enhance the Hotel's profitability and value "within the parameters of the business model currently employed by Manager and its affiliates." Nothing in that provision requires CQMC or its affiliates to maintain or expand any particular number of Club Quarters-branded hotels or prohibits them from pursuing other hospitality ventures. Ex. C § 2(A).

74. Section 2(B)(1)(f) requires Manager to "oversee the implementation of the 'Membership Network' as is made available to the Club Quarters pursuant to the Customer List/Network Agreement." It does not obligate CQMC to grow the Network, restore historical Member contribution, or achieve any particular business result. Ex. C § 2(B)(1)(f).

75. Section 2(B)(1)(a) requires Manager—**subject to Owner funding**—to ensure compliance with the "Club Quarters Standards," which are attached as an exhibit to the Management Agreement. Ex. C Art. 1, § 2(B)(1)(a) & Ex. A (attached to Management Agreement).

76. The Notice identifies no Standard that CQMC actually violated. Instead, it recites a series of financial metrics and declares that those results "evidence" a departure from the Standards. Ex. G.

77. Business results are not Club Quarters Standards.

78. Moreover, Altus Hospitality was created as an "internal business unit" of Club Quarters Management Company, not a separate legal entity.

79. The Notice nevertheless demands that CQMC "cure" the alleged defaults within thirty days by: (i) increasing the number of Club Quarters-branded hotels; (ii) growing the Customer Network and Customer Lists sufficiently to restore Member contribution to levels achieved in 2005; (iii) operating the Hotel in accordance with Club Quarters Standards; and (iv) paying Owner $2,273,643 in purported damages. Ex. G.

80. Those demands seek business outcomes, not the cure of identified contractual defaults. They also ignore changing market conditions and the longstanding physical and competitive deficiencies that Club Quarters repeatedly identified as the result of Owner's refusal to fund necessary capital improvements.

81. For example, none of the Management Agreement provisions that the Notice identified requires CQMC to increase the number of Club Quarters-branded hotels. And Owner's assertion that Club Quarters reduced the number of branded hotels "from sixteen to ten" is simply false: the current number of Club Quarters membership hotels (13) *exceeds* the number that existed when the Club Quarters System Agreements were executed (11).

82. Likewise, the Notice misstates the Plaintiffs' obligations under the Customer List/Network Agreement. Nowhere within that agreement are any of the Plaintiffs required to "grow" the Customer Network or Customer Lists to achieve any specified level of Member

contribution. Rather, the Customer List/Network Agreement simply gives the Hotel access to and requires participation in the Membership Network and Customer Lists.

83. The Notice also fails to provide any objective standard by which Club Quarters can be deemed to have "cured" these supposed defaults. It does not identify how many additional hotels must be added, what level of growth in the Customer Network or Customer Lists would suffice, what amount of Member contribution would satisfy Owner, or the specific conduct Club Quarters must undertake to cure the alleged Club Quarters Standards default.

84. As such, the Notice demands that Manager achieve, within thirty days, indefinite business results that depend on market conditions, third parties, and circumstances that developed over years and were exacerbated by Owner's decade-long refusal to ensure that the Hotel met Club Quarters Standards. Owner's own failure to fund required improvements directly impaired the Hotel's ability to remain competitive in a DC market filled with newly constructed and renovated hotels.

85. The $2,273,643 "damages" demand is unsupported. Owner describes its $2,273,643 "damages" demand as the cumulative EBITDA shortfall for 2023 through 2026 supposedly resulting from declining Member contribution. Ex. G.

86. But Owner provides no calculation or baseline for that figure, no explanation of how declining Member contribution caused the purported EBITDA shortfall, and no explanation of how payment would cure any conduct alleged in the Notice.

87. Nor did Club Quarters guarantee any particular financial result: to the contrary, the Management Agreement describes the Annual Operating Plan as containing "reasonable estimate[s]" of Gross Revenues and Net Operating Expenses for the forthcoming fiscal year, and

the Agreement elsewhere expressly disclaims any guarantee of projected earnings or future financial success. Ex. C §§ 5(A)(1)(a), 12(I).

88. In substance, Owner threatens to remove the Hotel from the Club Quarters system and excise Club Quarters from the Washington, D.C. market entirely, based on purported defaults that none of the Club Quarters System Agreements impose and "cures" that the Notice does not objectively define.

89. The Default Notice threatens that, if its purported cures (which are impossible to perform) are not satisfied, Owner will terminate the Management Agreement and invoke the cross-termination provisions of the other Club Quarters System Agreements. Ex. G.

90. The consequences of doing so would extend far beyond the day-to-day management of the Hotel: such termination would sever the contractual structure through which the Hotel obtains the Club Quarters brand, proprietary formulae, Customer Lists, and Customer Network, ending a relationship under which the Hotel has operated as part of the Club Quarters system for more than thirty years. Exs. A–D.

91. The Hotel is a critical and irreplaceable component of the Club Quarters system in Washington, D.C.; it cannot readily be replaced with another similarly situated property. In addition, its loss would disrupt longstanding customer and membership relationships, and damage Club Quarters' goodwill, reputation, brand, and ability to attract or retain members and hotel owners.

92. The importance of the Hotel's location to Club Quarters' member relationships is not theoretical. For example, the United States Secret Service generated more than 2,000 room nights at the Hotel in 2025.

93. Awarding Owner damages after terminating the interrelated agreements would not restore the Hotel to the network or repair the resulting injury to Club Quarters' customer relationships, Membership Network, goodwill, and brand.

***[Remainder of page intentionally blank]***

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2026.

JOHN PAUL NICHOLS



89020340;4