# EXHIBIT A

Washington, DC

## LICENSE AND ROYALTY AGREEMENT

THIS LICENSE AND ROYALTY AGREEMENT ("Agreement") is made as of October 28, 2005, by and between RCQ Hotel DC, LLC ("Owner"), a Delaware limited liability company having its principal place of business at c/o Rockwood Capital Corporation, Two Embarcadero Center, Suite 2360, San Francisco, California 94111, and Club Quarters Franchise Network, L.L.C. (1) ("CQFN"), a Delaware limited liability company having its principal place of business at 585 Old Stamford Road, New Canaan, Connecticut 06840.

### WITNESSETH:

WHEREAS, Owner is the owner of the Premises and the Club Quarters(1);

WHEREAS, CQFN is the owner of the Trademarks, the Club Quarters Development Formula, the Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software, all as hereinafter defined, and is willing to grant to Owner, and Owner desires to obtain from CQFN, a non-exclusive and nontransferable license to use the Trademarks exclusively in connection with the Club Quarters and access to and use of the Club Quarters Development Formula and the Club Quarters Operating Formula pursuant to the terms and subject to the conditions hereof;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties agree as follows:

### Article 1 - Definitions, Terms and References

**Definitions:** In this Agreement and any exhibits, addenda or riders hereto, the following terms shall have the following meaning:

**Affiliate** shall mean any entity owned or controlled by a party hereto, owning or controlling a party hereto or under common ownership with and controlled by a party hereto, with "control" meaning ownership of seventy-five percent (75%) or more of voting interests.

**Agreement** shall mean this License and Royalty Agreement, as it may be amended or supplemented from time to time.

**Approval, Approve or Approved** shall mean prior written approval, which approval shall not be unreasonably withheld or delayed.

(1) “Club Quarters” is a registered trademark of Club Quarters Franchise Network, LLC

**Club Quarters** shall mean that certain hotel and the restaurants and retail space, if applicable, at the Premises, and all furniture, fixtures, equipment, and inventories therein.

**Club Quarters Standards** shall mean the standards of operation and facilities that are generally consistent with the average requirements of Club Quarters users and prospective users which currently are primarily organizations with business travelers, as such standards are currently in effect for lodging facilities operated under the "Club Quarters" name as of the date of this Agreement. The facilities and services that are currently generally provided in hotels operating under the "Club Quarters" name and representing Club Quarters standards are described in Exhibit A. These services and facilities representing Club Quarters standards may be modified by Manager in its discretion from time to time based upon evolving market conditions in order to meet the needs of its users and prospective users; provided that any material change in the general standards of operation must be commercially justified to Owner.

**Club Quarters Development Formula** shall mean the proprietary formula developed and implemented by or on behalf of CQFN and its Affiliates for site selection and analysis, building design, configuration and construction that is intended to maximize revenue and minimize operating costs. This formula may be modified by Manager in its discretion from time to time based upon evolving market conditions in order to meet the needs of its users and prospective users; provided that any material change in the formula must be commercially justified to Owner.

**Club Quarters Marketing Formula** means the unique method developed by CQFN and its Affiliates to qualify and solicit users and set prices substantially eliminating the need for price discounting, payments to middlemen, and marketing and promotional expenses, as the same may be amended from time to time.

**Club Quarters Operating Formula** shall mean the proprietary business concept developed and implemented by or on behalf of CQFN and its Affiliates that includes methodologies and practices in each operating function that reduce operating costs and that are user-friendly to management and employees and that subject operating and capital expenditures to rigid scrutiny to ensure sufficient returns to warrant them. This formula may be modified by Manager in its discretion from time to time based upon evolving market conditions in order to meet the needs of its users and prospective users; provided that any material change in the formula must be commercially justified to Owner.

**Commencement Date** shall mean October 28, 2005.

**CQFN** shall mean Club Quarters Franchise Network, L.L.C.

**Customer List/Network Agreement** shall mean that certain Customer List/Network Agreement of even date herewith between Owner and Club Quarters Membership Network, L.L.C., a Delaware limited liability company and an Affiliate of CQFN, as such agreement may be amended from time to time.

**Default** shall mean a default under any of the obligations and requirements under this Agreement.

**Deferred License and Royalty Fee** shall have the meaning as provided in Article 4, Section C.

**Event of Default** shall mean the occurrence of any of the events described in Article 6 herein.

**Fiscal Year** shall mean a year which ends on December 31. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 364 days. A partial Fiscal Year shall constitute a separate Fiscal Year with any amounts due under this Agreement being prorated based on the number of days in such partial year.

**Force Majeure** shall mean any and all causes beyond the reasonable control of a party, and such that reasonable foresight and ability on the part of the affected party could not reasonably provide against, including, without limitation, civil unrest or commotion, riots, acts of terrorism (including hijacking, sabotage, bombing, murder, assault and kidnapping) hurricanes, typhoons, tornados, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, disease, epidemics; labor disputes, accidents, mechanical breakdown, shortages or inability to obtain labor, fuel, steam, water, electricity or materials, and acts of God, fire or other casualty, but only to the extent the same cannot be overcome with diligence and commercially reasonable expense.

**Gross Revenue** shall mean all revenues, receipts and income of any kind derived directly or indirectly from or in connection with the operation of the Club Quarters, determined on an accrual basis in accordance with generally accepted accounting principles, whether on a cash basis or credit, paid or collected, including, without limitation, net rent (i.e. gross rent less pass-throughs of utilities and other operating expenses) received from commercial tenants of the Club Quarters, and excluding, however: (i) funds furnished by Owner; (ii) investment income including interest accrued on amounts in the accounts of the Club Quarters; (iii) federal, state and municipal hotel, excise, sales, occupancy and use taxes collected directly from patrons and guests or as part of the sales price of any goods, services or displays, such as gross receipts, admissions, cabaret or similar or equivalent taxes and paid over to federal, state or municipal governments; (iv) gratuities; (v) proceeds of insurance and condemnation, except for the proceeds from business interruption insurance; (vi) proceeds from the sale or other disposition of capital assets; and rebates, discounts or credits of a similar nature; and (vii) "pass-throughs" of food or other expenses incurred by guests arising for the purchase of goods or services from third-party vendors.

**License and Royalty Fee** shall mean the fee to be paid to CQFN pursuant to Article 4 hereof.

**Management Agreement** shall mean that certain Management Agreement of even date herewith between Owner and Club Quarters Management Company, L.L.C., a Delaware limited

liability company and an Affiliate of CQFN, as such agreement may be amended from time to time.

**Management Revenue Fee** shall have the meaning ascribed to it in the Management Agreement.

**Manager** shall mean Club Quarters Management Company, L.L.C., the manager of the Club Quarters under the Management Agreement.

**Member** shall mean a subscriber for use of the Club Quarters.

**Net Operating Expenses** shall have the meaning set forth in the Management Agreement.

**Net Operating Income After Incentive Fees** shall mean Gross Revenue minus Net Operating Expenses.

**Owner** shall have the meaning set forth in the first paragraph of this Agreement or any successors in interest of Owner, including, without limitation, all permitted assignees of this or any of the Related Club Quarters Agreements or transferees of all or any portion of the Club Quarters.

**Premises** shall mean that property at 839 17th Street, N.W., Washington, D.C.

**Proprietary Software Design** shall mean those software components of the Club Quarters' computerized management system designed by or on behalf of, or licensed to, CQFN and made available to the Club Quarters pursuant to this Agreement.

**Related Club Quarters Agreements** shall mean the Management Agreement, the Customer List/Network Agreement and the Shared Services Agreement.

**Shared Services Agreement** shall mean that certain Services Agreement between Owner and Shared Operating Services, L.L.C., a Delaware limited liability company and an affiliate of CQFN.

**Term** shall have the meaning ascribed to it in Article 3 hereof.

**Termination Fee** shall mean an amount determined as set forth on Schedule A attached hereto.

**Trademarks** shall mean (i) the trademark registration for CLUB QUARTERS (and design), reg. no. 1,912,820, and (ii) any and all other trademarks, service marks, trade names, symbols, logos and designs (including restaurant names, lounge names or other outlet names) and the respective goodwill associated with each used by or registered by CQFN or one of its Affiliates, whether registered or unregistered and whether used alone or in connection with

any other words, trademarks, service marks, trade names, symbols, logos, slogans and designs.

## Article 2 - License

A. **Grant of License:** CQFN hereby grants to Owner a non-exclusive and non-transferable (other than pursuant to Article 7 below) right and license to use the Trademarks, the Club Quarters Development Formula and the Club Quarters Operating Formula for services offered only in connection with the Club Quarters, and the Proprietary Software Design, subject to the terms and conditions of this Agreement.

B. **Benefit of Use of the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software Design; No Other Rights Granted:** Except to the limited extent provided herein, the right to use of the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software shall remain with and inure to the benefit of CQFN and its Affiliates. Nothing in this Agreement should be construed to grant to Owner the right to assign or license to others the right to use the Trademarks or any names, marks, logos, commercial symbols or indicia of origin owned by CQFN or its Affiliates, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula or the Proprietary Software Design, except as explicitly set forth herein. Owner acknowledges that the worldwide goodwill associated with the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula and the Club Quarters Operating Formula and that ownership of the Trademarks and the unique and proprietary nature of the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software Design, and all rights therein and good will pertaining thereto, belong exclusively to CQFN and its Affiliates.

C. **Non-Exclusive Right:** CQFN reserves the right to use and grant to others the right to use all or some of the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software Design in connection with other hotels or other goods and services of any kind wherever offered by CQFN or its Affiliates or their respective licensees, subject to the territorial limitations set forth in Article 12, Section X, of the Management Agreement.

D. **Quality Standards:** Owner shall strictly comply with all quality standards applicable to the Club Quarters as and to the extent expressly set forth in the Management Agreement and agrees that such quality standards are necessary to protect and enhance the value of the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software Design, and the goodwill associated therewith. In the event that Owner uses the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula, or the Proprietary Software Design in a manner that does not comply with the terms of

this Agreement, CQFN shall have the right to require that Owner's improper use of the Trademarks, the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula and the Proprietary Software Design cease immediately upon notice to Owner setting forth CQFN's objections in reasonable detail.

## Article 3 - Term; Termination

A. **Term:** The term of this Agreement (the "Term") shall commence as of the Commencement Date and continue for a period of twenty-five (25) full Fiscal Years thereafter unless terminated pursuant to the provisions of this Agreement.

B. **Extension**. The initial twenty-five (25) year Term shall be automatically extended for a period of ten (10) years in the event that the Management Agreement is extended for such period pursuant to Article 3B of the Management Agreement. The Termination Fee upon the expiration of the (i) initial twenty-five (25) year Term shall be 5.0 times one year's License and Royalty Fee calculated by averaging the License and Royalty Fee earned by CQFN for the last three (3) Fiscal Years adjusted annually for inflation, and (ii) extended term shall be an amount equal to the License and Royalty Fee for the last Fiscal Year of the Term.

C. **Termination:** This Agreement shall terminate prior to expiration of the Term as follows:

(1) Upon any Event of Default (as such term is defined in Article 6 hereof), immediately at the option of the non-defaulting party by delivery of written notice to the defaulting party.

(2) Upon the termination of the Management Agreement or any other Related Club Quarters Agreement.

D. **Payments Upon Termination:** In the event this Agreement is terminated due to the occurrence of any of the events listed in the following provisions of this Article 3: (i) Section C(1) by CQFN where Owner is the party in default, and (ii) Section C(2), then, in addition to such remedies as may be available to CQFN at law or equity, Owner shall pay to CQFN the sum of: (a) the Termination Fee, plus (b) any and all amounts owed to CQFN under this Agreement up to the date of termination.

E. **Transition Procedures:** Upon the expiration or termination of the Term, for whatever reason, Owner and CQFN shall cooperate to accomplish an orderly cessation of the property of CQFN that is provided under this Agreement and Owner shall immediately cease use of the name "Club Quarters" and all proprietary information (including, without limitation, lists of Members), policies, systems, procedures, protocol and know-how related thereto and shall not engage, directly or indirectly, in the ownership or operation of any private membership hotel or similar enterprise.

## Article 4 – License and Royalty Fee

A. **License and Royalty Fee.** In consideration of its use of the Trademarks, the Club Quarters Development Formula, the Club Quarters Operating Formula and the Proprietary Software Design as permitted under this Agreement, Owner shall pay to CQFN the License and Royalty Fee.

B. **Fee Structure and Payment.** Owner shall pay to CQFN from the Commencement Date the annual License and Royalty Fee which shall be the greater of (a) an amount equal to (and in addition to) the applicable Minimum Fee under the Management Agreement for such year, which amount shall be adjusted as of January 1 of each calendar year during the Term by the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published, and (b) the sum of (i) one-half of one percent (0.50%) of all Gross Revenue for use of the Trademarks, (ii) two and one-half percent (2.50%) of all Gross Revenue for use of the Club Quarters Development Formula, the Club Quarters Marketing Formula, and the Club Quarters Operating Formula, and (iii) one-quarter of one percent (0.25%) of all Gross Revenue for use of the Proprietary Software Design, calculated on a Fiscal Year basis, but payable quarterly on or prior to the fifteenth (15) day of each February, May, August and November for the respective quarter, based upon a reasonable estimate of the amount due derived from the monthly reports provided to Owner by Manager pursuant to the Management Agreement, a copy of which Owner hereby agrees that Manager shall provide to CQFN for the purpose of determining the License and Royalty Fee.

C. **Fee Standaside.** If and to the extent in any Fiscal Year, the Net Operating Income After Incentive Fees for such Fiscal Year is less than eighty five percent (85%) of the Net Operating Income After Incentive Fees for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, and such results of operation are not the result, in whole or in part, of circumstances that constitute Force Majeure, then one hundred percent (100%) of that portion of the License and Royalty Fee that is for use of the Proprietary Software provided for in Section B(iii) above (i.e., 0.25% of all Gross Revenues) that is due to CQFN for such Fiscal Year shall not be paid; if and to the extent in any Fiscal Year, the Net Operating Income After Incentive Fees for such Fiscal Year is less than seventy five percent (75%) of the Net Operating Income After Incentive Fees for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, and such results of operation are not the result, in whole or in part, of circumstances that constitute Force Majeure, then that portion of the License and Royalty Fee that is for use of the Club Quarters Development Formula and the Club Quarters Operating Formula provided for in Section B(b)(ii) above (i.e., 2.50% of all Gross Revenues) and for use of the Trademarks provided for in Section B(b)(i) above (i.e., 0.50% of all Gross Revenues) shall be reduced from a combined 3.00% to 2.00%. The resulting reduction in the calculation of such fees that would otherwise have been due to CQFN for such Fiscal Year pursuant to Section B are hereinafter referred to as the "Deferred License and Royalty Fees". The Deferred License and

Royalty Fees shall not be paid unless Manager has made the payment, pursuant to Article 4, Section C(2) of the Management Agreement, for the Fiscal Year to which the Deferred License and Royalty Fees relates that is sufficient to cause the Net Operating Income After Incentive Fees for such Fiscal Year to be at least eighty five (85%) of the Net Operating Income After Incentive Fees for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, in which event the Deferred License and Royalty Fees shall be paid in subsequent Fiscal Years to the extent that Net Operating Income After Incentive Fees is available after payment of the License and Royalty Fee for such Fiscal Year.

D. **Subordination of License and Royalty Fee.** The License and Royalty Fee shall be paid pari passu with the payment to Manager under Article 5, Section F, of the Management Agreement of the Management Revenue, as more particularly set forth therein.

## Article 5 - Taxes

A. **Taxes.** CQFN shall be responsible for payment of all taxes imposed upon the receipt of the License and Royalty Fees. CQFN shall be responsible for all income taxes imposed by any jurisdiction upon the receipt of the License and Royalty Fee. Owner shall be responsible for payment of value added, goods and services, sales and similar taxes, if any, levied on or deducted from any amounts payable to CQFN or its Affiliates pursuant to this Agreement (but not any income taxes payable by CQFN or any of its Affiliates to any jurisdiction). The amount of such value added, goods and services, sales or similar taxes shall be payable by Owner to CQFN together with the payment to which it relates or as otherwise required by applicable law. To the extent that applicable law requires any such amounts to be paid by Owner directly to a governmental authority, Owner shall pay such amounts promptly and receipts or other proof of such payment shall be provided to CQFN promptly upon request.

B. **Cooperation.** Upon request, Owner and CQFN shall cooperate in good faith and exercise reasonable efforts to amend this Agreement for tax planning purposes, provided that such amendment does not materially and adversely affect the rights or reduce or increase the obligations of either Owner or CQFN. The parties shall at their own expense fully cooperate and keep each other fully apprised in the event of a tax audit, examination, investigation or inquiry by any governmental body in connection with any payments made pursuant to this Agreement. Each party shall promptly notify the other of any such tax audit, examination, investigation or inquiry concerning the other party of which it may become aware.

## Article 6 - Events of Default, Remedies

A. **Events of Default.** The following constitute Events of Default under this Agreement:

(1) The failure of either party to pay any sum of money to the other party when due and payable, if such failure is not cured within ten (10) days after written notice specifying such

failure is received by the defaulting party from the non-defaulting party, it being expressly agreed that any cure may be made without prejudice to the right of the party curing such failure to contest subsequently whether or not it was obligated under this Agreement to make such cure and, if appropriate, to obtain a refund of all or part of any payment made in connection with such cure;

(2) The failure of either party to perform, keep or fulfill any of the other agreements, covenants, undertakings or obligations or the breach in any material respect of any warranty or representation, set forth in this Agreement or in any document executed in connection herewith, if such failure or breach has or could have a material adverse effect on the operation of the Club Quarters or the rights and duties of either party hereto, if such failure is not cured within thirty (30) days after written notice specifying such failure is received by the defaulting party from the non□defaulting party; provided, however, that if (i) the consequences of such failure can be reduced to or stated as a sum of money with reasonable certainty and such sum is acceptable to the non-defaulting party acting reasonably, then the defaulting party shall have the right to cure such default by making a payment as provided in (1) above within such thirty (30) day period, unless such failure has caused the Owner to be in default under Approved Financing and such payment by Manager does not cure such Owner's default where Owner's lender has not accepted such cure, and (ii) if such failure is incapable of cure within such period, and the defaulting party commences to cure such default during such period and thereafter prosecutes such cure to completion with all due diligence (but in no event later than 60 days following delivery of the original notice of default), then, in either event, no Event of Default shall exist;

(3) The filing by Owner or CQFN of a voluntary petition in bankruptcy under Title 11 of the United States Code, or the issuing of any order for relief against Owner or CQFN under Title 11 of the United States Code, or the filing by Owner or CQFN of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors or owner's or CQFN's seeking or consenting to or acquiescing in the appointment of any custodian, trustee, receiver, conservator or liquidator of Owner or of all or any substantial part of the Club Quarters or of any or all of the rents, issues, profits, revenues or royalties thereof, or the making by Owner or CQFN of any general assignment for the benefit of creditors, or Owner's or CQFN's failure generally to pay its debts as such debts become due, or Owner's or CQFN's giving of notice to any governmental body of insolvency or pending insolvency or suspension of operations, or the entry by a court of competent jurisdiction of an order, judgment or decree approving a petition filed against Owner or CQFN seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); and

(4) An Event of Default attributable to a party, under any of the Related Club Quarters Agreements.

B. **Remedies.** If an Event of Default shall occur, in addition to the remedies available to each party at law and equity, the non-defaulting party shall have the right to immediately terminate this Agreement. In the event that CQFN is the defaulting party under this Article, [the Termination Fee and] all other amounts (including, without limitation, unpaid fees owing under this Agreement, shall be payable by Owner upon such termination. In the event that CQFN is the defaulting party under this Article, Owner shall pay CQFN such amounts as are then accrued and unpaid on or before the termination date of this Agreement (including, without limitation, unpaid fees owing under this Agreement).

## Article 7 - Transfer Restrictions

A. **Owner a Single-Purpose Entity; Transfer by Owner.** Owner shall at all times during the Term be a single-purpose entity whose only assets are the Premises and all improvements thereat, including the Club Quarters and the furniture, fixtures and equipment and the operating account used in connection therewith, and shall have the right to sell, convey or transfer its ownership of the Club Quarters and to assign its interest under this Agreement to another single-purpose entity, subject to the provisions below.

(1) In the event Owner sells, conveys or transfers its ownership of the Club Quarters or leases all or substantially all of the building which constitutes the Club Quarters as permitted under the Management Agreement and assigns the Management Agreement in connection with such sale, conveyance or other transfer, and if the transferee (or lessee, as the case may be, hereinafter referred to as a "transferee") agrees to be bound by the terms and conditions of this Agreement to the same extent as if such transferee had executed this Agreement with respect to obligations arising from and after the date of the applicable transfer, Owner may assign this Agreement to such transferee or to any entity which is controlled by, controls, or is under common control with such transferee without CQFN's consent. Owner shall pay all amounts then owing to CQFN at the time of such sale, conveyance, transfer or lease.

B. **Assignment by CQFN.** CQFN shall have the right to assign its rights and obligations under this Agreement without the consent of Owner, to any Affiliate, provided CQFN shall continue to be liable hereunder to the same extent as though no assignment had been made and subject to the limitations set forth in this Section B. CQFN may assign its rights to receive the License and Royalty Fee or portions thereof to any person as security for indebtedness. CQFN shall have the right to assign its rights and obligations under this Agreement to any entity that is a permitted transferee of Manager under the Management Agreement, provided, however, that Owner's Approval shall be required for any other assignment of CQFN's interest under this Agreement.

## Article 8 - Representations and Warranties

A. **Representations and Warranties of Owner.** In order to induce CQFN to enter into this Agreement, Owner does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the relevant governing documents relating to Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding-obligation of Owner enforceable in accordance with the terms hereof;

(2) There are no claims, litigation, proceedings or governmental investigation pending, or to the best of Owner's knowledge, threatened, against or relating to Owner, the properties or business of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of Owner's knowledge.

(3) Neither the consummation of the actions contemplated by this Agreement on the part of Owner to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound; and

(4) Owner is a single-purpose entity and its only assets are the Premises and all improvements thereat and property therein.

B. **Representations and Warranties of CQFN.** In order to induce Owner to enter in to this Agreement, CQFN does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the Articles of Formation and Operating Agreement of CQFN and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of CQFN enforceable in accordance with the terms hereof;

(2) There are no claims litigation, proceedings or governmental investigation pending, or to the best of CQFN's knowledge, threatened, against or relating to CQFN, the properties or business of CQFN or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of CQFN to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of CQFN's knowledge;

(3) Neither the consummation of the actions contemplated by this agreement on the part of CQFN to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or

provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which CQFN is a party or by which it is bound; and

(4) CQFN is the sole owner of the Club Quarters Development Formula, the Club Quarters Marketing Formula, the Club Quarters Operating Formula, the Trademarks and the Proprietary Software Design and has sole control of the use of all rights with respect to each of the foregoing, subject only to any other limited license agreements granted in favor of third parties.

## Article 9 - Miscellaneous

A. **Further Assurances.** Owner and CQFN shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary, as may be reasonably required without modifying the obligations of the parties hereunder, to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

B. **Waiver.** The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not to be deemed a waiver of such terms and conditions on any future occasion.

C. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

D. **Governing Law.** This Agreement shall be governed by the laws of the District of Columbia without regard to its conflicts of law provisions.

E. **Amendments.** This Agreement may not be modified, amended, surrendered, or changed, except by a written instrument executed by Owner and CQFN.

F. **Inspection Rights.** CQFN shall have the right to inspect the Club Quarters and examine the books and records of Owner pertaining to the Club Quarters at all reasonable times during the Term upon reasonable prior notice to Owner.

G. **Indemnity by CQFN.** CQFN shall indemnify and hold harmless Owner from and against any losses, liabilities, damages or claims against Owner arising out of (i) any gross negligence or willful misconduct of CQFN, its agents, contractors, subcontractors and employees; and (ii) any material breach of a covenant, representation or warranty of CQFN herein contained.

H. **Indemnity by Owner.** Owner shall indemnify and hold harmless CQFN from and against any losses, liabilities, damages or claims against CQFN arising out of: (i) any gross negligence or willful misconduct of Owner, its agents, contractors, subcontractors and

employees, and (ii) any material breach of a covenant, representation or warranty of Owner herein contained.

I. **Partial Invalidity.** In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by a final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto in which case this Agreement shall be of no force and effect.

J. **No Representation.** In entering into this Agreement, CQFN and Owner acknowledge that neither Owner nor CQFN have made any representations to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Club Quarters, and that CQFN and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by CQFN or Owner or as to the future financial success of the Club Quarters.

K. **Relationship.** In the performance of this Agreement, CQFN shall act solely as an independent contractor.

L. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

M. **Time of the Essence; Force Majeure.** Unless otherwise set forth herein, time is of the essence of this Agreement; provided, however, that time limitations set forth in this Agreement, except with respect to monetary obligations, shall be extended for the period of any delay due to causes beyond the delayed party's control or which cannot be reasonably foreseen or provided against, including without limitation, strikes, governmental regulations or orders, or events of Force Majeure.

N. **Interpretation.** No provisions of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted such provision.

O. **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement. The parties hereby agree that telecopied or facsimile signatures (or signatures sent as PDF files by email) may be used in place of original signatures on this Agreement.

P. **Consent and Approval.** Except as herein otherwise provided, whenever in this Agreement the Approval of CQFN and Owner is required, such Approval shall not be unreasonably withheld or delayed.

Q. **Notices.** Any notice, statement or demand required to be given under this Agreement shall be in writing and be, and at the option of the party giving notice, (i) personally delivered, (ii) transmitted by postage prepaid first class mail, or (iii) transmitted by Federal Express or other overnight courier service, addressed, if to each party at its address stated above, or to such other addresses as CQFN or Owner may designate in the manner herein provided. Any such notice shall be deemed to have been given on the date actually received. Owner and CQFN each agree that upon giving of any notice, it shall use reasonable efforts to advise the other by telephone that a notice has been sent hereunder. Such telephonic advice shall not, however, be a condition to the effectiveness of notice hereunder.

R. **Confidentiality.**

(i) The terms and provisions of this Agreement, all non-public information concerning the business, methods of operation, and ownership of each party, and all information made available by CQFN pursuant hereto, shall be confidential between Owner and CQFN and shall be released only to its officers, employees and investors; provided, however that such information may be made available to other parties only in connection with any court order, to comply with governmental rules and regulations, and as required by any proposed purchaser or mortgagee of all or any portion of Owner's interest in the Club Quarters.

(ii) Owner acknowledges and agrees that, with respect to CQFN, Manager and their Affiliates, and the formulas (referred to herein), software, licenses, standards, the methods of operation, financial information, business practices, reports, and all other related and ancillary information are all deemed to be proprietary and help Manager to achieve superior results. In addition, Owner recognizes that CQFN, Manager and their Affiliates endeavor at all times to keep its proprietary information from becoming public by selectively releasing information to third-parties that is absolutely necessary to achieve its goals and by obtaining confidentiality agreements from all third parties to whom proprietary information is provide. Subject to the right of Owner to provide information pursuant to paragraph (i) above, Owner shall keep all such information confidential and make reasonable efforts to insure that such information is not shared with any third parties except as provided herein. Subject to paragraph (i) above, Owner may only use such information in order to carry out its obligations under this Agreement and shall not share any such information with its affiliated entities for the benefit of such affiliated entities or in any way provide any such proprietary information to its entities owning, operating or managing competitive facilities. CQFN, Manager and their Affiliates recognize that Owner may be required to share some proprietary information with its lenders, investors and consultants, and Owner shall use due care to limit such information to the extent necessary and to require that lender enter into a confidentiality agreement reflecting the restrictions of this paragraph. CQFN, Manager and their Affiliates, also recognize that Owner may, in the course of selling the Club Quarters, need to provide proprietary information to potential investors and may do so to the extent that the information is provided to a short list of qualified buyers willing to execute a confidentiality agreement in accordance with the provisions of this paragraph, running to both Owner, on the one hand, and CQFN, Manager and their Affiliates, on the other hand.

S. **Resolution by Judicial Proceeding**. All disagreements and disputes arising under this Agreement may be resolved by judicial proceedings, for which purpose each party hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court of competent jurisdiction sitting in the County of New York, and each party hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court, or to the extent permitted by law, in such Federal court. Each party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court.

T. **Estoppel**. On request at any time and from time to time during the term of this Agreement, CQFN shall execute, acknowledge, and deliver to Owner and/or any lender to Owner within twenty (20) days following Owner's request therefor, a certificate: (i) certifying that this Agreement has not been modified and is in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and specifying the modifications); (ii) stating whether, to the best knowledge of the signatory of such certificate, any default exists, including any Event of Default, and if so, specifying each default of which the signatory may have knowledge; and (iii) providing any additional information reasonably requested by Owner or such lender.

U. **Subordination and Non-Disturbance Agreement**. If a Subordination and Non-Disturbance Agreement is entered into by Manager and any Owner's lender, the terms and conditions thereof whereby such lender agrees to "non-disturbance" provisions in respect of the Management Agreement shall apply to this Agreement whether or not this Agreement is specifically mentioned in such Subordination and Non-Disturbance Agreement.

IN WITNESS WHEREOF, CQFN and Owner, acting by and through their proper and duly authorized officers or representatives, have each duly executed this Agreement as of the day and year first above written.

OWNER: **RCQ HOTEL DC, LLC,**
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________
Walter P. Schmidt
Vice President

CQFN: **CLUB QUARTERS FRANCHISE NETWORK, L.L.C.,**
a Delaware limited liability company

By: ______________________
Jonathan D. Horowitz
Vice President and Secretary

## SCHEDULE A

## THE TERMINATION FEE

The "Termination Fee" payable under of this Agreement shall be as follows:

1. Article 3, Section B: the amounts as are set forth therein.
2. Article 3, Section D(i): 7.5 times one year's fees calculated by averaging all the fees earned by CQFN during the last three fiscal years adjusted annually for inflation;
3. Article 3, Section D(ii): where the Termination Fee to be paid under the Management Agreement is determined with reference to Schedule A, Section 4 thereof, 7.5 times one year's fees calculated by averaging all the fees earned by CQFN during the last three fiscal years adjusted annually for inflation;
4. Article 3, Section D(ii): where the Termination Fee to be paid under the Management Agreement is determined with reference to Schedule A, Section 5 thereof, 7.5 times one year's fees calculated by averaging all the fees earned by CQFN during the last three fiscal years adjusted annually for inflation;
5. Article 3, Section D(ii): where the Termination Fee to be paid under the Management Agreement is determined with reference to Schedule A, Section 6 thereof, 7.5 times one year's fees calculated by averaging all the fees earned by CQFN during the last three fiscal years adjusted annually for inflation;
6. Article 3, Section D(ii): where the Termination Fee to be paid under the Management Agreement is determined with reference to Schedule A, Section 7 thereof, (a) 5.0 times one year's fees, calculated by averaging all the fees earned by CQFN during the last three (3) fiscal years adjusted annually for inflation, where the shortfall under the Management Agreement is due to circumstances that constitute "Force Majeure" and (b) no payment (other than amounts payable under the Management Agreement) where the shortfall is due to circumstances that do not constitute "Force Majeure".

Except as otherwise expressly provided in the Agreement, no Termination Fee or other penalties shall be paid upon the termination of the Agreement. The amounts above that are subject to adjustment for inflation shall be adjusted as set forth therein by the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published.

IN WITNESS WHEREOF, Owner and SOS, acting by and through their proper and duly authorized officers or representatives, have each duly executed this Agreement as of the day and year first above written.

OWNER: **RCQ HOTEL DC, LLC,**
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________
Walter P. Schmidt
Vice President

SOS: **SHARED OPERATING SERVICES, L.L.C.,**
a Delaware limited liability company

By: ______________________
Jonathan D. Horowitz
Vice President and Secretary