UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.; CLUB QUARTERS FRANCHISE NETWORK, L.L.C.; CLUB QUARTERS MEMBERSHIP NETWORK, L.L.C.; and SHARED OPERATING SERVICES, L.L.C.,

Plaintiffs,

v.

CQ DC ACQUISITION LLC,

Defendant.

Case No. 26 Civ. 09393

**DEFENDANT CQ DC ACQUISITION LLC'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

PRYOR CASHMAN LLP

Todd E. Soloway
Bryan T. Mohler
Meghan E. Hill
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 326-0806
tsoloway@pryorcashman.com
bmohler@pryorcashman.com
mhill@pryorcashman.com

Attorneys for Defendant CQ DC Acquisition LLC

# TABLE OF CONTENTS


**I. PRELIMINARY STATEMENT** ........ 1

**II. ARGUMENT** ........ 4

A. Club Quarters Cannot Demonstrate a Likelihood of Success or a Serious Question Going to the Merits and a Balance of the Hardships ........ 5

1. *Personal services contracts are not enforceable by injunction* ........ 5
2. *Plaintiffs' application is premature* ........ 7
3. *Plaintiffs' invalid notice argument also fails* ........ 9
4. *The balance of the hardships favors Owner* ........ 10

B. Club Quarters Has an Adequate Remedy and Suffers No Irreparable Harm ........ 10

1. *Plaintiffs' alleged harm may be remedied by money damages* ........ 10
2. *Plaintiffs' cases are fundamentally inapposite* ........ 14

C. The Public Interest Weighs Against an Injunction ........ 15

**III. CONCLUSION** ........ 16

Defendant CQ DC Acquisition LLC ("Defendant" or "Owner") respectfully submits this memorandum of law in opposition to the application for a temporary restraining order filed by Plaintiffs Club Quarters Management Company, L.L.C. ("Manager"), Club Quarters Franchise Network, L.L.C., Club Quarters Membership Network, L.L.C. and Shared Operating Services, L.L.C. (collectively, "Club Quarters" or "Plaintiffs").

## I. PRELIMINARY STATEMENT

Club Quarters seeks emergency injunctive relief that has been specifically and repeatedly rejected by courts across the country, including in New York and the District of Columbia, whose law governs the Management Agreement. Under black-letter law, Plaintiffs cannot show a serious question going to the merits (let alone a likelihood of success) or irreparable harm. Nor can they show that an injunction in violation of bedrock legal principles is in the public interest.

**Plaintiffs Cannot Show Likelihood of Success or a Serious Question Going to the Merits.** Club Quarters' application suffers from several fatal defects precluding likelihood of success as a matter of law.

First and foremost, the relief Club Quarters seeks – to force Owner to accept and suffer performance of its management services and the occupation of Owner's property – is squarely barred by settled law. Defendant owns the Hotel and Club Quarters is a third-party hotel management company Owner hired to manage the Hotel, which by Club Quarters' own account has been performing terribly for years under its management. (Br.[1] at 9.) While the parties may disagree regarding who bears responsibility for such underperformance, Owner is legally entitled to chart its own course for its own property – including, if it so chooses, terminating Club Quarters.

[1] References to "Br." are to Plaintiffs' Memorandum of Law in Support, Doc. 5.

The law is firmly settled that hotel owners do not have to suffer the services of their hotel managers; owners are free to terminate their hotel managers at will, subject **only** to a claim for money damages. E.g., Marriott Int'l, Inc. v. Eden Roc, LLLP, 104 A.D.3d 583, 583 (1st Dep't 2013) (appellate court reversing the grant of an injunction to a hotel manager holding that a hotel management agreement is a "classic example of a personal services contract that may not be enforced by injunction"); see also FHR TB, LLC v. TB Isle Resort, LP, 865 F.Supp.2d 1172, 1194 (S.D. Fla. 2011) (applying New York law) (rejecting hotel manager's request for preliminary injunction noting that "the principal has the power to revoke the agency even if that revocation is wrong, even if it breaches the applicable contract and even if the revocation creates clear-cut liability for damages").

The reason why courts uniformly deny injunctions by hotel managers seeking to remain on an owner's property and to continue to perform discretionary management services is straightforward: Club Quarters is just a managing agent entitled to a fee for its services; it has no ownership or tenancy rights, and any relief to which it may be entitled lies in money damages. It is akin to an NFL team that fires its head coach; a homeowner who terminates a contractor; or an apartment building that terminates its managing agent – the coach, contractor and managing agent cannot force their services on the team, homeowner or apartment building owner. They have, at most, a claim for money damages for breach of contract.

Club Quarters and its counsel are well aware of the overwhelming law contravening its application. This includes cases in which Club Quarters' attorneys represented hotel owners and prevailed in opposing attempts by a hotel managers to impose their unwanted services on the hotel owners – exactly what Club Quarters improperly seeks to do here.

Club Quarters' own counsel has consistently espoused this long-settled rule. Plaintiffs' lead counsel, Joshua Bernstein (co-writing with Mr. Soloway, his former partner and counsel for Defendant in this litigation) articulated the law as follows:

> For decades, courts have repeatedly protected this significant termination right, refusing to enjoin terminations and even middle-of-the night takeovers by hotel owners even if such termination may constitute a breach of the contract. **The reason: hotel management agreements are often both agency contracts, revocable at will by the principal hotel owner, and personal services contracts, the termination of which courts have long refused to enjoin as antithetical to this country's prohibition against involuntary servitude**.

Joshua Bernstein and Todd E. Soloway, THE TERMINATION OF HOTEL MANAGEMENT AGREEMENTS: PART II, New York Law Journal (April 17, 2013) (emphasis added).

More recently, Mr. Bernstein and his co-counsel in this litigation, Kathleen Prystowsky, in a column labeled "Expert Analysis", again explained that "the general rule is that hotel management agreements, as agency and personal services contracts, **cannot be enforced by specific performance or injunctive relief**." Joshua Bernstein and Kathleen Prystowsky, TERMINATING HOTEL MANAGEMENT CONTRACTS AMID COVID-19, Law 360 (March 30, 2021) (emphasis added).

Because the Management Agreement is both an agency agreement and a personal services contract that cannot be enforced by injunction, Club Quarters has <u>no likelihood of success</u> on its claim for injunctive relief.

<u>Second</u>, Plaintiffs' application is premature, as Owner has not terminated the Management Agreement; indeed, the cure period has not expired under the notice of default dated September 22, 2026 (the "NOD," attached as Exhibit G to the Declaration of John Paul Nichols, Doc. 7-7) nor has Manager tendered – or even attempted to tender – a cure to the material defaults contained within the NOD.

**Club Quarters Also Cannot Show Irreparable Harm.** Club Quarters also has an adequate remedy at law in the form of money damages and cannot demonstrate irreparable harm. If Club Quarters fails to cure the defaults identified in the NOD, and Owner thereafter elects to terminate the Management Agreement, Club Quarters' remedy will be to seek damages for wrongful termination in the readily identifiable form of the fees it would claim to be due under the Management Agreement. It may not, under bedrock law, obtain injunctive relief to compel continued performance against Owner's will.

**Public Interest Weighs Against an Injunction.** The public interest is not served by entry of an injunction forcing Owner to remain unwillingly bound to a managing agent in a manner that, according to Club Quarters' own counsel, is "antithetical to this country's prohibition against involuntary servitude." This is a private contractual dispute and Club Quarters will be free to assert a claim for money damages if the Management Agreement is terminated – the precise remedy available at law.

Club Quarters' application should be denied.

## II. ARGUMENT

"To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the movant's favor; and (3) that the public's interest weighs in favor of granting an injunction." Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014) (Ramos, J.) (denying request for preliminary injunction). "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 190 F.

Supp. 2d 577, 580 (S.D.N.Y. 2002) (denying application for a temporary restraining order). Club Quarters cannot meet this standard.

### A. Club Quarters Cannot Demonstrate a Likelihood of Success or a Serious Question Going to the Merits and a Balance of the Hardships

#### *1. Personal services contracts are not enforceable by injunction*

Courts around the country have uniformly held that a hotel operator has no right to continued possession or operation of a hotel, even where the operator disputes the propriety of a notice of default or termination:

- In Marriott International, Inc. v. Eden Roc, LLLP, the New York Supreme Court, Appellate Division examined this exact issue in an action for a preliminary injunction brought by hotel manager (Marriott) against a hotel owner. The Court vacated an injunction granted by the lower court, holding that a hotel management agreement is a "classic example of a personal services contract that may not be enforced by injunction." 104 A.D.3d 583, 584 (1st Dep't 2013);

- In FHR TB, LLC v. TB Isle Resort, LP, the U.S. District Court for the Southern District of Florida, similarly held that hotel management agreements are personal service contracts which are not enforceable by injunction or specific performance. 865 F.Supp.2d 1172, 1206 (2011) (applying New York law);

- In Woolley v. Embassy Suites, Inc., the California Court of Appeals held that a hotel management agreement "undisputably call[s] for the rendition of services which require the exercise of special skill and judgment" and as such, constitutes a contract for personal services which cannot be enforced by injunction for specific performance. 227 Cal. App. 3d 1520, 1534 (1991);

- In Government Guarantee Fund of Finland v. Hyatt Corp., the Third Circuit upheld a decision and order requiring defendant hotel manager to vacate the premises and allow owner to transition the hotel to new management. 95 F.3d 291, 307 (3d Cir. 1996);

- In Woodley Rd. Joint Venture v. ITT Sheraton Corp., the District Court for the District of Delaware held that defendant hotel manager could not refuse to vacate the premises and continue operating the hotel following the hotel owner's notice of termination because the manager's agency was freely revocable. 1998 WL 1469541, *5 (D. Del. 1998); and

- In Pac. Landmark Hotel, Ltd. v. Marriott Hotels, Inc., the California Court of Appeal for the Fourth District vacated a preliminary injunction issued by the trial court, noting that the owner's "power of revocation is absolute and applies even if doing so is a violation of the contract." 19 Cal. App. 4th 615, 625-626 (1993) (internal quotations and citations omitted).

Club Quarters does not provide any precedent to the contrary, or even address this legal principle at all. Instead, Club Quarters cites cases that do not involve hotels or contracts that did not concern the provision of personal services and are therefore inapposite. See, e.g., Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 909 (2d Cir. 1990) (international news agency sought preliminary injunction prohibiting supplier of news photographs from discontinuing ongoing supply of photographs); R Squared Glob. Inv. v. Serendipity 3, Inc., 2011 WL 5244691 (S.D.N.Y. Nov. 2, 2011) (corporate licensing partner brought action seeking to enjoin the famed New York City restaurant, Serendipity, from terminating the parties' licensing agreement permitting R Squared to sell merchandise bearing Serendipity's intellectual property).

There is no doubt that the Management Agreement is an agreement for the provision of personal services by Club Quarters. As in any Management Agreement, Owner delegated to Club Quarters vast discretionary authority to manage the Hotel on a day-to-day basis as its agent. (HMA § 2(B)(1).) As a result, the Management Agreement is predicated on a high degree of cooperation, trust, and ongoing collaboration between the parties to ensure the successful management of the Hotel.

For example, the Hotel Management Agreement requires that Owner and Club Quarters work together to develop the Hotel's Annual Operating Plan. (Id. § 5(A).) The Annual Operating Plan comprises the plans for the entire operation of the Hotel by Club Quarters, including, inter alia, the annual budget, the Hotel's short, medium, and long-term revenue goals, and the Hotel's overall marketing and sales strategy. (Id. § 5(A).) The Management Agreement expressly obligates

Club Quarters and Owner to meet to discuss each party's suggestions and to resolve any areas of disagreement. (Id. § 5(A).) Thus, typical of personal services contracts in general, and hotel management agreements in particular, the Management Agreement provides a structure by which Club Quarters is Owner's agent and is responsible for carrying out day-to-day management of the Hotel, subject to Owner's supervision and approval.

In calling for such a degree of cooperation, trust, and ongoing collaboration between the parties, the express terms of the Management Agreement make it clear that this is exactly the type of contract which cannot be enforced by injunction. Courts have unequivocally refused to force the personal services of one party involuntarily upon another. Kakaes v. George Washington University, 790 A.2d 581 (D.C. 2002) (affirming Court of Appeals decision holding that employment contract cannot be enforced via specific performance); Tucker v. Warfield, 119 F.2d 112 (D.C. Cir. 1941) (determining that specific performance of a personal services contract is "impossible"); see also Eden Roc, 104 A.D.3d at 583 (reversing trial court entry of preliminary injunction); Woolley, 227 Cal. App. 3d 1520, 1534 (noting that specific performance of such contracts is impracticable because they "require mutual cooperation and trust, both of which have ceased to exist in the wake of rancorous litigation").

As a personal services contract, the Management Agreement cannot be enforced by injunction. Injunctive relief is not available to force Club Quarters' services or agency upon the Owner.

### *2. Plaintiffs' application is premature*

Plaintiffs also argue that they are entitled to a preliminary injunction because Federal courts "routinely issue injunctions to prevent the destruction of ongoing commercial relationships pending adjudication of whether termination is lawful, whether by tolling the cure period or by enjoining termination." (Br. at 16.) In support of this argument, they cite Reuters Ltd. v. United

Press Int'l, Inc., 903 F.2d 904, 909 (2d Cir. 1990), Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir. 1984), and R Squared Glob., Inc. v. Serendipity 3, Inc., 2011 WL 5244691, at *7 (S.D.N.Y. Nov. 3, 2011). None of these cases stands for that proposition. Critically, in each of those cases, a termination notice had been served. Reuters, 903 F.2d at 906; Roso-Lino, 749 F.2d at 125; R Squared, 2011 WL 5244691, at *5. That is not the case here, where Manager is still within the cure period set forth in the NOD. See Nichols Decl. Ex. G at 4. In the absence of a termination notice, Plaintiffs' application is premature, and should be denied.

Case law in this jurisdiction supports the conclusion that Manager's motion is premature. In Subaru Distributors Corp. v. Subaru of Am., Inc., 47 F. Supp. 2d 451, 474 (S.D.N.Y. 1999), a Subaru franchisee sought a preliminary injunction on the basis of the franchisor's "repeated[] threat[s] to terminate" the franchise agreement. Id. Although the franchisor had not issued a notice of termination (which would trigger a 90-day period for franchisee to contest the basis for termination), franchisee sought a preliminary injunction on the basis of other notices served by the franchisor, which had enacted stricter and more onerous financial requirements on franchisee's contractual purchases of vehicles for sale. Specifically, franchisee asked the court to grant an injunction that would prevent franchisor from terminating the agreement if franchisee refused to comply with the requirements of the notices. Id. at 455. While noting that termination of a franchise could constitute irreparable harm, the District Court held that under the circumstances, the franchisee "faces no imminent threat of termination . . . . Therefore, there is no danger of imminent irreparable harm to [franchisee] absent the issuance of a preliminary injunction, and I decline to grant one." Id., 47 F. Supp. 2d at 474; see also, e.g., Mezu-Ndubuisi v. Univ. of Rochester, No. 6:24-CV-06387 EAW, 2025 WL 36070, at *10 (W.D.N.Y. Jan. 6, 2025), aff'd in part, appeal

dismissed in part, No. 25-139, 2026 WL 456740 (2d Cir. Feb. 18, 2026) (motion for preliminary injunction denied for lack of ripeness where there were "numerous steps still to follow before any final decision is made" regarding reinstatement of plaintiff doctor's privileges at defendant hospital).

Here, before the cure period has expired, and before Plaintiffs have even attempted to tender a cure for the defaults in the NOD, several steps still must occur before any injunction preventing termination of the CQ Agreements would be ripe. See, e.g., CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc., 325 A.3d 1235, 1256 (D.C. 2024) (whether a party could cure or had cured the material defaults contained in default notice is a question for the fact finder).

***3. Plaintiffs' invalid notice argument also fails***

Plaintiffs argue that they are likely to succeed on the merits because the Notice is invalid, citing Nimbus Therapeutics, LLC v. Celgene Corp., 570 F. Supp. 3d 100 (S.D.N.Y. 2021). But Nimbus is distinguishable because there, the defendant served the plaintiff with a notice of termination of the relevant agreement without first following the agreement's bargained-for notice and cure provisions. Such is not the case here. Owner followed the Management Agreement's notice and cure provision, and Manager's time to cure has not yet run.

Similarly, In re 4Kids Ent., Inc., 463 B.R. 610, 619 (Bankr. S.D.N.Y. 2011) is distinguishable because the decision occurred in the context of a bankruptcy adversary proceeding after a full trial, and not at the procedural posture of a preliminary injunction hearing. The issue in the adversary proceeding trial was whether an agreement was terminated pursuant to a notice sent by the adversary defendant. The court found that the content of the purported "notice" did not reasonably put the debtor on notice of the purported defaults, nor was the "notice" served in the manner called for pursuant to the agreement. Thus the "notice" was not effective to terminate the agreement, and the agreement remained an asset of the bankruptcy estate.

#### *4. The balance of the hardships favors Owner*

The balance of equities likewise weighs against the extraordinary relief Club Quarters seeks. Club Quarters essentially asks this Court to compel Owner to continue accepting management services under a hotel management agreement that Manager has repeatedly and materially breached, thereby imposing an affirmative obligation to maintain an ongoing operational relationship with a manager it contends has failed to perform. That relief would override the parties' contractual allocation of rights and force Owner – who owns the Hotel and bears the financial and operational risks of its continued operation – to accept services it no longer wishes to receive.

By contrast, the only harm Club Quarters faces is merely economic harm that can be fully remedied through the payment of money damages should Club Quarters win on the merits. The balance of the equities does not favor issuance of emergency interim relief as a result.

### B. Club Quarters Has an Adequate Remedy and Suffers No Irreparable Harm

"The Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits." Id. (quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (involving a picture-services agreement for the supply of news photographs to a news organization, explaining that "a showing of probable irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction'").

#### *1. Plaintiffs' alleged harm may be remedied by money damages*

"[T]he Second Circuit has concluded that '[a] harm that can be remedied by a money judgment or at the end of trial is not an irreparable harm.'" Transcience Corp., 50 F. Supp. 3d at 458 (quoting Lee v. Choi, 140 Fed. Appx. 299, 300 (2d Cir. 2005)) (emphasis in original). Because Club Quarters has an adequate remedy through a claim for money damages, which can be

calculated from the terms of the contract, it has not suffered irreparable harm as a matter of law. It is axiomatic that there can be no irreparable harm, and thus no preliminary injunctive relief, where money damages would provide an adequate remedy. See, e.g., Allstate Ins. Co. v. Harvey Fam. Chiropractic, 677 F. App'x 716, 718 (2d Cir. 2017) (denying preliminary injunction where there was no evidence that plaintiffs could not be fully compensated by money damages); see also St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C., 131 F.4th 102, 108 (2d Cir. 2025).

It is equally well settled that a hotel manager[2] contracts to render services in exchange for money, and its damages are calculable based, inter alia, on the contract amounts. The existence of this adequate remedy at law precludes equitable relief, whether sought in an action for specific performance or an application for preliminary injunction. FHR TB, LLC v. TB Isle Resort, LP, 865 F.Supp.2d 1172, 1206 (2011) (noting that hotel operator had an adequate remedy in money damages and thus was not irreparably harmed); Woolley v. Embassy Suites, Inc., 227 Cal. App. 3d 1520, 1535 (1991) (vacating hotel manager's injunction and finding no irreparable harm because "the fee percentage is spelled out in the contracts").

---

[2] Club Quarters cites LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc. for the proposition that the termination of a hotel franchise agreement "strikingly similar to the License and Royalty Agreement here" was presumptively considered to constitute irreparable harm. Br. at 26, citing 92 F. Supp. 2d 119, 131 (E.D.N.Y. 2000). But LaGuardia by its own terms is wholly inapplicable here, because the Management Agreement is not "strikingly similar" to the franchise agreement at issue in LaGuardia. "Franchising is a widely prevalent system of marketing and distribution. What is often a small independent business (the franchisee) is granted, in return for a fee or other consideration, the right to market in the goods, services, or name brand of another (the franchisor). . . . Equally important, the franchise relationship allows the franchisor [to] acquire[ ] the aggressive self-motivation of franchisees, whose ownership fervor [in managing the hotel] is generally far greater than that of employee managers." Id. at 124-25.

Unlike the relationship of the parties here, in LaGuardia, the franchisee-owner is responsible for the management and operation of the hotel, while the franchisor performs no services – instead, "the franchisor . . . essentially lend[s] its national goodwill to the franchisee." Id. at 125. That is not the case here, where the essence of the parties' bargain is that Manager will provide personal services to Owner in exchange for Owner's payment to Manager of certain fees for its services. Because the harm with which Manager is threatened here is the loss of future fees for its management services – i.e., money damages – and not intangible harm such as Owner's tarnishing Manager's "goodwill" by conduct undertaken by Owner in managing the Hotel, LaGuardia does not apply.

Club Quarters cannot demonstrate irreparable harm because the injuries it identifies arise solely from the alleged loss of its contractual management relationship and associated economic interests. In its application, Club Quarters asserts that it will suffer irreparable harm because termination would remove its only Washington, D.C. hotel from the Club Quarters system, disrupt longstanding customer relationships, damage network goodwill, and injure the Club Quarters brand. (Br. at 26-27.) But each of these asserted harms flows directly from the termination of the HMA and consists of economic or contractual injuries. Club Quarters does not identify any harm that cannot be remedied through monetary relief if it ultimately prevails on the merits, nor does it identify any contractual provision entitling it to indefinite continued operation of the Hotel pending adjudication of the parties' dispute. See Hudson Pulp & Paper Corp. v. Swanee Paper Corp., 223 F.Supp. 617 (S.D.N.Y. 1963) (denying application for preliminary injunction and noting that "mere assertions of irreparable damage, absent prima facie supporting evidentiary facts, are insufficient to sustain applicant's burden of proof"); see also Woolley, 227 Cal. App. 3d 1520, 1535 (noting that although loss of reputation "might be difficult to measure, the subject could be adequately addressed through expert testimony" and thus was not irreparable).

In FHR TB, LLC, the U.S. District Court for the Southern District of Florida considered and rejected assertions of irreparable harm that are nearly identical to those that Club Quarters asserts here. There, Fairmont, the terminated operator of the Turnberry Isle Resort in Aventura, Florida, argued that it faced irreparable harm in the form of guest confusion, loss of reputation with guests, loss of reputation with employees, other hotel owners, and business partners, loss of status in the industry, and more. 865 F.Supp.2d at 1207-1212. The court rejected each of those allegations, even though news of Fairmont's termination was published in the Miami Herald and thus was widely known. Id. This is because, to the extent Fairmont could demonstrate any such

damage, through, e.g., cancelled reservations at other properties, they would be compensable in money damages. Id. at 1208–1209. The same is true here: Club Quarters has not offered evidence of any actual damage it has suffered, and to the extent such damage exists, it will be compensable. (Br. at 26-27.)

At bottom, Club Quarters' claim that its harm "would be impossible to calculate with reasonable certainty" rests on the premise that it cannot be restored as operator if the Hotel transitions to new management. But that consequence is inherent in any termination of a services contract. Club Quarters does not identify any non-economic injury distinct from the loss of the management relationship. (Id.) Further, any alleged harm posed to Club Quarters' brand is minor and fleeting: by its own account, Club Quarters currently operates "13 Club Quarters-branded hotels." (Br. at 14.) It is unclear how or why the loss of operation of this one property would cause Club Quarters any harm beyond any claim for money damages. See FHR TB, LLC, 865 F.Supp.2d at 1206-1212.

Last, Club Quarters alleges that injunctive relief is independently necessary to preserve the dispute-resolution process for which the parties expressly bargained. This is a red herring. The budget arbitration concerns a narrow issue of whether Owner unreasonably withheld approval of the 2026 Annual Operating Plan. It preceded, and is distinct from, the injunction sought in this case – which concerns a different dispute regarding the validity of the NOD and whether Owner may terminate the Management Agreement – and cannot be credibly portrayed as an injunction in aid of the budget arbitration. The single case cited by Club Quarters, Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616 (S.D.N.Y. 2010), underscores the lack of merit to this argument. In that case, the injunction preserved the same dispute that was headed to

arbitration, while here Club Quarters is using a pending budget arbitration to try to enjoin a separate NOD and termination dispute pending in court.

Because Club Quarters' alleged harms consist of lost fees, lost contractual expectations, and asserted reputational impacts arising from termination, all of which are compensable through damages, Club Quarters fails to satisfy the irreparable-harm requirement for emergency interim relief. See FHR TB, LLC, 865 F.Supp.2d at 1206; Woolley, 227 Cal. App. 3d at 1535.

### 2. *Plaintiffs' cases are fundamentally inapposite*

Reuters and other cases that Manager cites in favor of its application for a preliminary injunction are factually distinguishable from the facts pleaded by plaintiffs here. In R Squared, the District Court granted a preliminary injunction because in the absence of that relief, plaintiff, which was the exclusive licensee of defendant, would have been forced to cease operation of all three of its 'Serendipity'-branded restaurants, thus entirely "preventing the operation of the business for which [plaintiff] was formed." R Squared, 2011 WL 5244691, at *10. Plaintiff demonstrated that the loss of its entire business was irreparable harm.[1] Id. Likewise, Roso-Lino involved husband and wife owners of a Coca-Cola bottling franchise, who "st[ood] to lose their business forever" if their franchise agreement was terminated pending the resolution of the parties' dispute. Roso-Lino, 749 F.2d at 126. Here, Manager is not the "exclusive licensee" (or exclusive licensor, for that matter) of Owner. Nor will Manager's entire operations grind to a halt "forever" if Owner terminates the Management Agreement. As it acknowledges, Manager is the manager of thirteen Club Quarters-branded hotels. See Nichols Decl. at ¶81.

Reuters is further distinguishable because the terminated contract involved defendant's obligation to supply news photos to plaintiff wire service, and the Second Circuit held that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage

to the good will of the distributor." Reuters, 903 F.2d at 907–08. No such "unique product" is being "deliver[ed]" here (id.); Manager provides its management services to Owner in exchange for a fee. (Nichols Decl. Ex. C at § 2(B).) The alleged harm to CQ's brand goodwill is an attenuated risk that would flow from the loss of secondary agreements which could be terminated pursuant to cross-default and cross-termination provisions in the Management Agreement. (See Br. at 3; Nichols Decl. at ¶89.) But the real risk to Manager here is the clear and direct harm that would be caused by the loss of its fee stream for the remainder of the parties' decades-long contract. (See Br. at 6-7, Nichols Decl. at ¶22 (setting forth fees totaling no less than 9.75% of all Gross Revenue of the Hotel).)

### C. The Public Interest Weighs Against an Injunction

Last, Plaintiffs' public-interest argument is meritless. This is a private commercial dispute, not a case involving public health, safety, regulatory enforcement, or other public rights. Plaintiffs' own formulation of the public interest is simply that contracts should be enforced according to their terms and that the parties' notice-and-cure regime should be honored. But the public interest in enforcing contracts therefore does not support rewriting the parties' bargain by imposing indefinite judicial tolling or disabling Owner's bargained-for default and termination rights before Owner has even exercised them.

## III. CONCLUSION

For the reasons set forth herein, Owner respectfully requests that Club Quarters' application be denied.

Dated: New York, New York
October 28, 2026

**PRYOR CASHMAN LLP**

By: ______________________

Todd E. Soloway
Bryan T. Mohler
Meghan E. Hill
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 326-0806
tsoloway@pryorcashman.com
bmohler@pryorcashman.com
mhill@pryorcashman.com

*Counsel for Defendant*