UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.; CLUB QUARTERS FRANCHISE NETWORK, L.L.C.; CLUB QUARTERS MEMBERSHIP NETWORK, L.L.C.; and SHARED OPERATING SERVICES, L.L.C.,

Plaintiffs,

v.

CQ DC ACQUISITION LLC,

Defendant.

Case No. 26 Civ. 09393

**DEFENDANT CQ DC ACQUISITION LLC'S MEMORANDUM OF LAW ADDRESSING THE ISSUE OF IRREPARABLE HARM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

PRYOR CASHMAN LLP

Todd E. Soloway
Bryan T. Mohler
Meghan E. Hill
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 326-0806
tsoloway@pryorcashman.com
bmohler@pryorcashman.com
mhill@pryorcashman.com
*Attorneys for Defendant CQ DC Acquisition LLC*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ i

**I. PRELIMINARY STATEMENT ........ 1**

**II. FACTUAL BACKGROUND ........ 4**

**A. The Hotel and the Management Agreement** ........ 4

**B. The Ancillary Agreements** ........ 5

**C. Club Quarters' Performance Failures Lead Owner to Issue a Notice of Default** ........ 7

**D. Procedural History** ........ 8

**III. ARGUMENT ........ 8**

**A. Plaintiffs' Alleged Harm Is Ascertainable and Compensable By Money Damages** ........ 9

**B. Plaintiffs' Franchise and Distributorship Contract Cases Are Inapplicable to the Management Agreement, a Personal Services Agreement** ........ 13

**C. The Injunction Plaintiffs Seek Is Not "In Aid of Arbitration"** ........ 15

**IV. CONCLUSION ........ 16**

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Allstate Ins. Co. v. Harvey Fam. Chiropractic*,
677 F. App'x 716 (2d Cir. 2017) ....................9

*Beacon Assocs. Inc. v. Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018) ....................12

*FHR TB, LLC v. TB Isle Resort, LP*,
865 F. Supp. 2d 1172 (S.D. Fla. 2011) ....................2, 10, 11, 12, 16

*Getty Images (US), Inc. v. Microsoft Corp.*,
61 F. Supp. 3d 296 (S.D.N.Y. 2014) ....................8

*Hudson Pulp & Paper Corp. v. Swanee Paper Corp.*,
223 F. Supp. 617 (S.D.N.Y. 1963) ....................11

*Jacobson & Co. v. Armstrong Cork Co.*,
416 F. Supp. 564 (S.D.N.Y. 1976) ....................14

*Jacobson & Co. v. Armstrong Cork Co.*,
548 F.2d 438 (2d Cir. 1977) ....................13, 14

*LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*,
92 F. Supp. 2d 119 (E.D.N.Y. 2000) ....................14, 15

*Lee v. Choi*,
140 F. App'x 299 (2d Cir. 2005) ....................9

*R Squared Glob., Inc. v. Serendipity 3, Inc.*,
2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011) ....................13

*Reuters Ltd. v. United Press Int'l, Inc.*,
903 F.2d 904 (2d Cir. 1990) ....................9, 13, 14

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
754 F. Supp. 2d 616 (S.D.N.Y. 2010) ....................4, 16

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
749 F.2d 124 (2d Cir. 1984) ....................8, 13

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*,
190 F. Supp. 2d 577 (S.D.N.Y. 2002) ....................9

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ....................1, 9, 10

*Transcience Corp. v. Big Time Toys, LLC*
50 F. Supp. 3d 441 (S.D.N.Y. 2014) ....................9

*Woolley v. Embassy Suites, Inc.*,
227 Cal. App. 3d 1520 (1991) .......... 10, 11, 16

**STATUTES AND RULES**

Fed. R. Civ. P. 65 .......... 9

Defendant CQ DC Acquisition LLC ("Defendant" or "Owner") respectfully submits this memorandum of law solely addressing the issue of irreparable harm in opposition to the motion for a preliminary injunction (the "Motion") filed by Plaintiffs Club Quarters Management Company, L.L.C. ("Manager"), Club Quarters Franchise Network, L.L.C., Club Quarters Membership Network, L.L.C. and Shared Operating Services, L.L.C. (collectively, "Club Quarters" or "Plaintiffs").

## I. PRELIMINARY STATEMENT

Club Quarters seeks injunctive relief unavailable to them under New York and District of Columbia law, which govern the parties' Management Agreement. Plaintiffs cannot establish any of the elements necessary for a preliminary injunction to issue: they cannot show a serious question going to the merits (let alone a likelihood of success); they cannot demonstrate that they will suffer irreparable harm in the absence of an injunction; and they cannot show that an injunction in violation of bedrock legal principles is in the public interest.

In accordance with the Court's November 6, 2026 Order bifurcating the determination of Plaintiffs' preliminary injunction, Owner submits this memorandum of law solely with respect to Plaintiffs' failure to show irreparable harm. As stated by the Second Circuit, "[t]he irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction" and "must therefore be satisfied before the other requirements for an injunction can be considered." St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C., 131 F.4th 102, 106 (2d Cir. 2025) (affirming District Court denial of preliminary injunction). Plaintiffs cannot satisfy this requirement, and the Court should deny Plaintiffs a preliminary injunction.

Plaintiffs raise three arguments with respect to irreparable harm, each entirely lacking merit.

First, Plaintiffs argue the Hotel is a unique property within the brand – its only branded property in Washington, D.C. – and therefore its elimination from the Club Quarters System of

Hotels would irreparably injure Club Quarters' reputation, customer relationships and goodwill. This argument falls for several reasons. Initially, despite Plaintiffs' protestations regarding the "uniqueness" of Owner's property and potential intangible harm to the Club Quarters "system," the Hotel is only one in their portfolio of, by their own account, thirteen Club Quarters hotels. The Hotel is neither unique nor irreplaceable.

In FHR TB, LLC v. TB Isle Resort, LP., 865 F. Supp. 2d 1172, 1209 (S.D. Fla. 2011), plaintiff Fairmont Hotels & Resorts sought a preliminary injunction preventing defendant – the owner of a Florida hotel that Fairmont managed pursuant to a hotel management agreement similar to the parties' Management Agreement here – from terminating the Management Agreement. Fairmont claimed that the loss of the only property it managed in Florida would constitute irreparable harm. The court rejected that argument – the very same argument posited by Club Quarters here – holding that "the loss of a single hotel in a mature brand that has a critical mass would cause no irreparable harm," and denied the preliminary injunction. Id. at 1209.

Moreover, Plaintiffs also have an adequate remedy at law in the form of money damages. In FHR, the court likewise found that FHR's lost profits from its management of the Florida hotel were calculable and thus compensable by money damages. 865 F. Supp. 2d 1210. Likewise, here, if Club Quarters fails to cure the defaults identified in the Notice of Default served by Owner on September 22, 2026 (the "Default Notice"), and Owner thereafter terminates the Management Agreement, Club Quarters' remedy will be to seek damages for wrongful termination in the readily identifiable form of the fees it would claim to be due under the Management Agreement. In no circumstances would Club Quarters be permitted, under bedrock law, to obtain injunctive relief compelling Owner to accept Manager's continued performance against Owner's will.

Second, tacitly recognizing that the loss of the Management Agreement is compensable with money damages, Plaintiffs alternatively argue they will suffer irreparable harm if the Management Agreement is terminated because the Management Agreement contains cross-default and cross-termination provisions relating to the ***other*** CQ Agreements. Plaintiffs' logic seems to be that the real threat posed by Owner's Notice of Default is to the ancillary agreements, which are the sort of franchise and/or license agreements typically protectable by injunctive relief.

But that argument is the proverbial 'tail wagging the dog': the License Agreement and Customer List/Network Agreement provide Owner with a license to use Club Quarters' trademarks and other proprietary business information ***in connection with Manager's operation of the Hotel***. If Manager were not operating Owner's Hotel as a "Club Quarters"-branded property, the use of Manager's trademarks and proprietary information would be worthless to Owner. The crux of the parties' agreement is that Manager performs certain personal services on behalf of Owner at Owner's property, in exchange for fees tied to Manager's performance. The fact that termination of the Management Agreement may trigger cross-defaults or cross-terminations of the ancillary agreements does not change the fact that Manager's current breaches arise solely under the Management Agreement.

Third, because Plaintiffs cannot establish that they would suffer irreparable harm if they were terminated as the Manager of a single Hotel, they resort to distraction, suggesting that a preliminary injunction is necessary to "preserve the dispute resolution process for which the parties explicitly bargained." (Pls.' Br. 27-28.) Plaintiffs disingenuously imply that this motion is made "in aid of" an unrelated budget dispute arbitration pending before the American Arbitration Association. To be clear, an injunction in aid of arbitration is only necessary where there is a threat that the parties may "alter irreversibly the status quo before the arbitrators are able to render a

decision in the dispute," thus rendering the arbitration a "hollow formality." Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010). The sole issue before the arbitrator is the budget for fiscal year 2026, not determining the validity of the Default Notice or the existence of any alleged breaches of the Management Agreement by either party. Nothing about the parties' existing budget arbitration is dependent on the outcome of this litigation or this application for a preliminary injunction, and any suggestion otherwise is misleading.

## II. FACTUAL BACKGROUND

### A. The Hotel and the Management Agreement

Owner purchased the hotel known as Club Quarters Hotel, White House located at 839 17th Street NW, Washington, DC 20006 (the "Hotel") in 2016. See accompanying Declaration of Nathalie Abinader ("Abinader Decl."), at ¶ 4.

Manager operates the Hotel pursuant to a Management Agreement dated as of October 28, 2005 between CQ DC Acquisition LLC c/o Al Sraiya Hotels & Hospitality Group (as assignee[1] of RCQ Hotel Operator DC, Inc. and RCQ Hotel DC, LLC) as Owner and Manager (as amended, the "Management Agreement," a true and correct copy of which is annexed to the Abinader Decl. as **Exhibit 1**).

Pursuant to the Management Agreement, Owner agreed to delegate and Manager agreed to manage all aspects of the Hotel, including setting rates; budgeting; opening and managing bank accounts; hiring, supervision, training and firing all employees of the Hotel; entering contracts for the Hotel; purchasing supplies; and performing repairs.

[1] Owner was assigned all right, title and interest in and to the HMA, the License Agreement, the CLN Agreement and the Services Agreement by that certain Assignment and Assumption of Management Documents dated as of July 19, 2016, among RCQ Hotel DC, LLC and RCQ Hotel Operator DC, Inc. as Seller and Owner as Purchaser. Abinader Decl. ¶ 5 n. 1.

In performing its duties, Manager agreed to (i) to "use commercially reasonable efforts in carrying out [its] obligations to enhance the profitability and value of the [Hotel] ... within the parameters of the business model currently employed by Manager and its affiliates that is designed to provide value to guests of Club Quarters;" (Ex. 1 at § 2(A)); (ii) to "oversee the implementation of the 'Membership Network' as is made available to the [Hotel] pursuant to the Customer List/Network Agreement" (id. § 2(B)(l)(f)); and (iii) to "ensure compliance with the policies, systems, procedures and protocol of a Club Quarters and compliance with the Club Quarters Standards" (id. § 2(B)(l)(a)).

In exchange for providing those services, Manager is entitled to a base management fee of 2.75% of Gross Revenue and an incentive fee of 6% of Net Operating Income. (Ex. 1 § 4(B)). Should Manager fail to achieve 85% of the NOI projected in its annual budget, it is subject to a "Fee Standaside," whereby it receives no incentive fee, and if Manager fails to achieve 75% of the projected NOI, the base management fee is reduced to 2.00% of Gross Revenue. Id. § 4(C).

### B. The Ancillary Agreements

Owner and Manager's affiliates also entered into three ancillary agreements to facilitate the services Manager provides under the Management Agreement. These are:

(i) the License and Royalty Agreement, dated as of October 28, 2005 between Owner and CQFN ("License Agreement," a true and correct copy of which is annexed to the Abinader Decl. as **Exhibit 2**);

(ii) the Customer List/Network Agreement, dated as of October 28, 2005 between Owner and CQMN ("CLN Agreement," a true and correct copy of which is annexed to the Abinader Decl. as **Exhibit 3**); and

(iii) the Services Agreement, dated as of October 28, 2005, between Owner and another CQ affiliate, Shared Operating Services, L.L.C ("Services Agreement," a true and

correct copy of which is annexed to the Abinader Decl. as **Exhibit 4**, and collectively, the "CQ Agreements").

As set forth in the CQ Agreements, CQ agreed to provide Owner with all-inclusive hotel management services together with access to its proprietary information, all designed to operate in concert to deliver Members to the Hotel and to "achieve superior results."

Pursuant to the CLN Agreement, the Hotel is granted access to (i) the Club Quarters Customer Lists and "the right to solicit customers (members)" to benefit the Hotel, as well as access to (ii) the Customer Network, which is defined as "the system whereby Customers of any Club Quarters can use another Club Quarters hotel in accordance with rules and practices" of the Membership Network. (Ex. 3 at Art. 1). In exchange for access to the Customer Lists and the Customer Network, Owner pays Club Quarters 2.0% and 1.75% of annual Gross Revenue, respectively. (Id. at Art. 4.)

Pursuant to the License Agreement, the Hotel is granted permission to use Club Quarters' trademarks, the Development Formula, the Marketing Formula, the Operating Formula,[2] and Proprietary Software, "for services offered only in connection with" Club Quarters' management of the Hotel. (Ex. 2 at § 2(A).) In exchange, Owner pays Club Quarters (i) 0.5% of all Gross Revenue for use of the Trademarks, (ii) 2.5% of all Gross Revenue for use of the Club Quarters Development Formula, the Club Quarters Marketing Formula, and the Club Quarters Operating Formula, and (iii) 0.25% of all Gross Revenue for use of the Proprietary Software Design. (Ex. 2 at Art. 4.)

[2] Although not important for the purposes of this submission, the Development, Marketing and Operating Formulas purport to be proprietary methods used by CQ to run the properties it manages as "Club Quarters" hotels, and also to expand the brand to additional properties.

Last, pursuant to the Shared Services Agreement, Club Quarters agreed to provide Owner with certain services and facilities that it provides to all hotels in the Club Quarters system (e.g., accounting, IT, human resources and marketing services) and Owner agreed to pay its proportionate share of the total expense for those services. (Ex. 4 at Art. 2, 4.)

### C. Club Quarters' Performance Failures Lead Owner to Issue a Notice of Default

When Owner purchased the Hotel, Club Quarters touted itself as a thriving brand, with sixteen other hotels under its management, including six in New York City, two in Chicago, four in London, and one in each of San Francisco, Philadelphia, Boston and Houston. (Abinader Decl. ¶ 16.) As set forth above and as conceded by Club Quarters in its Complaint and motion papers, Club Quarters' business model was to offer "corporate clients access to a network of strategically located hotels at negotiated rates in exchange for recurring room nights and long-term relationships." (Pls.' Br. at 4).

Club Quarters has shifted away from this business model, and is beginning to re-brand some of the Club Quarters hotels under its management and launching a new business line, Altus Hospitality, to serve as a third-party manager for its properties. (Abinader Decl. ¶ 18.) These changes reflect the declining value of the Club Quarters "brand," which can no longer drive reservations to the Hotel. (Id. ¶ 19.) While Owner is paying 9.75% of Gross Revenue in fees to Club Quarters for its services and the supposed use of the Club Quarters brand to drive revenue, the percentage of reservations derived from Club Quarters "member" contribution has fallen as low as 9% in recent years, and currently hovers around 20%. (Id.)

Manager's failure to operate the Hotel in accordance with the Club Quarters "system" as it promised to do in the Management Agreement is a material breach entitling Owner to exercise its default remedies pursuant to the Management Agreement. (Id. ¶ 20) On September 28, 2026,

Owner issued a comprehensive Notice of Default to Manager, detailing Manager's numerous breaches and requiring that Manager cure its defaults on or before October 31, 2026.

### D. Procedural History

On October 27, 2026, Club Quarters filed the complaint in this action and simultaneously moved for a preliminary injunction and temporary restraining order. See Declaration of Meghan E. Hill, Esq. ("Hill Decl."), at ¶3. The parties appeared before Judge Edgardo Ramos for the temporary injunction hearing on October 29, 2026, at which time Defendant extended Club Quarters' time to cure to November 15, 2026, as reflected in the minute order appearing on the docket for October 29, 2026. Id. at ¶4. Accordingly, Plaintiffs withdrew their application for a TRO. Id.

After the parties appeared before this Court for the first time on November 6, 2026, Owner agreed to a second extension of Club Quarters' time to cure pursuant to the Default Notice, which now expires November 30, 2026. Id. at ¶5. At the November 6 hearing, the Court bifurcated the determination of Plaintiffs' motion for a preliminary injunction, ordering Owner to first submit opposition solely in response to the question of whether Club Quarters has established irreparable harm, as reflected in the minute order at ECF Doc. 20. Hill Decl. ¶6. This submission follows.

## III. ARGUMENT

"A party seeking a preliminary injunction is generally required to show (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, (2) that the moving party is likely to suffer irreparable injury in the absence of a preliminary injunction, (3) a balance of the hardships tipping in favor of the moving party, and (4) that the public interest would not be disserved by the issuance of a preliminary injunction. Getty Images (US), Inc. v. Microsoft Corp., 61 F. Supp. 3d 296, 299

(S.D.N.Y. 2014) (Cote, J.) (denying request for preliminary injunction where plaintiff failed to demonstrate irreparable harm).

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction" and "must therefore be satisfied before the other requirements for an injunction can be considered." St. Joseph's, 131 F.4th at 106 (affirming District Court denial of preliminary injunction); see also Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 190 F. Supp. 2d 577, 581 (S.D.N.Y. 2002) ("The Second Circuit has deemed the threshold showing of 'irreparable harm' to be of particular significance under Rule 65, regardless of the strength of the movant's case on the merits."), quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (international news agency sought preliminary injunction prohibiting supplier of news photographs from discontinuing ongoing supply of photographs).

### A. Plaintiffs' Alleged Harm Is Ascertainable and Compensable By Money Damages

"[T]he Second Circuit has concluded that '[a] harm that can be remedied by a money judgment or at the end of trial is not an irreparable harm.'" Transcience Corp., 50 F. Supp. 3d 441, 458 (S.D.N.Y. 2014), quoting Lee v. Choi, 140 Fed. Appx. 299, 300 (2d Cir. 2005)) (emphasis in original). Because Club Quarters has an adequate remedy through a claim for money damages, which can be calculated from the terms of the contract, it has not suffered irreparable harm as a matter of law. It is axiomatic that there can be no irreparable harm, and thus no preliminary injunctive relief, where money damages would provide an adequate remedy. See, e.g., Allstate Ins. Co. v. Harvey Fam. Chiropractic, 677 F. App'x 716, 718 (2d Cir. 2017) (denying preliminary injunction where there was no evidence that plaintiffs could not be fully compensated by money damages); see also St. Joseph's, 131 F.4th 108 ("Monetary "compensation need only be 'adequate' for preliminary relief to be unwarranted, not perfect.").

In St. Joseph's, the plaintiff anesthesia provider argued that absent an injunction preventing the defendant hospital from soliciting or hiring its employees, it would be irreparably harmed by "lost customer relationships, lost opportunity costs, the loss of their trained clinicians, and reputational harm." Id., 131 F.4th 106. The Court of Appeals disagreed, finding that none of those alleged harms were sufficient to merit a preliminary injunction. Id.

Here, Club Quarters argues it cannot be compensated by money damages, because "[a] damages award after termination would not restore the Hotel to the [Club Quarters] network or repair the resulting injury to [Club Quarters'] customer relationships, Membership Network, goodwill, and brand." (Pls.' Br. at 15-16). As was the case with the plaintiff in St. Joseph's, the alleged harm to Club Quarters' brand goodwill is an attenuated risk: here, the harm that would flow from the loss of secondary agreements which could be terminated pursuant to cross-default and cross-termination provisions in the Management Agreement. (See Pls.' Br. at 3; Nichols Decl. at ¶89.) But the direct harm to Manager is the loss of its fee stream for the remainder of the parties' decades-long contract. (See Pls.' Br. at 6-7, Nichols Decl. at ¶22 (setting forth fees totaling no less than 9.75% of all Gross Revenue of the Hotel).)

In that respect, it is well settled that a hotel manager contracts to render services in exchange for money, and its damages are calculable based, inter alia, on the contract amounts. The existence of this adequate remedy at law precludes equitable relief, whether sought in an action for specific performance or an application for preliminary injunction. FHR, 865 F.Supp.2d at 1206 (noting that hotel operator had an adequate remedy in money damages and thus was not irreparably harmed); Woolley v. Embassy Suites, Inc., 227 Cal. App. 3d 1520, 1535 (1991) (vacating hotel manager's injunction and finding no irreparable harm because "the fee percentage is spelled out in the contracts").

Club Quarters does not identify any harm that cannot be remedied through monetary relief if it ultimately prevails on the merits, nor does it identify any contractual provision entitling it to indefinite continued operation of the Hotel pending adjudication of the parties' dispute. See Hudson Pulp & Paper Corp. v. Swanee Paper Corp., 223 F.Supp. 617 (S.D.N.Y. 1963) (denying application for preliminary injunction and noting that "mere assertions of irreparable damage, absent prima facie supporting evidentiary facts, are insufficient to sustain applicant's burden of proof"); see also Woolley, 227 Cal. App. 3d 1520, 1535 (noting that although loss of reputation "might be difficult to measure, the subject could be adequately addressed through expert testimony" and thus was not irreparable).

In FHR, the U.S. District Court for the Southern District of Florida considered and rejected assertions of irreparable harm that are nearly identical to those that Club Quarters asserts here. There, Fairmont, the terminated operator of the Turnberry Isle Resort in Aventura, Florida, argued that it faced irreparable harm in the form of guest confusion, loss of reputation with guests, loss of reputation with employees, other hotel owners, and business partners, loss of status in the industry, and more. 865 F.Supp.2d at 1207-12. The court rejected each of those allegations, even though news of Fairmont's termination was published in the Miami Herald and thus was widely known. Id. This is because, to the extent Fairmont could demonstrate any such damage, through, e.g., cancelled reservations at other properties, they would be compensable in money damages. Id. at 1208–1209. The same is true here: Club Quarters has not offered evidence of any actual damage it has suffered, and to the extent such damage exists, it will be compensable. (Pls.' Br. at 26-27.)

The terms of the Management Agreement also point to the parties' advance consideration of how to quantify their damages in the event of a breach. "Schedule A" to the Management

Agreement sets forth the computation of a "Termination Fee" payable upon the termination of the Management Agreement, using different formulas to compute the fee depending on the nature of the termination (e.g., as the result of a party default or upon Manager's failure of the performance test). (See Ex. 1 at id.) The provision notes that "[e]xcept as otherwise expressly provided in the [Management] Agreement, no Termination Fee or other penalties shall be paid upon the termination of the [Management] Agreement." Id. Manager cannot credibly argue that the harm from a wrongful termination cannot be quantified when an easily quantifiable fee is set forth in the Management Agreement itself.

At its core, Club Quarters' claim that its harm "would be impossible to calculate with reasonable certainty" rests on the premise that it cannot be restored as manager if the Hotel transitions to new management. But that consequence is inherent in any termination of a services contract. Club Quarters does not identify any non-economic injury distinct from the loss of the management relationship. (Id.) Further, any alleged harm posed to Club Quarters' brand is minor and fleeting: by its own account, Club Quarters currently operates "13 Club Quarters-branded hotels." (Pls.' Br. at 14.) It is unclear how or why the loss of operation of this one property would cause Club Quarters any harm beyond any claim for money damages.[3] See FHR, 865 F.Supp.2d at 1206-1212.

[3] Although CQ cites Beacon Assocs. Inc. v. Apprio, Inc., 308 F. Supp. 3d 277, 288 (DDC 2018) for the proposition that "a wrongful 'termination for default'" can constitute irreparable injury, that case involved a government subcontractor, whose allegedly damaged reputation was directly relevant because government regulations required consideration of the subcontractor's reputation in the process of awarding government contracts. Id. The court also found irreparable harm because it determined that plaintiff risked the loss of difficult-to-quantify institutional knowledge, because defendant had poached 40 of plaintiff's employees. Id. Neither of those circumstances are present here.

**B. Plaintiffs' Franchise and Distributorship Contract Cases Are Inapplicable to the Management Agreement, a Personal Services Agreement**

Plaintiffs next claim that termination of the Management Agreement will cause irreparable harm because it "threatens cross-termination" of the other CQ Agreements and as a result, the "dismantling [of] the member-driven [Club Quarters] system." (Pls.' Br. at 26). In support of this contention, Club Quarters reasons that because Owner is also a party to the License Agreement and the CLN Agreement, both of which deal with Owner's use of Club Quarters' proprietary information and business concepts, a line of cases dealing with the loss of an exclusive distributorship or franchise are analogous. Not so.

Reuters, Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir. 1984), Jacobson & Co. v. Armstrong Cork Co.,548 F.2d 438 (2d Cir. 1977) and R Squared Glob., Inc. v. Serendipity 3, Inc., 2011 WL 5244691 (S.D.N.Y. Nov. 3, 2011) all concern exclusive distributorships or licenses, which are fundamentally distinct from the Management Agreement.

In R Squared, the District Court granted a preliminary injunction because in the absence of that relief, plaintiff, which was the exclusive licensee of defendant, would have been forced to cease operation of all three of its 'Serendipity'-branded restaurants, thus entirely "preventing the operation of the business for which [plaintiff] was formed." R Squared, 2011 WL 5244691, at *10. The R Squared plaintiff demonstrated irreparable harm by showing that it stood to lose its entire business. Id.

Likewise, Roso-Lino involved husband and wife owners of a Coca-Cola bottling franchise, who "st[ood] to lose their business forever" if their franchise agreement was terminated pending the resolution of the parties' dispute. Roso-Lino, 749 F.2d at 126 (emphasis added). Jacobson involved the same fact pattern: a small business was an authorized distributor of acoustical tile

ceilings when the manufacturer of the acoustical tile terminated the distributorship, allegedly wrongfully. There, the Second Circuit found that the District Court had ample evidence to support its finding that the distributor would suffer irreparable harm. Id. at 445; see also the underlying opinion in Jacobson & Co. v. Armstrong Cork Co., 416 F. Supp. 564, 570 (S.D.N.Y. 1976), in which the District Court found that plaintiff sufficiently alleged "an injury that is difficult of precise calculation in dollars and cents."

Here, Manager is not the "exclusive licensee" (or exclusive licensor, for that matter) of Owner. Nor will Manager's entire operations grind to a halt "forever" if Owner terminates the Management Agreement. As it acknowledges, Manager is the manager of thirteen Club Quarters-branded hotels, all of which are operational. See Nichols Decl. at ¶81.

Reuters is distinguishable as well, because the terminated contract involved defendant's obligation to supply news photos to plaintiff wire service, and the Court of Appeals held that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." Reuters, 903 F.2d at 907–08. No such "unique product" is being "deliver[ed]" here (id.); Manager provides its management services to Owner in exchange for a fee. (Nichols Decl. Ex. C at § 2(B).) While the CLN Agreement and License Agreement involve Owner's use of Club Quarters' intellectual property and proprietary information, that information is used solely in connection with Club Quarters' management of Owner's Hotel.

Nor is the Management Agreement – or even the License Agreement[4] – analogous to a hotel franchise agreement, contrary to Club Quarters' argument regarding LaGuardia Assocs. v.

[4] Plaintiffs misleadingly compare the License Agreement here with the "license agreement" at issue in LaGuardia. But all aspects of the LaGuardia parties' relationship were governed by a single agreement; here, the License Agreement is ancillary to Manager's provision of management services under the HMA. In the absence of an agreement by Manager to operate Owner's Hotel, Owner would have no need of 'Club Quarters' branding.

Holiday Hospitality Franchising, Inc., 92 F. Supp. 2d 119, 131 (E.D.N.Y. 2000). In LaGuardia, the termination of a hotel franchise agreement was presumptively considered to constitute irreparable harm. (Pls.' Br. at 26, citing 92 F. Supp. 2d 119, 131 (E.D.N.Y. 2000)). But LaGuardia by its own terms is wholly inapplicable here, because the CQ Agreements are not "strikingly similar" to the franchise agreement at issue in LaGuardia. "Franchising is a widely prevalent system of marketing and distribution. What is often a small independent business (the franchisee) is granted, in return for a fee or other consideration, the right to market in the goods, services, or name brand of another (the franchisor). . . . Equally important, the franchise relationship allows the franchisor [to] acquire[ ] the aggressive self-motivation of franchisees, whose ownership fervor [in managing the hotel] is generally far greater than that of employee managers." Id. at 124-25.

Unlike the relationship of the parties here, in LaGuardia, the franchisee-owner is responsible for the management and operation of the hotel, while the franchisor performs no services – instead, "the franchisor . . . essentially lend[s] its national goodwill to the franchisee." Id. at 125. That is not the case here, where the essence of the parties' bargain is that Manager will provide personal services to Owner in exchange for Owner's payment to Manager of certain fees for its services. Because the harm with which Manager is threatened here is the loss of future fees for its management services – i.e., money damages – and not intangible harm such as Owner's tarnishing Manager's "goodwill" by conduct undertaken by *Owner* in managing the Hotel, LaGuardia does not apply.

### C. The Injunction Plaintiffs Seek Is Not "In Aid of Arbitration"

Last, Club Quarters alleges that injunctive relief is independently necessary to preserve the dispute-resolution process for which the parties expressly bargained. This is a red herring. The budget arbitration concerns a narrow issue of whether Owner unreasonably withheld approval of the 2026 Annual Operating Plan. It preceded, and is distinct from, the injunction sought in this

case – which concerns a different dispute regarding the validity of the Default Notice and whether Owner may terminate the Management Agreement – and cannot be credibly portrayed as an injunction in aid of the budget arbitration.

The single case cited by Club Quarters, Rex Med., 754 F. Supp. 2d at 616, underscores the lack of merit to this argument. In that case, the injunction preserved the exact dispute that was headed to arbitration, while here Club Quarters is using the pendency of a budget arbitration to try to enjoin a separate dispute pending in this court with respect to Owner's Default Notice and the potential termination of the Management Agreement based on Manager's defaults.

Because Club Quarters' alleged harms consist of lost fees, lost contractual expectations, and asserted reputational impacts arising from termination, all of which are compensable through damages, Club Quarters fails to satisfy the irreparable-harm requirement for interim relief. See FHR TB, LLC, 865 F.Supp.2d at 1206; Woolley, 227 Cal. App. 3d at 1535.

## IV. CONCLUSION

For the reasons set forth herein, Owner respectfully requests that the Court issue an order: (i) finding that Club Quarters has failed to demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction, and that accordingly, the Court need not proceed to determine the remaining factors required for preliminary injunctive relief; (ii) denying Plaintiffs' motion for a preliminary injunction; and (iii) granting Owner such other and further relief as is just and necessary.

Dated: New York, New York
November 11, 2026

**PRYOR CASHMAN LLP**

By: ______________________
Todd E. Soloway
Bryan T. Mohler
Meghan E. Hill

7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 326-0806
tsoloway@pryorcashman.com
bmohler@pryorcashman.com
mhill@pryorcashman.com

*Counsel for Defendant*