UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.; CLUB QUARTERS FRANCHISE NETWORK, L.L.C.; CLUB QUARTERS MEMBERSHIP NETWORK, L.L.C.; and SHARED OPERATING SERVICES, L.L.C.,

Plaintiffs,

v.

CQ DC ACQUISITION LLC,

Defendant.

Case No. 26 Civ. 09393

**DECLARATION OF NATHALIE ABINADER IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Nathalie Abinader, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Vice President of Asset Management at Jones Lang LaSalle Americas, Inc., Hotels and Hospitality Division ("JLL"). JLL is the asset manager of the property located at 839 17th Street NW, Washington, DC 20006 (the "Hotel"), on behalf of CQ DC Acquisition LLC ("Owner" or "Defendant"), the defendant in the above-captioned action (the "Action"). JLL has been the asset manager for the Hotel since 2016.

2. I submit this Declaration in opposition to the motion for a preliminary injunction filed by plaintiffs Club Quarters Management Company, L.L.C. ("Manager"); Club Quarters Franchise Network, L.L.C. ("CQFN"); Club Quarters Membership Network, L.L.C. ("CQMN"); and Shared Operating Services, L.L.C. ("SOS," and collectively, "Plaintiffs" or "Club Quarters "), dated October 27, 2026.

3. In my role as Vice President, I oversee and evaluate the operation of the Hotel, including evaluating Club Quarters' performance in accordance with the operative agreements that govern the management of the Hotel, as set forth in further detail below. Unless specifically noted

otherwise, the statements in this Declaration are based on my personal knowledge and understanding, and upon my review of JLL's file for this property.

**A. <u>Background</u>**

4. Owner purchased the hotel known as Club Quarters Hotel, White House located at 839 17th Street NW, Washington, DC 20006 (the "Hotel") in 2016.

5. As set forth herein, Manager and its affiliates operate the Hotel pursuant to a Management Agreement and three ancillary agreements, each of which facilitates the services Manager provides under the Management Agreement. The four agreements are as follows:

(i) the Management Agreement dated as of October 28, 2005 (as amended, the "Management Agreement"), between CQ DC Acquisition LLC c/o Al Sraiya Hotels & Hospitality Group (as assignee[1] of RCQ Hotel Operator DC, Inc. and RCQ Hotel DC, LLC) as Owner and Manager ("Management Agreement" or "HMA," a true and correct copy of which is annexed hereto as **Exhibit 1**);

(ii) the License and Royalty Agreement, dated as of October 28, 2005 between Owner and CQFN ("License Agreement," a true and correct copy of which is annexed hereto as **Exhibit 2**);

(iii) the Customer List/Network Agreement, dated as of October 28, 2005 between Owner and CQMN ("CLN Agreement," a true and correct copy of which is annexed hereto as **Exhibit 3**); and

(iv) the Services Agreement, dated as of October 28, 2005, between Owner and another CQ affiliate, Shared Operating Services, L.L.C ("Services Agreement," a true and

[1] Owner was assigned all right, title and interest in and to the Management Agreement, the License Agreement, the CLN Agreement and the Services Agreement by that certain Assignment and Assumption of Management Documents dated as of July 19, 2016, among RCQ Hotel DC, LLC and RCQ Hotel Operator DC, Inc. as Seller and Owner as Purchaser.

correct copy of which is annexed hereto as **Exhibit 4**, and collectively, the "CQ Agreements").

6. As set forth in the CQ Agreements, CQ agreed to provide Owner with all-inclusive hotel management services together with access to its proprietary information, all designed to operate in concert to deliver Members to the Hotel and to "achieve superior results."

7. But in recent years, CQ has made a deliberate decision to abandon that system – pivoting its business away from the cultivation of the Club Quarters brand and toward its separate "Altus Hospitality" third-party hotel management business – and in doing so has deprived Owner of the consideration for which Owner continues to pay CQ a fee load approaching 10% of Gross Revenues, several multiples of the base management fee under a typical hotel management agreement.

**B. The CQ Agreements and Their Terms**

8. Under the Management Agreement, Owner agreed to delegate and Manager agreed to manage all aspects of the Hotel, including setting rates; budgeting; opening and managing bank accounts; hiring, supervision, training and firing all employees of the Hotel; entering contracts for the Hotel; purchasing supplies; and performing repairs. As relevant here, Manager agreed to (i) to "use commercially reasonable efforts in carrying out [its] obligations to enhance the profitability and value of the [Hotel] ... within the parameters of the business model currently employed by Manager and its affiliates that is designed to provide value to guests of Club Quarters;" (Ex. 1 at § 2(A)); (ii) to "oversee the implementation of the 'Membership Network' as is made available to the [Hotel] pursuant to the Customer List/Network Agreement" (id. § 2(B)(l)(f)); and (iii) to "ensure compliance with the policies, systems, procedures and protocol of a Club Quarters and compliance with the Club Quarters Standards" (id. § 2(B)(l)(a)).

9. In exchange for providing those services, Manager was entitled to a base management fee of 2.75% of Gross Revenue, and an incentive fee of 6% of Net Operating Income. (Ex. 1 § 4(B)).

10. Should Manager fail to achieve 85% of the NOI projected in its annual budget, it is subject to a "Fee Standaside," whereby it receives no incentive fee, and if Manager fails to achieve 75% of the projected NOI, the base management fee is reduced to 2.00% of Gross Revenue.

11. Pursuant to the CLN Agreement, the Hotel is granted access to (i) the CQ Customer Lists and "the right to solicit customers (members)" to benefit the Hotel, as well as access to (ii) the Customer Network, "the system whereby Customers of any Club Quarters can use another Club Quarters hotel in accordance with rules and practices" of the Membership Network. (Ex. 3 at Art. 1).

12. In exchange for access to the Customer Lists and the Customer Network, Owner pays CQ 2.0% and 1.75% of annual Gross Revenue, respectively. As with the Management Agreement, if Manager fails to achieve 85% of the NOI projected in its annual budget, a Fee Standaside provision reduces its total fees under the CLN Agreement from 3.75% to 1.0% of Gross Revenue, and if Manager fails to achieve 75% of the projected NOI, its CLN Agreement fees are reduced to $0. (Id. at Art. 4.)

13. Pursuant to the License Agreement, the Hotel is granted permission to use CQ's trademarks, the Development Formula, the Marketing Formula, the Operating Formula[2] and Proprietary Software "for services offered only in connection with" Club Quarters' management of the Hotel. (Ex. 2 § 2(A).)

[2] The Development, Marketing and Operating Formulas purport to be proprietary methods used by CQ to run the properties it manages as "Club Quarters" hotels, and also to expand the brand to additional properties.

14. In exchange, Owner pays CQ (i) 0.5% of all Gross Revenue for use of the Trademarks, (ii) 2.5% of all Gross Revenue for use of the Club Quarters Development Formula, the Club Quarters Marketing Formula, and the Club Quarters Operating Formula, and (iii) 0.25% of all Gross Revenue for use of the Proprietary Software Design. (Id. at Art. 4.)The License Agreement also contains a Fee Standaside provision. If CQ fails to achieve 85% of the NOI projected in its annual budget, the License & Royalty Fee for use of Proprietary Software is reduced from .25% of Gross Revenues to $0, and if Manager fails to achieve 75% of the projected NOI, its cumulative License Agreement fees are reduced from 3.00% to 2.00% of Gross Revenue. (Id.)

15. Finally, pursuant to the Shared Services Agreement, CQ agreed to provide Owner with certain services and facilities that it provides to all hotels in the CQ system (e.g., accounting, IT, human resources and marketing services) (Ex. 4 at Art. 2) and Owner agreed to pay its proportionate share of the total expense for those services. (Id. at Art. 4.) There is no Fee Standaside provision in the Shared Services Agreement. Because the Hotel's proportionate share of those expenses is based in part upon the Hotel's overall performance, the Hotel's share of total expenses is typically less in years where its performance is worse.

**C. CQ's Performance Failures Lead Owner to Issue a Notice of Default**

16. When Owner purchased the Hotel, CQ touted itself as a thriving brand, with sixteen other hotels under its management, including six in New York City, two in Chicago, four in London, and one in each of San Francisco, Philadelphia, Boston and Houston.

17. As set forth above and as conceded by CQ in its Complaint and motion papers, CQ's business model was to offer "corporate clients access to a network of strategically located

hotels at negotiated rates in exchange for recurring room nights and long-term relationships." (Br. at 4).

18. CQ has gradually shifted away from its core business model, while simultaneously beginning to re-brand some of the CQ hotels under its management and launching a new business line, Altus Hospitality, to serve as a third-party manager for its properties.

19. These changes evidence the declining value of the Club Quarters "brand," which can no longer drive reservations to the Hotel. While Owner is paying 9.75% of Gross Revenue in fees to CQ for its services and the supposed use of the CQ brand to drive revenue, the percentage of reservations derived from CQ "member" contribution has fallen as low as 9% in recent years, and currently hovers around 20%.

20. Manager's failure to operate the Hotel in accordance with the Club Quarters "system" as it promised to do in the Management Agreement is a material breach entitling Owner to exercise its default remedies pursuant to the Management Agreement.

21. On September 22, 2026, Owner issued a comprehensive Notice of Default ("NOD") to Manager, detailing Manager's numerous breaches and requiring that Manager cure its defaults on or before October 31, 2026. I was involved in the preparation of the NOD, a true and correct copy of which is annexed hereto as **Exhibit 5**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: New York, NY
November 11, 2026