# EXHIBIT 1

confidential
Adam Pozza
Apr 14, 2014 17:38

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is made as of October 28, 2005, by and between RCQ Hotel DC, LLC ("Owner"), a Delaware limited liability company having its principal place of business at c/o Rockwood Capital Corporation, Two Embarcadero Center, Suite 2360, San Francisco, California 94111, and Club Quarters Management Company, L.L.C. ("Manager"), a Connecticut limited liability company having its principal place of business at 585 Old Stamford Road, New Canaan, Connecticut 06840.

## WITNESSETH:

WHEREAS, Owner is the owner of the Premises and the Club Quarters (each as defined below);

WHEREAS, Manager has experience in the management and oversight of other facilities as Club Quarters that also receive services and access to proprietary business concepts from Manager and Affiliates (defined below) of Manager; Manager and its Affiliates provide to hotel owners all-inclusive hotel management services and access to its unique proprietary business concept and proprietary formulae developed and implemented by them in their own hotels; a "Club Quarters" provides its guests with unique combination of locations, products and low price;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties agree as follows:

### Article 1 - Definitions, Terms and References

Definitions: In this Agreement, the following terms shall have the following meaning:

**Affiliate** shall mean any entity owned or controlled by a party hereto, owning or controlling a party hereto or under common ownership with and controlled by a party hereto, with "control" meaning ownership of seventy-five percent (75%) or more of voting interests.

**Agreement** shall mean this Management Agreement, as it may be amended or supplemented from time to time.

**Annual Occupancy Budget** shall have the meaning as provided in Article 5, Section A.



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

**Annual Operating Plan** shall have the meaning as provided in Article 5, Section A.

**Approval, Approves or Approved** shall mean prior written approval, which approval shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, certain matters are subject to the approval of Owner in its sole and absolute discretion as expressly set forth in this Agreement.

**Approved Financing** shall mean any financing of the Premises and/or the Club Quarters which satisfies the provisions of Article 6. Approved Financing may include, without limitation, mezzanine loans and other financing made to entities which directly or indirectly own Owner.

**Approved Budgets** shall mean, collectively, the Owner approved Annual Operating Plan, Annual Occupancy Budget, the Routine Capital Expenditures Budget and the Major Capital Expenditures Budget.

**Club Quarters** shall mean that certain hotel and the restaurant and retail space at the Premises, and all Furniture, Fixtures and Equipment, and Inventories.

**Club Quarters Standards** shall mean the standards of operation and facilities that are generally consistent with the average requirements of Club Quarters users and prospective users which currently are primarily organizations with business travelers, as such standards are currently in effect for lodging facilities operated under the "Club Quarters" name as of the date of this Agreement. The facilities and services that are currently generally provided in hotels operating under the "Club Quarters" name and representing Club Quarters standards are described in Exhibit A. These services and facilities representing Club Quarters standards may be modified by Manager in its discretion from time to time based upon evolving market conditions in order to meet the needs of its users and prospective users; provided that any material change in the general standards of operation must be commercially justified to Owner.

**Commencement Date** shall mean October 28, 2005.

**Cure Payment** shall have the meaning as provided in Article 3, Section D.

**Customer List/Network Agreement** shall mean that certain Customer List/Network Agreement dated as of the date hereof, between Owner and Club Quarters Membership Network, L.L.C., a Delaware limited liability company and an Affiliate of Manager.

**Debt Service** shall mean regularly scheduled payments of interest and principal on Approved Financing.

**Deferred Management Revenue Fee** shall have the meaning as provided in Article 4, Section D.

**Event of Default** shall mean the occurrence of any of the events described in Article 9 herein.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

**Expert** means an independent nationally recognized hotel consulting firm or individual with at least ten (10) years experience in the hotel industry relevant to and appropriate for the matter which such individual is being asked to resolve, appointed within fifteen (15) days after either party invokes the Expert process set forth herein in each instance by agreement of the parties or, failing agreement within such 15-day period, by agreement concluded as soon as practicable of the proposed Experts nominated by each party (in any event within thirty (30) days following the date a party invokes the Expert process), in which event the determination shall be made by majority vote of the two (2) proposed Experts and the additional one (1) Expert chosen by them. All references hereinafter to the "Expert" shall be deemed to refer to the three (3) Experts if three (3) Experts are appointed as contemplated herein.

**Extended Term** shall have the meaning as provided in Article 3, Section B.

**Fiscal Year** shall mean a year which ends on December 31. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 364 days. A partial Fiscal Year shall constitute a separate Fiscal Year with any amounts due under this Agreement being prorated based on the number of days in such partial year.

**Force Majeure** shall mean any and all causes beyond the reasonable control of a party, and such that reasonable foresight and ability on the part of the affected party could not reasonably provide against, including, without limitation, civil unrest or commotion, riots, acts of terrorism (including hijacking, sabotage, bombing, murder, assault and kidnapping) hurricanes, typhoons, tornados, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, disease, epidemics; labor disputes, accidents, mechanical breakdown, shortages or inability to obtain labor, fuel, steam, water, electricity or materials, and acts of God, fire or other casualty, but only to the extent the same cannot be overcome with diligence and commercially reasonable expense.

**Furniture, Fixtures and Equipment** shall mean all furniture, furnishings, wall coverings, fixtures and equipment and systems located at, or used in connection with, the Club Quarters, together with all replacements thereof and additions thereto.

**Gross Revenue** shall mean all revenues, receipts and income of any kind derived directly or indirectly by Manager from or in connection with the operation of the Club Quarters, determined on an accrual basis in accordance with generally accepted accounting principles, whether on a cash basis or credit, paid or collected, including, without limitation, net rent (i.e. gross rent less pass-throughs of utilities and other operating expenses) received from commercial tenants of the Club Quarters, and excluding, however: (i) funds furnished by Owner; (ii) investment income including interest accrued on amounts in the accounts of the Club Quarters; (iii) federal, state and municipal hotel, excise, sales, occupancy and use taxes collected directly from patrons and guests or as part of the sales price of any goods, services or displays, such as gross receipts, admissions, cabaret or similar or equivalent taxes and paid over to federal, state or municipal governments; (iv) gratuities; (v) proceeds of insurance and condemnation, except for the proceeds from business interruption insurance; (vi) proceeds from the sale or other


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

disposition of capital assets; and rebates, discounts or credits of a similar nature; and (vii) "pass-throughs" of food or other expenses incurred by guests arising for the purchase of goods or services from third-party vendors.

**Initial Term** shall have the meaning as provided in Article 3 hereof.

**Inventories** shall mean inventories of merchandise and supplies, such as soap, toilet paper, stationery, writing pens, paper products, menus, expendable office supplies, fuel, expenses supplies and similar items.

**Know How** shall mean the expertise of Manager and its Affiliates in the systems, procedures and protocol in connection with the management and operation of Club Quarters.

**License and Royalty Agreement** shall mean that certain License and Royalty Agreement dated of even date herewith between Owner and Club Quarters Franchise Network, L.L.C., a Delaware limited liability company and an Affiliate of Manager.

**Major Capital Expenditures** means any capital expenditures made in connection with the Club Quarters, including without limitation, repairs, alterations, improvements, renewals, replacements, or additions to the Club Quarters, but excluding any capital expenditures made in connection with Furniture, Fixtures and Equipment.

**Major Capital Expenditures Budget** shall mean that budget for Major Hotel Building Expenditures prepared in accordance with Article 5, Section A.

**Manager** is Club Quarters Management Company, L.L.C.

**Management Fees** shall mean the Management Revenue Fee and the Management Incentive Fee, collectively.

**Management Incentive Fee** shall have the meaning as provided in Article 4, Section B.

**Management Revenue Fee** shall have the meaning as provided in Article 4, Section B.

**Member** shall mean a subscriber for the use of the Club Quarters.

**Minimum Fee** shall mean the following:

(a) In the event that Owner voluntarily elects to cause the Club Quarters to lose fifty percent (50%) or more of available room nights by taking rooms out of service (in connection with a major remodeling of the Club Quarters or other comparable action taken at Owner's discretion), then the Minimum Fee shall be $175,000 per year;

(b) Otherwise, subject to paragraph (c) below, the Minimum Fee shall be $83,333 per year; and



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(c) Notwithstanding the provisions of paragraphs (a) and (b) above, (i) for any Fiscal Year where the actual Net Operating Income After Incentive Fee for such Fiscal Year is less than eighty-five percent (85%) of Net Operating Income After Incentive Fee set forth in the Approved Annual Operating Plan for such Fiscal Year, the Minimum Fee shall be $0, and (ii) the amounts set forth in paragraphs (a) and (b) above shall be adjusted as of January 1 of each calendar year during the Term by the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published ("CPI").

**Net Operating Expenses** shall mean all costs and expenses of any kind incurred in connection with the operation of the Club Quarters. Net Operating Expenses shall include, without limitation, all payments to Manager or its Affiliates under this Agreement and any of the other Related Club Quarters Agreements (but excluding the Management Incentive Fee), premiums for insurance required to be maintained pursuant to Article 7, Sections A and B, of this Agreement, all real estate taxes, all personal property taxes and all betterment assessments levied against the Club Quarters or any of its component parts, and reasonable travel expenses of employees, officers and other representatives and consultants of Manager and its Affiliates. Contributions to the Reserve shall also be deemed to be part of Net Operating Expenses. The following items shall be excluded from Net Operating Expenses: federal, state and municipal hotel excise, sales, occupancy and use taxes collected directly from patrons and guests or as part of the sales price of any goods, services or displays, such as gross receipts, admissions, cabaret or similar or equivalent taxes paid over to federal, state or municipal governments, loan interest, interest income, capital lease interest expense, building rent, depreciation and amortization, extraordinary items, and differences on exchange.

**Net Operating Income** shall mean Gross Revenue minus Net Operating Expenses.

**Net Operating Income After Incentive Fee** shall mean, for any period, and amount equal to the Net Operating Income for such period less the Incentive Fee payable for such period.

**Other Club Quarters** shall mean other hotels operated by Manager or one of its Affiliates under the "Club Quarters" name.

**Operating Account** shall have the meaning as provided in Article 5, Section D.

**Owner** shall have the meaning set forth in the first paragraph of this Agreement or any successors in interest of Owner, including, without limitation, all permitted assignees of this or any of the Related Club Quarters Agreements or transferees of all or any portion of the Club Quarters.

**Owner's Capital** shall mean the purchase price paid for the Club Quarters plus all subsequent Major Capital Expenditures.

**Performance Test** shall have the meaning as provided in Article 3, Section D.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

**Permitted Lien** shall have the meaning as provided in Article 6, Section B.

**Premises** shall mean that property at 839 17th Street, N.W., Washington D.C.

**Related Club Quarters Agreements** shall mean the License and Royalty Agreement, the Customer List/Network Agreement and the Shared Services Agreement.

**Reserve** shall have the meaning as provided in Article 5, Section E.

**Reserve Account** shall have the meaning as provided in Article 5, Section E.

**Restricted Area** shall be the area depicted on Exhibit B hereto.

**Routine Capital Expenditures** shall mean (i) alterations, improvements, replacements, renewals, and additions to the Furniture, Fixtures and Equipment, and (ii) certain routine repairs and maintenance to the Club Quarters which are normally capitalized under GAAP (e.g., interior repainting, and resurfacing interior walls, floors, ceilings, and parking areas), but which are not Major Hotel Building Expenditures.

**Routine Capital Expenditures Budget** shall have the meaning as provided in Article 5 Section A.

**Shared Services** shall mean those certain services that are available pursuant to that certain Shared Services Agreement or from Other Club Quarters which may be utilized at the Club Quarters where Manager deems the utilization thereof to be a more efficient alternative.

**Shared Services Agreement** shall mean that certain Shared Services Agreement dated as of even date herewith between Owner and Shared Operating Services, L.L.C., a Delaware limited liability company and an Affiliate of Manager.

**Subordinated Management Incentive Fee** shall have the meaning as provided in Article 5, Section F.

**Term** shall have the meaning as provided in Article 3 hereof.

**Termination Fee** shall mean an amount determined as set forth on Schedule A attached hereto.

## Article 2 - Engagement of Manager

A. <u>Operation of the Club Quarters</u>: Manager shall be responsible for the management and operation of the Club Quarters and all of its facilities and activities in a manner consistent with the management and operation of Other Club Quarters: (i) in a proper and businesslike manner and in accordance with the Approved Budgets subject to the following allowances for overruns:



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

if and as soon as Manager becomes aware of a potential excess expenditure beyond the amount of the respective item in the Approved Budget in excess of the following percentages, Manager shall promptly report such anticipated excess expenditure to Owner and obtain Owner's prior written Approval for the overspend for the balance of the year:

- variable costs – one percent (1%) of budgeted Gross Revenue
- fixed costs (excluding Shared Services) – five percent (5%) of the budgeted amount of each respective line item
- Shared Services – five percent (5%) of the budgeted amount
- building costs (excluding utilities, property tax and insurance) –five percent (5%) of the budgeted amount
- utilities, property tax and insurance – no approval required to pay for any variances;

(ii) in compliance with this Agreement, all easements, covenants and restrictions affecting the Premises and all applicable governmental laws, rules, regulations, ordinances, orders and requirements; and (iii) in accordance with the requirements of (a) any carrier having insurance on the Club Quarters or any part thereof, and (b) any Approved Financing (to the extent that Owner has provided Manager with copies of the governing documents), provided that the requirements in (a) are reasonable and intended solely to address matters related to life safety and security and do not result in any material deviation from the Club Quarters Standards, and in (b) above do not alter any provisions hereof or increase the obligations of Manager or diminish Manager's rights as otherwise set forth herein except to a "de minimis" extent, unless otherwise agreed by Manager, or cause the Club Quarters or the operation thereof to deviate in any manner from the Club Quarters Standard, and provided, further, that to the extent required by this Agreement, Owner has provided the necessary funds for the operation, maintenance, repair and improvement of the Club Quarters. Manager shall use commercially reasonable efforts in carrying out the foregoing obligations to enhance the profitability and value of the Club Quarters; provided, however, that Manager's efforts shall be undertaken within the parameters of the business model currently employed by Manager and its affiliates that is designed to provide value to guests of Club Quarters. Manager hereby confirms that the loan from Lehman Brothers Bank FSB made pursuant to that certain Loan Agreement dated of even date herewith between Lehman Brothers Bank and RCQ Hotel DC, LLC satisfies the provisions of this paragraph (ii) and other terms of this Agreement governing financing of the Premises.

B. <u>**Manager's Services**</u>:

(1) Manager shall provide the following services:

(a) Oversee the management and operation of the Premises to ensure compliance with the policies, systems, procedures and protocol of a Club Quarters and compliance with the Club Quarters Standards;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(b) Arrange for and oversee the provision of Shared Services for the Club Quarters as are made available to the Club Quarters pursuant to the Shared Services Agreement that in Manager's judgment reasonably exercised are necessary or desirable for the efficient operation of the Club Quarters in accordance with the Club Quarters Standards;

(c) Determine all room rates and related charges based on a long-term relationship with users, the provision of significant savings to users, Club Quarters policy of smoothing out rate increases over time, and consideration of input from users (as currently provided for in user agreements); provided, however, that reductions in room rates set forth in a proposed Annual Operating Plan from room rates in the immediate prior Fiscal Year shall require Owner's Approval;

(d) Make available to guests of prospective members complimentary rooms as Manager may reasonably deem necessary, provided that the loss of revenue to the Club Quarters as a result of having provided such rooms on a complimentary basis shall not exceed $10,000 per annum;

(e) Prepare and submit for Owner's Approval, and implement, (i) the Annual Operating Plan, (ii) the Annual Occupancy Budget, (iii) the Routine Capital Expenditures Budget, and (iv) the Major Capital Expenditures Budget, as more particularly described below;

(f) Update from time to time policies and procedures for the Club Quarters, including operations, personnel, credit, promotion and public relations, and customer and Member services and administration, and oversee the implementation of the "Membership Network" as is made available to the Club Quarters pursuant to the Customer List/Network Agreement;

(g) Determine all credit policies, including entering into arrangements and agreements with credit card organizations;

(h) Purchase, using the credit of Owner, all inventories, supplies and replacements of and additions to Furniture, Fixtures and Equipment and other services and merchandise as are appropriate for the proper operation of the Club Quarters and in accordance with the Approved Annual Operating Plan;

(i) Supervise and control all deposits into and disbursements from the Operating Account in accordance with this Agreement;

(j) Report the Gross Revenue for each month and produces a quarterly P&L and oversee the bookkeeping services provided to the Club Quarters;

(k) Ascertain to what extent employee services necessary at the Club Quarters may be provided by sharing such services with Other Club Quarters, and oversee the identification, appointment, assignment, instruction and supervision of all personnel necessary or advisable for the operation of the Club Quarters as more particularly provided in Section C of this Article 2;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(l) Determine employment policies including salary rates and terms, welfare and benefit plans, if any for the Club Quarters;

(m) Arrange in Owner's name for utility, telephone, cable television and interactive television services, vermin extermination, security, trash removal and other services utilizing Club Quarters Property Management Services pursuant to the Shared Services Agreement;

(n) Enter into such leases, licenses, concession agreements and other undertakings in Owner's name as reasonably appropriate, including leasing of commercial space, including, without limitation, a restaurant, at the Club Quarters; provided that, all such agreements with a term greater than one (1) year that are not terminable by Owner without penalty on not more than thirty (30) days prior notice shall require Owner's Approval;

(o) Cause all needed repairs and maintenance to be made to the Club Quarters, utilizing Club Quarters Property Management Services available to the Club Quarters under the Related Club Quarters Agreements; cause all such other things to be done in or about the Club Quarters as shall be necessary to comply with all requirements of governmental authority, boards of fire underwriters and other bodies exercising similar functions; provided, however, that expenditures Major Capital Expenditures shall be accomplished as provided in Section 6(D) hereof;

(p) Generally oversee the legal affairs of the Club Quarters; provided, however, that except for the provision of legal services in connection with routine collection matters for the Club Quarters, Owner shall have the right to Approve the commencement of legal proceedings, the selection of counsel in connection therewith, and any settlement negotiations; provided, further, that Manager shall have the right to intervene at its expense with its own counsel in legal matters to the extent that any such matters involve the rights, obligations, property, reputation or personnel of Manager or any of its Affiliates;

(q) Engage such persons or organizations as Manager deems appropriate to provide advice in connection with the operations of the Club Quarters, including attorneys, accountants and other professionals and specialists in accordance with the Approved Annual Operating Plan; and

(r) Cause all such other actions to be taken in or about the Club Quarters as shall be necessary to comply with all requirements of governmental authorities, boards of fire underwriters and other bodies exercising similar functions.

(2) Notwithstanding anything contained in this Agreement to the contrary, Manager shall have no authority on behalf of Owner to do any of the following without Owner's prior written Approval in each instance or as provided in the Approved Budgets:

(a) Borrow money, guaranty the debts of any third person, or mortgage, pledge, grant a security interest in or otherwise encumber all or any part of the Premises;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(b) Enter into any lease for the use of any item of FF&E or other property where (i) the annual rent obligation is greater than $75,000 per Fiscal Year or (ii) the aggregate annual rent obligation under all such leases is greater than $125,000 per Fiscal Year;

(c) Incur any liabilities or obligations to third parties in Manager's capacity on behalf of Owner which are unrelated to the operation, maintenance and security of the Premises or to the performance of Manager's responsibilities under this Agreement;

(d) Enter into any collective bargaining, recognition or other labor agreements;

(e) Enter into any contract or other arrangement (or series of related contracts or arrangements) if the expenditures thereunder would, or are reasonably anticipated to, exceed $100,000 in the aggregate, or if the term of such contract has a term in excess of one (1) year; provided that, Manager may enter into contracts in excess of such amounts in the event of an emergency as necessary to make repairs to avoid imminent damage to persons or property;

(f) Settle any casualty insurance claims which involve, or which are reasonably estimated to involve, amounts in excess of $75,000, and any condemnation awards;

(g) Institute or defend any legal or equitable proceedings with respect to the Premises, including the selection of counsel other than routine collection litigation and similar matters involving ordinary day to day operations of the Club Quarters involving amounts in controversy of less than $50,000;

(h) Employ any professional firm for more than $25,000 in each instance and the aggregate for such employment shall be as contemplated in the Approved Operating Budget, or enter into any arrangement for the employment of any attorney or accountant;

(i) Prosecute in court any tax claims or appeals;

(j) Except as contemplated in the Related Club Quarters Agreements, purchase goods, supplies and services from itself or any Affiliate of Manager, or enter into any other transaction with an affiliate of Manager, unless prior to the consummation of such transaction all of the prices and other terms thereof and the identity of the vendor and its relationship to Manager shall have been disclosed to and approved by Owner in writing, which may be withheld in Owner's sole and absolute discretion, it being agreed that any such proposed transaction shall be submitted to independent third parties for competitive bidding, and Manager shall promptly provide the results of such bidding to Owner;

(k) Acquire on behalf of Owner any land or any interest therein;

(l) Acquire any capital assets of the Club Quarters or any interest therein;

(m) Consent to any condemnation or participate in any condemnation proceeding relating to the Club Quarters, or any portion thereof;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(n) Sell, transfer or otherwise dispose of all or any portion of the Premises or the Club Quarters except for dispositions of FF&E to the extent expressly permitted herein, expressly provided for in the Owner approved Annual Operating Plan or except for sales of replaced FF&E in the ordinary course of the business of the Club Quarters;

(o) Perform any alterations to the Premises or any portion thereof except to the extent Manager's performance of any such alteration shall be expressly provided for in the Owner approved Annual Operating Plan or as otherwise permitted herein;

(p) Make any capital expenditure unless expressly provided in either the Owner approved Routine Capital Expenditure Budget or the Major Capital Expenditure Budget or as otherwise permitted herein; and

(q) Take any other action which, under the terms of this Agreement, is prohibited or requires the Approval of Owner.

(3) The specific amounts set forth in this Article 2, Section B, are subject to adjustment for inflation as of the beginning of each Fiscal Year by the percentage increase during the preceding Fiscal Year in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published

C. **<u>Employees</u>**: The Club Quarters manager and all other personnel at the Club Quarters shall be employees of Manager or its Affiliates. Manager shall identify, appoint, assign, instruct and supervise all personnel necessary or advisable for the operation of the Club Quarters. The cost of all salaries, welfare and benefit plans and payroll processing costs shall be operating expenses of the Club Quarters. Manager may, in its discretion reasonably exercised, cause employees at the Club Quarters to provide services to Other Club Quarters, or cause employees at Other Club Quarters to provide services to the Club Quarters; in either such event, the costs for employees at one Club Quarters providing services to Other Club Quarters shall be shared on the basis of the cost to the provider of such services. If Owner is dissatisfied with the performance of any employees at the Club Quarters, Owner shall have the right to communicate such dissatisfaction to Manager in a written statement setting forth in detail the specific reasons for Owner's dissatisfaction, whereupon Manager shall consider such statement from Owner in good faith and apprise Owner of the action that Manager has agreed to take in response to such statement from Owner, it being understood that final disposition of such matters shall be made at Manager's sole discretion reasonably exercised except in the case where Owner reasonably believes an employee has been negligent, committed fraud or misappropriated funds, in which case Owner, in its sole discretion, may instruct Manager to bar such employee from the Club Quarters and any assets of Owner and to take all reasonable action to ensure that such person no longer has any authority to take any action on behalf of Owner with respect to any funds of Owner or any accounts pledged to any lender of Owner . Notwithstanding any other provisions of this Agreement to the contrary, Manager shall not be responsible for any misappropriation of funds or property of Owner by, or other willful misconduct or negligence of, employees of


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Manager or its Affiliates on-site at the Club Quarters or employees of Manager or its Affiliates who are involved in providing Shared Services to the Club Quarters and Other Club Quarters, except for the following senior management employees who are currently engaged in providing such Shared Services, and their successors:

Ralph Bahna President Masterworks Development
Jon Horowitz Vice President Masterworks Development
Allen Stevens Vice President Masterworks Development
Martin Lawrence President Club Quarters Management Company LLC
Charles Parr Chief Financial Officer
Michael Smith Vice President Hotel Operations
George Ramirez Vice President Marketing
Elizabeth Rannie Chief Accountant

Notwithstanding the foregoing provisions of this Section C or any other provisions of this Agreement to the contrary, Manager shall be responsible to Owner for acts of its senior management employees who are not based at the Club Quarters to the extent that such employees have conspired to commit acts that constitute fraud or misappropriation of funds or property of Owner and shall reimburse Owner for losses arising out of such fraud or misappropriation.

D. <u>Name</u>: During the Term of this Agreement, the Club Quarters shall be known as "Club Quarters" with such additional identification as may be necessary to provide local area identification. The rights to use the name "Club Quarters" and related trademarks and trade names have been obtained by Owner pursuant to and in accordance with the License and Royalty Agreement.

E. <u>Operation at Owner's Expense</u>: In performing its duties hereunder, Manager shall act solely for the account of Owner and, except as expressly set forth herein, all expenses incurred by Manager in accordance with this Agreement in connection with such performance shall be borne exclusively by Owner. Manager shall in no event be required to advance any of its own funds for the operation of the Club Quarters, nor to incur any liability in connection therewith unless Owner shall have furnished Manager with funds necessary for the discharge thereof. To the extent that adequate funds are not available from the Operating Account for the payments to be made pursuant to Article 5, Section F, Owner shall provide to the Club Quarters working capital as determined under Article 5, Section F. If and to the extent that Manager shall have advanced funds that Owner would otherwise be required to pay under this Agreement ("Manager Advances") to the Club Quarters (it being expressly understood that Manager shall have no obligation to do so), Manager Advances shall be repaid promptly by Owner upon demand by Manager without interest. Manager shall give Owner not less than three (3) days prior written notice of any Manager Advance. Any disputes between Manager and Owner concerning the need and amount required for working capital and other funds necessary for the operation of the Club


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Quarters may be submitted to an Expert for determination in accordance with Article 12, Section T. If Owner shall have disputed the need for funds that have been provided by Manager as Manager Advances, then such Manager Advances shall be repaid (without interest) by Owner only if, and promptly upon the rendering of a decision by the Expert that such Manager Advances were necessary. Owner shall also reimburse Manager (for which Manager shall be permitted to make payment from the Operating Account) for the cost to Manager for visits to the Club Quarters from personnel of Manager where the presence of such persons is reasonably necessary for the operation of the Club Quarters.

F. <u>**Manager's Employees as Guests of the Club Quarters**</u>: Employees, officers and other representatives and consultants of Manager and its Affiliates who are providing services to the Club Quarters under this Agreement or any of the Related Agreements shall be afforded reasonable accommodations, laundry, valet and other such services by and at the Club Quarters without charge to such persons or Manager when working on matters pertaining directly to the operation of the Club Quarters. In addition, employees of Manager and its Affiliates shall have the right to stay at the Club Quarters on personal travel on weekends and at other times when such accommodation does not impair potential bookings of any paying guests, in accordance with the applicable benefit plan of Manager or its Affiliates, as the same may be modified from time to time with the Approval of Owner.

## Article 3 - Term; Extension; Termination

A. <u>**Term**</u>: The term of this Agreement (the "Term") shall commence as of the Commencement Date and continue for a period of twenty five (25) full Fiscal Years thereafter (the "Initial Term"), and shall continue thereafter until terminated as provided below.

B. <u>**Extension**</u>: Manager shall have the right to elect, by delivery of written notice ("Extension Notice") to Owner at least 180 days prior to the expiration of the Initial Term, to extend the Term of this Agreement for one additional period of ten (10) years (the "Extended Term"). The Initial Term and the Extended Term, if any, are hereinafter referred to as the "Term". In the event that Manager timely exercises its right to extend the Term pursuant to the preceding sentence, Owner may elect, in its sole discretion, to nullify Manager's election and to cause this Agreement to terminate upon the expiration of the Initial Term, by giving written notice to Manager within thirty (30) days following Owner's receipt of the Extension Notice, in which event Owner shall pay to Manager the applicable Termination Fee as a condition to termination of this Agreement as of the end of the Initial Term or the Extended Term, as the case may be without deduction or offset of any kind. The Termination Fee upon the expiration of the Initial Term shall be 5.0 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation as provided in Schedule A, and upon expiration of the Extended Term shall be an amount equal to the Management Fee paid for the last Fiscal Year of the Extended Term.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

C. **Termination**: This Agreement may be terminated prior to expiration of the Term as follows:

(1) Upon any Event of Default (as such term is defined in Article 9 hereof), at the option of the non-defaulting party exercised by written notice to the defaulting party given within sixty (60) days thereof;

(2) Upon either party's application for or consent to appointment of a receiver, trustee or liquidator of all or a substantial part of its assets, filing of a voluntary petition in bankruptcy, or admission in writing of its inability to pay debts as they come due, the making of a general assignment for the benefit of creditors, filing of a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency proceeding, or if any order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating either party a bankrupt or insolvent or approving a petition seeking reorganization of either party or appointing a receiver, trustee or liquidator of either party or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days, at the option of the non-defaulting party;

(3) At either Manager's or Owner's election, as permitted in Article 6, Section E;

(4) At either Manager's or Owner's election, upon the termination of any of the Related Club Quarters Agreements in accordance with the terms thereof by written notice to the other party given within sixty (60) days of the date of any such termination;

(5) After the first five (5) years from the Commencement Date, at Owner's election if Owner has converted the Club Quarters to a non-hotel use, provided that upon the closure of the Club Quarters for the purpose of carrying out the work for such conversion, Owner shall pay to Manager the amounts due pursuant to Section E of this Article 3; provided, however, that as a condition to the exercise of such right of termination, Owner shall have provided Manager with notice of its intention to convert the Club Quarters to a non-hotel use that shall be given not less than one hundred eighty (180) days prior to the commencement of any alterations, additions or improvements to the Club Quarters that are necessary to accomplish any such conversion and that may have an adverse effect upon the operation of the Club Quarters. Any such termination shall be effective no earlier than the expiration of such one hundred and eighty (180) day period and such notice shall be of no force or effect if at any time within three (3) years after the date such notice is given the Club Quarters continues or resumes operation as a hotel or other facility for transient guests. (For the avoidance of doubt, Owner shall not have the right to convert the Club Quarters to any other use during the first five (5) years from the Commencement Date);

(6) Pursuant to the termination provisions of Section D of this Article 3.

D. **Performance Termination**: Owner shall have the right to terminate this Agreement if:


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(1) For any three (3) of five (5) consecutive Fiscal Years, the Net Operating Income After Incentive Fee of the Club Quarters as set forth in the annual accounting prepared by Manager showing the results of the operation of the Club Quarters for each of such three (3) Fiscal Years is less than eighty percent (80%) of the Net Operating Income After Incentive Fee set forth in the Approved Annual Operating Plan for each of such three (3) Fiscal Years; and

(2) Such results of operation in any of such three (3) Fiscal Years is the result of Force Majeure, (in which case Manager shall be entitled to the Termination Payment as provided in Schedule A, Item 7) or such results of operation in any of such three (3) Fiscal Years is not the result of Force Majeure, (in which case Manager shall be entitled to the Termination Payment as provided in Schedule A, Item 7). Manager shall bear the burden of proof in the event that it asserts that any failure to meet the performance standards set forth in subparagraph (1) is due to Force Majeure.

Owner may exercise its rights of termination under this Section D by giving written notice to Manager within ninety (90) days after Owner's receipt from Manager of an annual accounting that shows that the criteria set forth in subparagraph (1) above have been satisfied. Such notice shall set forth a date of termination that is not less than sixty (60) not more than ninety (90) days from the date such notice is given. Within thirty (30) days after Manager's receipt by Owner of any such notice of termination, Manager may contest such action by Owner on the basis of subparagraph (2), during which contest the notice of termination shall be suspended, or Manager may elect to cause the Net Operating Income After Incentive Fee in the last of such three (3) Fiscal Years to be at least eighty percent (80%) of the Net Operating Income After Incentive Fee set forth in the Approved Annual Operating Plan for such Fiscal Year by making a cash payment to Owner equal to the amount by which such Net Operating Income After Incentive Fee is less than eighty percent (80%) of the Net Operating Income After Incentive Fee in the Approved Annual Operating Plan for such Fiscal Year (the "Cure Payment"). If Manager makes the Cure Payment, then (i) the operating results of the last of the three (3) Fiscal Years referred to in subparagraph (1) above shall be disregarded for purposes of this Section D and the notice of termination from Owner shall be deemed revoked, and (ii) any prior Fiscal Years for which actual Net Operating Income After Incentive Fee was less than eighty percent (80%) of the Net Operating Income After Incentive Fee in the Approved Annual Operating Plan for such Fiscal Year shall continue to count toward the calculation of the performance test set forth in subparagraph (1) above to the extent that they are within any applicable period of five (5) Fiscal Years. Manager may exercise the right to make a Cure Payment only one (1) time during the Initial Term and only one (1) time during the Extension Term. If Owner and Manager disagree as to whether or not Owner has the right to terminate this Agreement pursuant to this Section and such disagreement is not resolved within thirty (30) days after either party notifies the other of its disagreement, then the matter shall be resolved by arbitration as provided herein. Failure of the Club Quarters to meet the standards set forth above as a result of which Owner shall have the right to terminate this Agreement, and Manager's election not to make a Cure Payment, shall not (i.e., by itself absent a breach of Manager's obligations under this Agreement) constitute a default


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

or breach by Manager of its obligations under this Agreement and termination as provided herein shall be Owner's sole and exclusive remedy in such event.

E. **Payments Upon Termination**:

(1) In the event this Agreement is terminated due to the occurrence of any of the events listed in the following provisions of this Article 3: (i) Section C(1) by Manager where Owner is the party in default, (ii) Section C(2) by Manager where Owner is the party who has taken the actions described therein or against whom such actions have been taken, (iii) Section C(3); (iv) Section C(4) where termination by Manager of any Related Club Quarters Agreement is the result of Owner's breach, (v) termination by Owner in the case of Section C (5), or (vi) Section C (6), then, in addition to such remedies as may be available to Manager at law or equity, Owner shall pay to Manager the sum of: (a) the Termination Fee, plus (b) any and all amounts owed to Manager under this Agreement up to the date of termination.

(2) In the event that this Agreement is terminated by Owner following the occurrence of an Event of Default attributable to Manager under Section 9(A), no Termination Fee shall be payable by Owner in connection with such termination, but Owner shall pay to Manager any and all amounts owed to Manager under this Agreement up to the date of termination.

(3) On or before the effective date of any termination of this Agreement, Owner shall pay the amounts described in Section 3B above or paragraphs (1) or (2) above, as applicable, provided that, in the event of any good faith dispute between Owner and Manager as to the amount of any Termination Fee or other amounts due to Manager, Owner and Manager shall submit such dispute to the Expert for the sole purpose of determining if the basis for Owner's disputing the amount claimed by Manager as due is reasonable (but without determining the underlying dispute); if the determination by the Expert is that the basis for Owner's disputing the amount that Manager claims is due is unreasonable, then (a) Owner shall either (x) pay all amounts claimed by Manager to an escrow agent or, at Owner' option, (y) deliver to such escrow agent an irrevocable Letter of Credit for all amounts claimed by Manager in favor of Manager drawn on a United States bank reasonably acceptable to Manager (such amounts or Letter of Credit to be retained by such escrow agent pending resolution of any such dispute, and then to be paid or delivered to the party entitled thereto when such dispute is resolved) mutually acceptable to the parties, or, if the parties cannot agree on the identity of the escrow agent within ten (10) days after either party proposes that an escrow agent be appointed, then the escrow agent shall be chosen by the Expert, and (b) provided that Owner has made such payment in full or delivered such Letter of Credit to an escrow agent as contemplated in clause (a), such dispute shall not impair or delay any right of termination by Owner or Manager under this Agreement, and termination shall occur as provided in this Agreement, and Owner and Manager shall resolve the dispute regarding amounts due as provided in this Agreement or under applicable law. If the determination by the Expert referred to above is that the basis for Owner's disputing the amount that Manager claims is due is reasonable, then the amount paid to the escrow agent under subsection (a)(x) above, or the amount of the Letter of Credit provided under subsection (a)(y)


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

above, shall be fifty percent (50%) of the amount claimed by Manager as due, and all other terms of this Section (3) shall apply.

F. **Transition Procedures**: Upon the expiration or termination of the Term, for whatever reason, Owner and Manager shall cooperate to accomplish an orderly cessation of the services of

Manager that are provided under this Agreement and Owner shall immediately cease use of the name "Club Quarters" and all proprietary information (including, without limitation, lists of Members), policies, systems, procedures, protocol and know-how related thereto and shall not engage, directly or indirectly, in the ownership or operation of any private membership hotel or similar enterprise. On or before the effective date of any termination of this Agreement, Manager shall assign and transfer to Owner without compensation:

(a) all of the books and records respecting the Hotel and all contracts, leases, and other documents respecting the Premises and the Club Quarters (other than Manager's proprietary information) and which are in the custody or control of Manager, and

(b) all of Manager's right, title, and interest in and to all liquor, restaurant, and other licenses and permits, if any, used by Manager in the operation of the Premises. Manager recognizes that all licenses held and used by it solely for the operation of the Premises are held for the benefit of Owner and Manager has no ownership therein, except in order to fulfill its obligations hereunder. If Manager or any Affiliate of Manager is the holder of any liquor license for the Premises and upon the request of Owner, Manager (or such Affiliate) shall enter into a temporary lease, license or such other agreement as may be permitted under applicable law, to permit the continuous and uninterrupted sale of alcohol beverages at the Premises consistent with prior operations. In such event, Manager (or its Affiliate, if applicable) shall not be entitled to compensation in connection with such arrangement, but shall not incur any cost or liability in connection therewith and shall be indemnified by Owner and, if applicable, the successor owner of the Premises, and named as an additional insured on any "dramshop" or other liability insurance pertaining to the sale of alcoholic beverages at the Premises.

Owner acknowledges that upon the termination of this Agreement Owner shall have no right to use of and shall immediately cease using the name "Club Quarters" and any related trademarks, trade names or logo or any of the proprietary information, promotional materials or processes used in connection therewith.

## Article 4 – Fees

A. **Fees**. As consideration for Manager's services provided hereunder, Manager shall retain from the Operating Account, or if there are insufficient funds in the Operating Account, Owner shall pay to Manager promptly but not later than ten (10) days after demand from Manager, the fees determined in accordance with Paragraph B below.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

B. **Fee Structure and Payment**. The fees to be paid as provided in Section A above are as follows:

(1) the greater of: (a) the Minimum Fee, and (b) two and three-quarters percent (2.75%) of all Gross Revenue (the "Management Revenue Fee"),

PLUS

(2) six percent (6.0%) of Net Operating Income (the "Management Incentive Fee"),

calculated on a Fiscal Year basis. The Management Revenue Fee shall be payable quarterly on or prior to the fifteenth (15) day of each April, July and October for the respective quarter, based upon actual Gross Revenue for the Fiscal Year to date, taking into account previous quarterly payments made in such Fiscal Year. Seventy-five percent (75%) of the estimated Management Incentive Fee shall be payable quarterly on or prior to the fifteenth (15) day of each April, July and October for the respective quarter, based upon actual Net Operating Income for the Fiscal Year to date, taking into account previous quarterly payments made in such Fiscal Year. Within thirty (30) days after delivery to Owner of the accounting referred to in Article 5, Section C, below, Manager and Owner shall confer to determine what what fees are required to be paid for the immediately preceding Fiscal Year, and what adjustments, if any, are required to the fees paid pursuant to this Section, as a result of calculating such fees on an annual basis for the Fiscal Year to which such fees relate, and appropriate payment shall be made by Manager to Owner or by Owner to Manager, as the case may be, within fifteen (15) days after such determination. Any disagreement concerning such determination shall be resolved by arbitration as provided herein.

C. **Fee Standaside**.

(1) If and to the extent in any Fiscal Year, the Net Operating Income After Incentive Fee for such Fiscal Year as reported by Manager in the annual accounting is less than eighty five percent (85%) of the Net Operating Income After Incentive Fee for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, and such results of operation are not the result, in whole or in part, of circumstances that constitute Force Majeure, then one hundred percent (100%) of the Management Incentive Fee that is due to Manager for such Fiscal Year pursuant to Section B above shall not be earned or paid, except as provided in Section (2) below.

(2) If and to the extent in any Fiscal Year, the Net Operating Income After Incentive Fee for such Fiscal Year as reported by Manager in the annual accounting is less than seventy five percent (75%) of the Net Operating Income After Incentive Fee for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, and such results of operation are not the result, in whole or in part, of circumstances that constitute Force Majeure, then the Management Revenue Fee for such Fiscal Year shall be reduced from two and three quarters percent (2.75%) to two percent (2.00%) of all Gross Revenue, and the resulting reduction of three-quarters of one percent of Gross Revenues (the "Deferred Management Revenue Fee") to


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

the Management Revenue Fee that would otherwise be due to Manager for such Fiscal Year pursuant to Section B above shall not be paid; provided, however, that if Manager, within thirty (30) days after delivery to Owner of the annual unaudited accounting for the Fiscal Year to which the Deferred Management Revenue Fee relates has made a payment to Owner sufficient to cause the Net Operating Income After Incentive Fee for such Fiscal Year to be at least eighty five (85%) of the Net Operating Income After Incentive Fee for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year, the Deferred Management Revenue Fee for such Fiscal Year and the Management Incentive Fee for such Fiscal Year shall be due and payable in full upon such payment by Manager. If Manager does not elect to make the payment referred to in the preceding sentence, then the Deferred Management Revenue Fee shall be due and paid in subsequent Fiscal Years within thirty (30) days after delivery to Owner of the annual unaudited accounting for each such Fiscal Year to the extent that Net Operating Income After Incentive Fee exceeds eighty five percent (85%) of the Net Operating Income After Incentive Fee for such Fiscal Year as set forth in the Approved Annual Operating Plan for such Fiscal Year and is available after payment of the Management Incentive Fee for such Fiscal Year.

(3) Any disagreement concerning fee stand asides pursuant to this Section shall be resolved by arbitration as provided herein.

(4) In the event of any termination of this Agreement, any outstanding Deferred Management Revenue Fee that is due and payable for any Fiscal Years, including, without limitation, the Fiscal Year or portion thereof in which such termination occurs, shall be paid as a condition precedent to any such termination.

**Article 5 - Club Quarters Budgetary and Accounting Process**

A. **Annual Operating Plan**: Not later than November 1 (or such other date as may be mutually agreed) of each Fiscal Year during the Term, Manager shall submit to Owner for Owner's Approval a proposed annual operating plan (the "Annual Operating Plan") for the next Fiscal Year. The Annual Operating Plan shall be prepared by Manager with due regard for economic or operating conditions that may have an adverse impact on the travel and hospitality industry, including, without limitation, oversupply of hotel inventory in the markets served by the Club Quarters. If Owner does not Approve any item in the proposed Annual Operating Plan, the proposed Annual Operating Plan nevertheless shall be effective upon the commencement of the Fiscal Year to which it relates, except that disputed items shall be resolved by arbitration as provided herein, pending the outcome of which, the items as set forth in the most recent Approved Annual Operating Plan shall be applied for the Fiscal Year to which the proposed Annual Operating Plan relates, adjusted for the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published. The Annual Operating Plan shall contain the following:


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(1) (a) reasonable estimate of Gross Revenues and Net Operating Expenses for the forthcoming Fiscal Year, subject to and containing reasonable contingency amounts. These shall be itemized in detailed departmental and sub-departmental schedules and also presented in summary form. Assumptions shall be presented in narrative form, detailing the basis of such schedules; (b) a separate estimate of the fees to Manager to be paid for the forthcoming Fiscal Year, and (c) cash flow schedules; Manager shall establish proposed Net Operating Expenses based upon then current Club Quarters Standards; increases in any items of controllable Net Operating Expenses that exceed the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published, shall require Owner's Approval; reductions in room rates set forth in a proposed Annual Operating Plan from room rates in the immediate prior Fiscal Year shall require Owner's Approval;

(2) a budget (the "Annual Occupancy Budget") of anticipated occupancy levels for the forthcoming Fiscal Year based upon the prior Fiscal Year's occupancy levels and anticipated market conditions for the forthcoming Fiscal Year;

(3) a budget (the "Routine Capital Expenditures Budget") setting forth the proposed expenditures from the Reserve of amounts anticipated to be spent for Routine Capital Expenditures for the forthcoming Fiscal Year with a projection of such expenditures for each of the four subsequent Fiscal Years, including, without limitation, the Club Quarter's requirements for replacement of Furniture, Fixtures and Equipment, as may be necessary to comply with the Club Quarters Standards;

(4) a budget (the "Major Capital Expenditures Budget") setting forth the proposed Major Capital Expenditures required for the forthcoming Fiscal Year with a projection of such expenditures for each of the four subsequent Fiscal Years and a reasonable reserve for such expenditures;

B. **Books and Records**: Manager shall maintain full and adequate books of account and other records reflecting the results of operation of the Club Quarters on an accrual basis, all in accordance with generally accepted accounting principles. Manager shall not be required to maintain such books for account at the Club Quarters but shall make the books of account available to owner upon Owner's reasonable request.

C. **Accounting**. Manager shall deliver to Owner within approximately twenty (20) days after the end of each (a) calendar month, monthly estimated statements of operation of the Club Quarters, and (b) calendar quarter, an interim accounting showing the results of the operation of the Club Quarters for such quarter, in each case reports shall for the Fiscal Year to date and include, without limitation, a computation of Gross Revenues and Gross Operating Expenses and a bank reconciliation of any accounts pledged for the benefit of any lender of Owner. Such interim accounting and the annual accounting referred to below shall: (i) be in a form substantially as set forth as Exhibit C hereto, or as otherwise Approved by Owner; (ii) be taken


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

from the books and records maintained by Manager for the Club Quarters in the manner herein above specified; (iii) follow a general form used by Manager for Other Club Quarters, allowing for deviations which are necessary in order to comply with this Agreement; and (iv) separately state the amount of fees and any other amounts payable or expenses reimbursable to Manager or its Affiliates. Manager shall use reasonable efforts to deliver to Owner within sixty (60) days after the end of each Fiscal Year an unaudited accounting for the prior Fiscal Year. If within thirty (30) days after receipt of such annual accounting, Owner requests that such annual accounting be reviewed and certified, Manager shall cause such annual accounting to be audited and certified at Owner's expense (but not as a Net Operating Expense of the Club Quarters) by a firm of certified public accountants having hotel accounting experience selected by Manager after Approval by Owner.

D. **Operating Account**. Manager shall establish in Owner's name a separate bank account in a bank selected by Manager and Approved by Owner and any lender of Owner for the day-to-day operation of the Club Quarters (the "Operating Account"). The Operating Account shall be under the control of Manager as agent for Owner except to the extent that the Operating Account is subject to a "springing lock-box" or other cash management arrangement, which activates according to the default provisions of the Approved Financing, and so long as such arrangement does not change the priority of application of cash flow from the provisions set forth in clauses (a) through (f) of Article 5(F) below. Manager and Owner shall be entitled to designate the persons (who may be employees of Manager or the Club Quarters) who are authorized signatories for the making of deposits and withdrawals from the Operating Account in accordance with this Agreement.

E. **Reserve Account and Reserve**.

(1) Manager shall establish in Owner's name a separate bank account in a bank selected by Manager and Approved by Owner and any lender for the deposit of the "Reserve" as hereinafter defined (the "Reserve Account"). The Reserve shall be the exclusive property of Owner and maintained by Manager, and checks or other documents of withdrawal therefrom shall be signed jointly by a representative of Manager and representative of Owner; contributions to the Reserve shall be included in Net Operating Expenses. The Reserve shall be available to meet the needs of the Club Quarters for anticipated Routine Capital Expenditures and emergency repairs. On or before the twentieth (20th) day of each month for the preceding month, Manager shall deposit into the Reserve Account as a reserve (the "Reserve") an amount initially agreed to be three percent (3%) of the Gross Revenue for the preceding calendar month. The amount of the Reserve may be increased by Manager with Owner's Approval in connection with the Approval of the Annual Operating Plan if Manager determines based upon Manager's experience at the Club Quarters that the percentage amount of the Reserve must be changed to meet the needs of the Club Quarters for anticipated Routine Capital Expenditures and emergency repairs. The proceeds from the sale of Furniture, Fixtures and Equipment no longer needed for the operation of the Club Quarters and any interest earned on the Reserve also shall be deposited as part of the Reserve. At the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year and shall be in addition to the amount to be deposited


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

as part of the Reserve in the next Fiscal Year. The Reserve Account may be pledged as collateral to any lender, and any lender shall have reasonable approval rights over disbursements from such reserve, to the extent Owner may agree to such rights as part of any Approved Financing; provided that, any rights of a lender with respect to the Reserve Account shall not modify the rights or obligations or Owner and Manager with respect to such account as set forth in this Agreement.

(2) If the percentage contributions for the Reserve provided for above are in Manager's judgment reasonably exercised insufficient to maintain the Club Quarters to the Club Quarters Standards, such that the cost of Routine Capital Expenditures and other expenses of the Club Quarters reasonably anticipated by Manager to be made or incurred during the forthcoming Fiscal Year as set forth in the approved Annual Operating Plan exceeds the funds expected to be available when needed in the Reserve, and if Owner within thirty (30) days of Manager's request does not agree to provide the additional required funds, Manager shall either accept Owner's position or refer the matter to arbitration as provided herein for a determination as to whether or not the additional funds for the Reserve requested by Manager are necessary to maintain the Club Quarters to the Club Quarters Standards for the Fiscal Year in discussion and the next four (4) Fiscal Years.

F. **Disbursements and Distributions; Subordinated Management Revenue Fees**. As of the end of each calendar month, Manager shall disburse from (or retain in, if the applicable funding obligation is not payable at the end of such month) the Operating Account funds held therein in the following priority: (a) to pay all Net Operating Expenses (other than Management Fees) incurred in accordance with this Agreement, (b) to pay fifty-eight and nine-tenths percent (58.9%) of the Management Revenue Fee, (c) to fund all required reserves, (d) to pay forty-one and one tenth percent (41.1%) of the Management Revenue Fee, (e) to pay the Management Incentive Fee, (f) to maintain available working capital of $100,000 or such other amount as Owner and Manager may from time to time mutually agree, which amounts shall be adequate to pay all obligations of Owner under this Agreement, and shall be retained in the Operating Account; and (g) finally, the balance of all funds remaining in the Operating Account shall be distributed to Owner; provided, however, that (i) since the Management Revenue Fee and the Management Incentive Fee are payable quarterly rather than monthly, at the end of those months where the Management Fees are not payable, the amounts described in (b), (d) and (e) shall be retained in the Operating Account and not distributed until the end of the applicable quarter as applicable (subject to distribution of such amounts to cover items of higher priority under clauses (a) through (g) above, and (ii) the Management Incentive Fee for any such calendar quarter that shall have been earned shall not be paid (A) in the case of the present Owner, to the extent that the balance of the funds paid to Owner, on an annual basis, as provided herein, are less than the lesser of (1) the principal and interest required to be paid under the Approved Financing or (2) seven percent (7%) of the Owner's Capital, on an annual basis, increased by the amount of the Major Capital Expenditures made at Owner's expense in excess of amounts funded from the Reserve, and (B) in the case of any subsequent Owner, to the extent that the balance of the funds paid to Owner, on an annual basis, as provided herein, are less than the lesser of (1) the principal and interest required to be paid under the Approved Financing or (2) seven percent (7%) of the


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

capitalized value on an annual basis, applying a capitalization rate of seven percent (7%) of the Net Operating Income After Incentive Fee for the Club Quarters for the one (1) full Fiscal Year immediately preceding the acquisition of the Club Quarters by such subsequent Owner (the amount of the Management Incentive not paid by operation of this Section F is hereinafter referred to as the "Subordinated Management Incentive Fee"). All Subordinated Management Incentive Fees shall be paid to Manager (a) by deduction from distributions to Owner from the Operating Account to the extent that such distributions on an annual basis exceed (x) in the case of the present Owner, seven percent (7%) of the Owner's Capital on an annual basis, increased by the amount of the Major Capital Expenditures made at Owner's expense in excess of amounts funded from the Reserve, and (y) in the case of a subsequent Owner, seven percent (7%) of the capitalized value on an annual basis, applying a capitalization rate of seven percent (7%) of the Net Operating Income After Incentive Fee for the Club Quarters for the one (1) full Fiscal Year immediately preceding the acquisition of the Club Quarters by such subsequent Owner, and (b) upon any termination of this Agreement.

## Article 6 – Ownership of the Club Quarters; Financing; Routine Maintenance and Major Capital Expenditures

A. <u>Ownership</u>. Owner covenants throughout the Term that (i) Owner (or any entity which directly or indirectly owns Owner) shall own the Club Quarters free and clear, except for Approved Financing or as otherwise permitted hereunder, and (ii) Owner shall not own any other assets, including without limitation, real and personal property, except its interest in the Club Quarters and all property used in connection therewith; (iii) the formation documents and operating/shareholders/partnership agreements of Owner shall contain the provisions set forth on Exhibit D. Notwithstanding the foregoing, with respect to any Owner subsequent to the original Owner, an Owner shall not be required to hold its ownership interest in the Club Quarters in conformity to Exhibit D if it can demonstrate to Manager's reasonable satisfaction that, due to the then current net worth of such Owner or other facts, the likelihood of a bankruptcy of such Owner is minimal.

B. <u>Financing of Club Quarters</u>. Owner (or any entity which directly or indirectly owns Owner) shall be permitted to finance the Club Quarters and, in connection therewith, to encumber the Club Quarters and all other assets of Owner used in connection therewith, whether by mortgage, deed of trust or other instrument (collectively, a "Permitted Lien"), including without limitation, the granting of a pledge or assignment of ownership interests in any entity which directly or indirectly owns Owner only to the extent that such financing complies with the provisions hereof (each such financing being referred to herein as an "Approved Financing"). With respect to the first financing of the Club Quarters only (which has heretofore been approved by Manager), such financing shall not be refinanced increased, or modified for a period of twenty-four (24) months from the date hereof unless the "loan-to-value" ratio (as established as set forth below in respect of refinancings) is no higher than seventy five percent (75%), and the


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

holder of the Permitted Lien in respect of such financing has executed a Subordination and Non-Disturbance Agreement substantially in the form attached hereto as Exhibit E. Any subsequent financing or refinancing of the Club Quarters shall be subject to the following requirements, (i) Owner's providing to Manager at least thirty (30) days in advance of the closing of any such financing or refinancing such information, certified by an officer of Owner as to being true and complete copies of all matters delivered to delivered by Owner to Manager, that Manager may reasonably request to confirm that the "loan-to-value" ratio shall be no higher than eighty percent (80%); for purposes of determining the "value" of the Club Quarters in the application of the foregoing "loan-to-value" ratio test, such value shall be determined within ninety (90) days prior to the closing of the proposed financing by a nationally recognized real estate appraiser, licensed in the jurisdiction in which the Club Quarters is located, and selected by agreement of the parties, or, if the parties fail to come to such agreement within thirty (30) days after any one of the parties has nominated an appraiser, then the selection shall be left to the Expert, and (ii) the holder of the Permitted Lien in respect of the any subsequent financing or refinancing shall execute a Subordination and Non-Disturbance Agreement with Manager that in form and substance is customary for financings similar to such subsequent financing at the time such subsequent financing is closed. Without limiting the foregoing, a Subordination and Non-Disturbance Agreement shall be deemed to be "customary" in accordance with the immediately preceding sentence if it is acceptable to at least two domestic institutional lenders, which lenders shall have issued at least Five Hundred Million Dollars ($500,000,000) in loans on hotel transactions in the aggregate. The proposed Subordination and Non-Disturbance Agreement in respect of any financing or refinancing of the Club Quarters shall be submitted to Manager not less than thirty (30) days prior to the proposed closing date of such financing or refinancing. Within ten (10) days after receipt of the proposed Subordination and Non-Disturbance Agreement, Manager and Owner shall confer in good faith in an effort to agree to the form of Subordination and Non-Disturbance Agreement to be submitted to the proposed lender in connection with such financing or refinancing. If Manager and Owner are unable to agree upon a form of such Subordination and Non-Disturbance Agreement after a period of ten (10 days from the commencement of their discussion of the form of Subordination and Non-Disturbance Agreement, either Owner or Manager shall have the right to require that the matter of the form of the Subordination and Non-Disturbance Agreement to be submitted to the proposed lender be determined by the Expert, which form of Subordination and Non-Disturbance Agreement shall be customary for financings similar to such subsequent financing or refinancing. With respect to any financing of the Club Quarters and any subsequent syndication or securitization by any lender of such financing, Manager shall reasonably cooperate with the lender and Owner to expeditiously effect such financing or subsequent syndication or securitization

C. **Routine Maintenance**. Manager shall maintain the Club Quarters in good repair and condition and in conformity with applicable laws and regulations, subject to the provision of funds therefor in the Approved Annual Operating Plan. In so doing, Manager shall make or cause to be made, as it deems necessary such routine repairs, routine maintenance, and minor alterations for which the cost can be expensed under generally accepted accounting principals in the United States. The costs of such repairs, maintenance, and alterations shall be included in Net Operating Expenses.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

D. **Major Capital Expenditures**. At the same time the Annual Operating Plan is submitted to Owner pursuant to Article 5 hereof, Manager shall submit the Major Capital Expenditures Budget for the forthcoming Fiscal Year. Manager (unless Manager and Owner agree that Owner shall undertake such work), at Owner's expense, shall make all recommended Major Capital Expenditures that are (a) Approved by Owner, (b) necessary to comply with any Approved Financing or any applicable law, regulation or order, (c) necessary for the continued safe and orderly operation of the Club Quarters, or (d) necessary to maintain the Club Quarters in compliance with the Club Quarters Standards. All Major Capital Expenditures shall be made with as little hindrance to the operation of the Club Quarters as possible, and Owner and Manager shall use all reasonable efforts to prevent any liens from being filed against the Club Quarters which arise from any such work and, if any such liens are filed, Owner shall promptly obtain the release thereof. Where it has been agreed that Owner shall undertake such work, if Owner does not promptly begin and diligently pursue to completion any Major Capital Expenditures permitted under this Section D, Manager shall be authorized to undertake such Major Capital Expenditures on Owner's behalf after providing written notice to Owner. If Owner and Manager disagree as to whether any Major Capital Expenditures are necessary for any of the purposes described above in this Section D, Manager shall either accept Owner's position or refer the matter to arbitration as provided herein. Notwithstanding the foregoing, Manager may undertake Major Capital Expenditures on Owner's behalf that are not provided for in the Annual Operating Plan where, in Manager's judgment reasonably exercised, such expenditures are necessary to cause the Club Quarters to comply with Club Quarters Standards, subject to a maximum permitted expenditure of $50,000 (adjusted annually for changes in the CPI) in each instance, provided, however, that such permitted expenditures shall not exceed $100,000 (adjusted annually for changes in the CPI) in the aggregate in any Fiscal Year, or, without such monetary limitations, to the extent such expenditures are necessary in an emergency to protect the health and safety of persons or to prevent imminent damage to the Club Quarters.

E. **Damage, Destruction or Taking**. If all or portion of the Club Quarters shall be damaged or destroyed at any time during the Term by fire, casualty or any other cause, or taken by condemnation or taking by any governmental authority in the exercise of its power of eminent domain, and the cost of repairing, rebuilding or replacing does not exceed seventy-five percent (75%) of the replacement cost of the Club Quarters, Owner will, at its own cost and expense and with due diligence, repair, rebuild or replace the same so that after such repairing, rebuilding or replacing, the Club Quarters shall be substantially the same as prior to such damage, destruction or taking. Owner shall undertake such work within ninety (90) days after the proceeds of any insurance become available to Owner for such repairing, rebuilding or replacing, and shall complete the same diligently. If the Club Quarters is damaged or destroyed or a portion is taken by condemnation to such an extent that the cost of repairing, rebuilding or replacing exceeds seventy-five percent (75%) of the replacement cost of the Club Quarters, Owner shall have no obligation to repair, rebuild or replace the Club Quarters and either party may elect to terminate this Agreement by giving written notice to the other party given within sixty (60) days of the date of such damage or destruction or condemnation or other taking. As a condition precedent to such termination by Owner, Owner shall pay to Manager (a) the Termination Fee, plus (b) any and all amounts owed to Manager under this Agreement up to the date of termination. If the parties


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

cannot agree on whether the cost of repairing, rebuilding or replacing does not exceed seventy five percent (75%) of the replacement cost of the Club Quarters, the matter shall be referred to arbitration as provided herein. Owner and Manager shall request separate awards in the event of a condemnation or taking by any governmental authority in the exercise of its power of eminent domain. If separate awards are not available, the award to Owner, net of expenses incurred pursuant to alterations, repairs and replacement required hereby, shall be fairly and equitably apportioned between Owner and Manager, giving consideration to the remaining length of the Term, and Owner's share thereof shall be used exclusively for the restoration of the Club Quarters where Owner is required or has elected to restore the Club Quarters.

F. **Restaurant**. The current Club Quarters Standards provide that space at each Club Quarters will be leased for use as a restaurant and bar. It is anticipated that at all times during the Term, there shall be a restaurant and bar at the Club Quarters. The quality of the restaurant and bar therein shall be subject to Manager's reasonable satisfaction that the restaurant is consistent with the Club Quarters Standards. Owner shall not discontinue use of such space as a restaurant and bar or enter into any other arrangements for the use of such space without Manager's Approval.

## Article 7 – Insurance

A. **Property Insurance**. Owner shall procure and maintain throughout the Term at Owner's expense (and not as a Net Operating Expense) insurance insuring the full replacement value of the Club Quarters, its component parts, and all Furniture, Fixtures and Equipment, against damage from risks of all nature customarily insured against in the jurisdiction in which the Club Quarters is located. Owner shall carry such other or additional insurance in such amounts and against such risks as Owner and Manager reasonably deem necessary with respect to the buildings, facilities and contents of the Club Quarters.

B. **Business Insurance**. Owner and Manager shall procure at Owner's expense and maintain throughout the Term as a Net Operating Expense the following insurance throughout the Term:

(1) Owner shall obtain comprehensive general public liability insurance in amounts satisfactory to Owner, but in any event not less than a combined single limit of $100,000,000 for each occurrence, for personal injury and death and property damage, which shall, among other risks, include coverage against liability arising out of the ownership or, operation of motor vehicles, as well as coverage in such amount against all claims brought anywhere in the world arising out of alleged: (i) bodily injury; (ii) death; (iii) property damage; (iv) assault or battery; (v) false arrest, detention or imprisonment or malicious prosecution; (vi) libel, slander, defamation or violation of the right of privacy; (vii) wrongful entry or eviction; and (viii) liquor law or dram shop liability;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(2) Manager shall obtain worker's compensation insurance or insurance required by similar employee benefit acts as well as insurance having a minimum per occurrence limit as Owner may reasonably deem advisable against all claims which may be brought for personal injury or death of Club Quarters employees, but in no event less than amounts prescribed by law;

(3) Owner shall obtain business interruption insurance covering loss of income to both Owner and Manager for a minimum period of two (2) years resulting from interruption of business caused by the occurrence of any of the risks insured against under the property damage insurance referred to above; such income to Manager shall be based upon the amount of Fees and reimbursements to Manager that are set forth in the most recent Operating Budget prepared by Manager prior to Manager's having any knowledge of the occurrence for which the business interruption insurance proceeds are available;

(4) Manager shall obtain employment practices liability insurance covering employment related claims by employees and former employees; and

(5) Manager shall obtain fiduciary insurance coverage against claims by any participants in any benefit plans for employees that Manager or any of its Affiliates may maintain in connection with the employment of employees pursuant to this Agreement.

C. **Form of Policies**. All insurance required by above shall be in such form and with such companies as shall be reasonably satisfactory to Owner with advice from Manager with all efforts being made to obtain the lowest premium possible and in all events from an insurance company with a claims paying ability rating not lower than "A". Any insurance may be provided under umbrella or blanket policies of insurance covering additional properties managed by Manager. All insurance maintained pursuant to Article 7 shall be in the name of Owner and Manager, as appropriate, and shall contain a standard mortgagee clause in favor of the holder of a Permitted Lien and shall name such mortgagee as an additional insured or as a loss payee as appropriate so long as the Club Quarters is subject to a Permitted Lien.

D. **Insurance Proceeds**. Subject to the rights of any holder of a Permitted Lien, which shall not prohibit or diminish the availability and use of insurance proceeds for the purposes contemplated in this Section D, Owner and Manager agree that, if Owner shall elect to repair or restore the Club Quarters after an insurable casualty, all proceeds of property damage insurance required to be maintained by Owner under this Article 7 when and if collected by Owner shall be deposited in a trust account in a bank or trust company approved by the beneficiary of a Permitted Lien or, if there is no Permitted Lien, Approved by Manager and Owner, and such insurance proceeds shall be used to the extent necessary for the restoration or reconstruction of the Club Quarters and any other improvement or improvements on the Premises, together with replacing any Furniture, Fixtures and Equipment required in the operation of the Club Quarters, all such proceeds being pledged and dedicated by the parties for that purpose.

E. **Certificates**. Certificates of all policies shall be delivered to the party hereunder who is not required to purchase the insurance and thereafter certificates of renewal shall be so delivered not less than thirty (30) days prior to the expiration date of such policies. All such certificates


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days prior written notice to such other party.

F. **Owner's Right to Procure Insurance**. With the exception of worker's compensation insurance or insurance required by similar employee benefit acts, if Owner can demonstrate to Manager's reasonable satisfaction that Owner is able to procure any of the insurance required to be obtained pursuant to this Article 7, and the cost thereof as allocated to the Club Quarters compares favorably to the cost of insurance that would be procured by Manager, then Owner shall have the right to procure such insurance, in which event Manager shall be relieved of its obligation to do so.

## Article 8 - Taxes

A. **Property Taxes**. Owner shall pay or cause to be paid, prior to delinquency, all real estate taxes, all personal property taxes and all betterment assessments levied against the Club Quarters or any of its component parts.

B. **Other Taxes**. Manager shall be responsible for all income taxes imposed by any jurisdiction upon the receipt of the all fees hereunder. Owner shall be responsible for payment of value added, goods and services, sales and similar taxes, if any, levied on or deducted from any amounts payable to Manager or its Affiliates pursuant to this Agreement (but not any income taxes payable by Manager or any of its Affiliates to any jurisdiction). The amount of such value added, goods and services, sales or similar taxes shall be payable by Owner to Manager together with the payment to which it relates or as otherwise required by applicable law. To the extent that applicable law requires any such amounts to be paid by Owner directly to a governmental authority, Owner shall pay such amounts promptly and receipts or other proof of such payment shall be provided to Manager promptly upon request.

C. **Cooperation**. Upon request, Owner and Manager shall cooperate in good faith and exercise reasonable efforts to amend this Agreement for tax planning purposes, provided that such amendment does not materially and adversely affect the rights or reduce or increase the obligations of either Owner or Manager. The parties shall at their own expense fully cooperate and keep each other fully apprised in the event of a tax audit, examination, investigation or inquiry by any governmental body in connection with any payments made pursuant to this Agreement. Such cooperation shall include, but not be limited to, the retention and protection of all records required to document amounts charged or paid by each party under this Agreement and the prompt production of such records and supporting documentation on request by the other party. Each party shall promptly notify the other party of any such tax audit, examination, investigation or inquiry concerning the other party of which it may become aware.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

## Article 9 - Events of Default, Remedies

A. **Events of Default**. The following constitute Events of Default under this Agreement:

(1) The failure of either party to pay any sum of money to the other party when due and payable, if such failure is not cured within ten days (10) where the amount due is less than $1.0 Million, and thirty (30) days for all other amounts after written notice specifying such failure is received by the defaulting party from the non-defaulting party, it being expressly agreed that any cure may be made by payment of the amount claimed to the other party, or, if the paying party so elects, by making payment to an escrow agent (to be retained by such escrow agent pending resolution of any dispute concerning such payment) mutually acceptable to the parties, or, if the parties cannot agree on the identity of the escrow agent within ten (10) days after either party proposes that an escrow agent be appointed, then the escrow agent shall be chosen by the Expert; such payment shall be without prejudice to the right of the party curing such failure to contest subsequently whether or not it was obligated under this Agreement to make such cure and, if appropriate, to obtain a refund of all or part of any payment made in connection with such cure.

(2) The failure of either party to perform, keep or fulfill any of the other agreements, covenants, undertakings or obligations or the breach in any material respect of any warranty or representation, set forth in this Agreement or in any document executed in connection herewith, if such failure or breach has or could have a material adverse effect on the operation of the Club Quarters or the rights and duties of either party hereto, if such failure is not cured within thirty (30) days after written notice specifying such failure is received by the defaulting party from the non□defaulting party; provided, however, that if (i) the consequences of such failure can be reduced to or stated as a sum of money with reasonable certainty and such sum is acceptable to the non-defaulting party acting reasonably, then the defaulting party shall have the right to cure such default by making a payment as provided in (1) above within such thirty (30) day period, unless such failure has caused the Owner to be in default under Approved Financing and such payment by Manager does not cure such Owner's default where Owner's lender has not accepted such cure, and (ii) if such failure is incapable of cure within such period, and the defaulting party commences to cure such default during such period and thereafter prosecutes such cure to completion with all due diligence (but in no event later than 60 days following delivery of the original notice of default), then, in either event, no Event of Default shall exist.

(3) The filing by Owner or Manager of a voluntary petition in bankruptcy under Title 11 of the United States Code, or the issuing of any order for relief against Owner or Manager under Title 11 of the United States Code, or the filing by Owner or Manager of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors or owner's or Manager's seeking or consenting to or acquiescing in the appointment of any custodian, trustee, receiver, conservator or liquidator of Owner or of all or any substantial part of the Club Quarters or of any or all of the rents, issues, profits, revenues or royalties thereof, or the making by Owner or Manager of any general assignment for the benefit


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

of creditors, or Owner's or Manager's failure generally to pay its debts as such debts become due, or Owner's or Manager's giving of notice to any governmental body of insolvency or pending insolvency or suspension of operations, or the entry by a court of competent jurisdiction of an order, judgment or decree approving a petition filed against Owner or Manager seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive);

(4) Acts of senior management employees of Manager who are not based at the Club Quarters, to the extent that such employees have conspired to commit acts that constitute fraud or misappropriation of funds or property of Owner;

(5) An Event of Default attributable to a party, after expiration of any applicable cure periods, under any of the Related Club Quarters Agreements.

B. <u>**Remedies**</u>. If an Event of Default shall occur, in addition to the remedies available to each party at law and equity, the non-defaulting party shall have the right to immediately terminate this Agreement. In the event that Owner is the defaulting party under this Article and Manager has exercised its right to terminate, the Termination Fee and all other amounts (including, without limitation, unpaid fees owing under this Agreement), shall be payable by Owner upon such termination. In the event that Manager is the defaulting party under this Article, Owner shall pay Manager such amounts as are then accrued and unpaid on or before the termination date of this Agreement (including, without limitation, unpaid fees owing under this Agreement).

## Article 10 - Transfer Restrictions

A. <u>**Owner a Single-Purpose Entity; Transfer by Owner**</u>. Owner shall at all times during the Term be a single-purpose entity whose only assets are its interest in the Premises and all improvements thereat, including the Club Quarters and the Furniture, Fixtures and Equipment and the Operating Account, and shall have the right to sell, convey or transfer its interest in the Club Quarters and to assign its interest under this Agreement to another single-purpose entity, subject to the provisions below.

(1) In the event Owner sells, conveys or transfers ownership of the Club Quarters or leases all or substantially all of the building which constitutes the Club Quarters, and if the transferee (or lessee, as the case may be, hereinafter referred to as a "transferee") agrees to be bound by the terms and conditions of this Agreement to the same extent as if such transferee had executed this Agreement, subject to Manager's Approval as provided below, Owner may assign this Agreement to such transferee. Manager shall advise Owner in writing within thirty (30) days of receipt by Manager of notice from Owner of the proposed transfer as to whether Manager Approves the proposed transferee. If Manager does not advise Owner within such thirty (30) day


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

period, Manager shall be deemed to have Approved such transferee and to have agreed to continue to manage the Club Quarters pursuant to the terms of this Agreement. In the event Manager elects to continue to manage the Club Quarters, Owner shall pay all amounts then owing to Manager at the time of such sale, conveyance, transfer or lease. In the event Manager elects to terminate this Agreement as a result of any such transfer, Owner shall pay the Termination Fee under this Agreement and under the Related Club Quarters Agreements.

(2) Notwithstanding the provisions of subsection (1) above, Owner shall not, without Manager's Approval which may be given or withheld in Manager's sole discretion, convey or transfer its ownership of the Club Quarters or lease all or substantially all of the building which constitutes the Club Quarter with a transferee if any of the following apply: (a) the transferee does not agree to be bound by all the terms and conditions of this Agreement and does not agree to assume and perform Owner's obligations under this Agreements arising from and after the date of such assignment in writing by execution of an assignment and assumption agreement in a form reasonably acceptable to Manager, or (b) one or more of the following applies to the transferee: (i) such transferee or any entity which directly or indirectly controls or is controlled by such entity has engaged in criminal activities or is controlled by a person or entity engaged in criminal activities; (ii) Manager is able to demonstrate clearly and convincingly that such transferee or any entity which directly or indirectly controls or is controlled by such transferee, is generally regarded within the hospitality industry to be engaged in criminal activities or an associate or agent of criminals or is widely believed to be controlled by a person or entity engaged in criminal activities or an agent of criminals; or (iii) such transferee directly and/or indirectly through any of its Affiliates or any of their respective shareholders, members, partners, directors, officers, operates (as franchisor or other licensor or manager) one or more hotels in competition with Manager or any of Manager's Affiliates. For purposes of this subparagraph (2), a potential transferee shall not be deemed to "operate" any hotels merely due to direct or indirect ownership or hotels without actual day-to-day management responsibilities. Owner shall promptly submit to Manager such information that Manager shall reasonably request concerning any proposed transferee for the purpose of assisting Manager to make the determinations contemplated herein. Thereafter, Manager shall have a period or ten (10) days to Approve proposed transferee or to submit written objections to Owner. If Manager does not respond within such ten-day period, then Manager shall be deemed to have Approved such transferee. If Manager shall have disapproved any proposed transferee, Owner shall have the right to cause the matter of the qualification of such proposed transferee to be determined by the Expert.

B. <u>**Assignment by Manager**</u>. Manager shall have the right to assign its rights and obligations under this Agreement without the consent of Owner to any Affiliate, provided Manager shall continue to be liable hereunder to the same extent as though no assignment had been made and subject to the limitations set forth in this Section B. Manager may assign its rights to receive the Management Fee or portions thereof to any person as security for indebtedness. Manager shall have the right to assign its rights and obligations under this Agreement to any entity that is not an Affiliate of Manager, provided, however, that Owner's Approval shall be required for any such assignment if any of the following apply, which Approval may be given or withheld in Owner's sole discretion: (a) the assignee does not agree to be bound by all the terms


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

and conditions of this Agreement and does not agree to assume and perform Manager's obligations under this Agreement, in a writing in form and substance reasonably satisfactory to Owner, (b) the Related Club Quarters Agreements are also being assigned simultaneously to the assignee or one of its Affiliates and the transferee will operate and manage all hotel properties operated under the "Club Quarters" brand, or (c) such assignee or any entity which directly or indirectly controls such entity has engaged in criminal activities or an associate or agent of criminals or is controlled by a person or entity engaged in criminal activities.

## Article 11 - Representations and Warranties

A. **Representations and Warranties of Owner**. In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the relevant governing documents relating to Owner, and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding-obligation of Owner enforceable in accordance with the terms hereof;

(2) There are no claims, litigation, proceedings or governmental investigation pending, or to the best of Owner's knowledge, threatened, against or relating to Owner, the properties or business of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of Owner's knowledge, except as has been fully disclosed in writing to Manager;

(3) Neither the consummation of the actions contemplated by this Agreement on the part of Owner to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound;

(4) Owner is a single-purpose entity and its only assets are the Premises and all improvements thereat, including, without limitation, the Club Quarters and the Furniture, Fixtures and Equipment and the Operating Account.

B. **Representations and Warranties of Manager**. In order to induce Owner to enter in to this Agreement, Manager does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the Articles of Formation and Operating Agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(2) There are no claims litigation, proceedings or governmental investigation pending, or to the best of Manager's knowledge, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of Manager's knowledge, except as fully disclosed in writing to Owner; and

(3) Neither the consummation of the actions contemplated by this Agreement on the part of Manager to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## Article 12 - Miscellaneous

A. **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary as reasonably required without modifying the obligations of the parties hereunder, to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

B. **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not to be deemed a waiver of such terms and conditions on any future occasion.

C. **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

D. **Governing Law**. This Agreement shall be governed by the laws of the District of Columbia without regard to its conflicts of law provisions.

E. **Amendments**. This Agreement may not be modified, amended, surrendered, or changed, except by a written instrument executed by Owner and Manager.

F. **Inspection Rights**. Owner shall have the right to inspect the Club Quarters and examine the books and records of Manager pertaining to the Club Quarters at all reasonable times during the Term.

G. **Indemnity by Manager**. Manager shall indemnify and hold harmless Owner from and against any losses, liabilities, damages or claims (including attorneys fees and costs) against Owner arising out of (i) any gross negligence or willful misconduct of Manager, its agents, contractors, subcontractors and employees, (ii) any material breach of a covenant, representation


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

or warranty of Manager herein contained; and (iii) the actions of Manager in carrying out its responsibilities in accordance with the provisions hereof.

H. **Indemnity by Owner**. Owner shall indemnify and hold harmless Manager from and against any losses, liabilities, damages or claims (including attorney's fees and costs) against Manager arising out of (i) any negligence or willful misconduct of Owner, its agents, contractors, subcontractors and employees; (ii) any material breach of a covenant, representation or warranty of Owner herein contained; (iii) the actions of Owner in carrying out its responsibilities in accordance with the provisions hereof, (iv) the actions of employees at the Club Quarters, unless Manager has been grossly negligent or has breached its obligations under this Agreement including without limitation a failure to select, maintain and supervise its employees in conformity to the Club Quarters Standards and prudent industry standards and procedures, and (v) the statutory and contractual obligations and liabilities arising from the termination of any employees of at the Club Quarters upon the termination of the Agreement for any reason.

I. **Partial Invalidity**. In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by a final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto in which case this Agreement shall be of no force and effect.

J. **No Representation**. In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager have made any representations to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Club Quarters, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Club Quarters.

K. **Relationship**. In the performance of this Agreement, Manager shall act solely as an independent contractor.

L. **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

M. **Time of the Essence; Force Majeure**. Unless otherwise set forth herein, time is of the essence of this Agreement; provided, however, that time limitations set forth in this Agreement, except with respect to monetary obligations, shall be extended for the period of any delay due to causes beyond the delayed party's control or which cannot be reasonably foreseen or provided against, including without limitation, strikes, governmental regulations or orders, or events of Force Majeure.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

N. **Interpretation**. No provisions of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted such provision.

O. **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement. The parties hereby agree that telecopied or facsimile signatures (or signatures sent as PDF files by email) may be used in place of original signatures on this Agreement.

P. **Consent and Approval**. Except as herein otherwise provided, whenever in this Agreement the Approval of Manager and Owner is required, such Approval shall not be unreasonably withheld or delayed.

Q. **Notices**. Any notice, statement or demand required to be given under this Agreement shall be in writing and be, and at the option of the party giving notice, (i) personally delivered, (ii) transmitted by postage prepaid first class mail, or (iii) transmitted by Federal Express or other overnight courier service, addressed to each party at its address stated above, or to such other addresses as Manager or Owner may designate in the manner herein provided. All notices to Owner shall be addressed to Walter Schmidt, Suzanne Woody and David Becker, with a copy to Paul, Hastings, Janofsky & Walker, LLP, 515 South Flower Street, Los Angeles, CA 90071, Attention: Alan Weakland, Esq. Any such notice shall be deemed to have been given on the date actually received. Owner and Manager each agree that upon giving of any notice, it shall use reasonable efforts to advise the other by telephone that a notice has been sent hereunder. Such telephonic advice shall not, however, be a condition to the effectiveness of notice hereunder.

R. **Confidentiality**. The terms and provisions of this Agreement, all non-public information concerning the business, methods of operation, and ownership of each party, and all reports, budgets and other information made available by Manager pursuant hereto, shall be confidential between Owner and Manager and shall be released only to its officers, employees and investors; provided, however that such information may be made available to other parties only in connection with any court order, to comply with governmental rules and regulations, and as required by any proposed purchaser or mortgagee of all or any portion of Owner's interest in the Club Quarters.

S. **Determination by an Expert**. Where pursuant to this Agreement a matter is referred to an Expert for determination, the following provisions shall apply to such Expert's determination:

(a) The decision of the Expert shall be rendered within fifteen (15) days after a matter is referred to the Expert, shall be final and binding on the parties, and shall not be capable of challenge, whether by arbitration, in court or otherwise.

(b) Each party shall be entitled to make written submissions to the Expert, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission prior to any decision by the Expert. The


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

parties shall make available to the Expert all books and records relating to the issue in dispute and shall render to the Expert any assistance requested of the parties. The costs of the Expert and the proceedings shall be borne as directed by the Expert unless otherwise provided for herein. The Expert may direct that such costs be treated as a Net Operating Expense.

(c) The terms of engagement of the Expert shall include an obligation on the part of the Expert to:

(i) notify the parties in writing of his decision within thirty (30) days from the date on which the Expert has been selected (or such other period as the parties may agree or as set forth herein);

(ii) apply the Club Quarters Standards to issues involving the level of facilities and services at the Club Quarters; and

(iii) establish a timetable for the making of submissions and replies.

T. **Resolution by Arbitration**. Where pursuant to the terms of this Agreement certain disagreements and disputes may or are required to be resolved by arbitration, such arbitration shall be conducted as follows: The matter shall be referred for determination to an independently qualified consultant mutually agreed upon by the parties who shall be from a nationally recognized consulting firm providing management services to the hotel industry. In the event the parties are unable to agree upon such an arbitrator, then the matter shall be determined by an arbitrator selected by a senior partner of a recognized audit firm with experience in providing auditing services to the hotel industry selected by agreement of the parties hereto, or, if the parties fail to agree, then either party may require by notice to the other party that such arbitrator be selected or designated by the American Arbitration Association. All arbitration shall be held and finally determined in the State of New York and shall be governed (except for the method of selection of the arbitrator) in accordance with the Commercial Arbitration Rules of the American Arbitration Association (or any successor thereto). Each party shall be responsible for one half of the fees and expenses of the arbitrator. The decision and award of the arbitrator so selected shall be binding upon both Owner and Manager and shall be enforceable in accordance with the applicable laws of the State of New York.

U. **Resolution by Judicial Proceeding**. Except as provided in Section T above, all other disagreements and disputes arising under this Agreement may be resolved by judicial proceedings, for which purpose each party hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court of competent jurisdiction sitting in the County of New York, and each party hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court, or to the extent permitted by law, in such Federal court. Each party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

V. **Estoppel**. On request at any time and from time to time during the term of this Agreement, Manager shall execute, acknowledge, and deliver to Owner and/or any lender to Owner within twenty (20) days following Owner's request therefor, a certificate: (i) certifying that this Agreement has not been modified and is in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and specifying the modifications); (ii) stating whether, to the best knowledge of the signatory of such certificate, any default exists, including any Event of Default, and if so, specifying each default of which the signatory may have knowledge; and (iii) providing any additional information reasonably requested by Owner or such lender.

W. **Right of First Offer**. If, at any time Owner shall have elected not to rebuild the Club Quarters and/or terminate this Agreement pursuant to Article 6, Section E, such election shall be deemed to be a decision by Owner to effect a sale of the Club Quarters, in which event, upon receipt by Manager of Owner's notice that it has elected not to rebuild the Club Quarters and/or to terminate this Agreement, such notice shall constitute an invitation to Manager to make an all cash offer to purchase the Club Quarters (the notice from owner is hereinafter referred to as the "Offer Notice"). At any time during the first thirty (30) days after the date on which Manager receives the Offer Notice (the "First Offer Period"), Manager may, at its option, make an offer to purchase the Club Quarters by giving written notice thereof to Owner setting forth the terms and conditions of Manager's offer to purchase, after the receipt of which Owner and Manager shall negotiate in good faith and on an exclusive basis for a period of not less than forty-five (45) days for the purchase by Manager of the Club Quarters. In the event that Manager's offer to purchase the Club Quarters is not accepted by Owner within such forty-five (45-) -day period, Owner shall not at any time within the immediately ensuing three hundred and sixty five (365) day period (hereinafter referred to as the "Second Offer Period") enter into a binding agreement to effect a transfer of the ownership of the Club Quarters, whether directly, or indirectly, and whether is one or several transactions, (hereinafter referred to as an "Ownership Transfer") to a third party unless the price to be paid by such third party is not less than 90% of the price and on substantially the same other commercial terms specified in the Offer Notice, and provided that such third party qualifies as a permitted transferee under Article 10, Section A, in which event Owner shall be free to sell the Club Quarters to such party without Approval of Manager within the Second Offer Period. If at any time during the Second Offer Period a third party offers to effect an Ownership Transfer at a price less than 90% of the price ("Non-conforming Offer") and Owner desires to accept the Nonconforming Offer, then Owner shall deliver to Manager written notice setting forth the purchase price and all other commercial terms proposed by such third party. Such notice shall constitute an irrevocable offer from Owner to Manager, in accordance with the terms and conditions set forth below, to effect the Ownership Transfer. At any time during fourteen (14) days after the date on which Manager receives such notice Manager may, at its option, elect to effect an Ownership Transfer pursuant to the Non-conforming Offer by giving written notice thereof to Owner. In the event that Manager does not exercise its option to effect the Ownership Transfer within such period of fourteen (14) days, may, within the balance of the Second Offer Period, enter into a binding agreement to effect the Ownership Transfer to such third party at the price, and on the same other commercial terms, specified in the Non-conforming Offer, provided that such third party qualifies as a permitted transferee under


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Article 10, Section A. The closing of any proposed Ownership Transfer must be completed within sixty (60) days following the end of the First Offer Period or the Second Offer Period, as the case may be. Failing such finalization, such Offer Notice and any response to it given by Manager shall be null and void and all of the provisions of this Article 12, Section X must again be complied with before Owner shall have the right to finalize an Ownership Transfer. Owner shall not be released from any of its obligations hereunder by reason of any previous Manager's failure to so elect or any previous approval by Manager under Article 10, Section A of an Ownership Transfer, and all subsequent Ownership Transfers, whether by Owner or prior transferees under prior Ownership Transfers, shall be subject to Manager's rights under Article 10, Section A and this Article 12, Section X. Manager's rights under this Article 12, Section X, are in addition to, and not in lieu of or exclusive of, Manager's rights under Article 10, Section A.

X. **Territorial Restriction**. During the Term, Manager and its Affiliates shall not shall not operate or provide any of the services provided under this Agreement to any hotel or lodging facility of any type, whether or not operated under the "Club Quarters" name, in the Restricted Area without Owner's prior written consent which may be withheld in Owner's sole discretion Approval.

Y. **Recordation**. A memorandum of this Management Agreement in the form attached hereto as Exhibit F shall be executed by the parties hereto simultaneously with the execution of this Agreement and shall be recorded as soon as practical thereafter in the land records of the office of the Recorder of Deeds of the District of Columbia.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

IN WITNESS WHEREOF, Manager and Owner, acting by and through their proper and duly authorized officers or representatives, have each duly executed this Agreement as of the day and year first above written.

"MANAGER":

Club Quarters Management Company, L.L.C.,
a Connecticut limited liability company

By: ______________________
Jonathan D. Horowitz
Vice President and Secretary

"OWNER":

RCQ Hotel DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________
Walter P. Schmidt
Vice President


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

IN WITNESS WHEREOF, Manager and Owner, acting by and through their proper and duly authorized officers or representatives, have each duly executed this Agreement as of the day and year first above written.

"MANAGER":

Club Quarters Management Company, L.L.C.,
a Connecticut limited liability company

By: ______________________________
Jonathan D. Horowitz
Vice President and Secretary

"OWNER":

RCQ Hotel DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________________
Walter P. Schmidt
Vice President

LEGAL_US_W # 52874461.2


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

## SCHEDULE A

## THE TERMINATION FEE

The "Termination Fee" payable under of this Agreement shall be as follows:

1. Article 3, Section B: the amounts as are set forth therein.

2. Article 3, Section E(1)(i): 7.5 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation;

3. Article 3, Section E(1)(ii): 7.5 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation;

4. Article 3, Section E(1)(iii): 7.5 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation;

5. Article 3, Section E(1)(iv): 7.5 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation;

6. Article 3, Section E(1)(v): 7.5 times one year's fees calculated by averaging all the fees earned by Manager during the last three fiscal years adjusted annually for inflation; and

7. Article 3, Section E(1)(vi): 5.0 times one year's fees, calculated by averaging all the fees earned by Manager during the last three (3) fiscal years adjusted annually for inflation, where the shortfall is due to circumstances that constitute "Force Majeure" and $875,000 where the shortfall is due to circumstances that do not constitute "Force Majeure".

Except as otherwise expressly provided in the Agreement, no Termination Fee or other penalties shall be paid upon the termination of the Agreement. The amounts above that are subject to adjustment for inflation shall be adjusted as set forth therein by the percentage increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, U.S. Cities Average (1982-1984=100), published by the United States Bureau of Labor Statistics, or any revisions or replacement thereto subsequently published.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# EXHIBIT A

## CLUB QUARTERS STANDARDS


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38




## BELONGING TO CLUB QUARTERS

Club Quarters is a major innovation for organizations that regularly use hotels. It is a new, private, full service hotel model for business travelers.

Member organizations enjoy:

- The best locations in the center of big cities
- Exclusive use of a cleaner, safer and quieter place
- Unique, high-tech & user friendly services for the business traveler in a club-like atmosphere
- Big savings for members, even greater savings for employees' personal use

Employees enjoy:

- "Night on the House" certificate every business stay
- Personal use privileges at 11 Club Quarters at your organization's low rates
- Subsidized rates for employees, family and friends on weekends and holiday periods starting at $46. Added benefits for wedding parties

## CLUB QUARTERS FEATURES

### PRIVATE HOTEL

- Prime business district/central city locations
- Exclusive membership
- Restricted entry - safer, cleaner, quieter
- Low hotel room rates
- Subsidized weekend/holiday rates, monthly and day room rates

### CLUB-LIKE FEATURES

- Twenty-four hour Member Service Desk
- Private Club Room with free amenities
- Garments stored and cleaned between visits
- Exercise equipment delivered to guestrooms upon request
- Privileges at other Club Quarters locations

### FACILITIES & SERVICES

- Restaurant, bar, meeting rooms & fitness facility
- Room service & multi menu room delivery
- Light shopping/refrigerator stocking

### TECHNOLOGY

- Instant check in/check out
- Free high speed Internet access
- Complimentary Business Center
- Interactive web site

### ACCOMMODATIONS

Four room sizes with 2-line direct dial speaker and cordless phone, work station, free, fast Internet access, dataport, voice mail, satellite/cable TV with pay per view movies, coffee/tea maker. Long stay units. Corporate apartments at some Club Quarters.

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# EXHIBIT B

## RESTRICTED TERRITORY


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

MAPQUEST

839 17th St Nw
Washington DC
20006-3940 US

**Notes:**




NAVTEQ ON BOARD

All rights reserved. Use Subject to License/Copyright

This map is informational only. No representation is made or warranty given as to its content. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# EXHIBIT C

## FORM OF MONTHLY, QUARTERLY AND ANNUAL REPORTS


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Club Quarters

SAMPLE MONTHLY/QUARTERLY REVENUE REPORT (NOTE: MONTHLY REPORTS ARE BASED ON ESTIMATED FIGURES, QUARTERLY NUMBERS ARE ACTUAL FIGURES)

OPERATING SUMMARY:

| | Rooms Available | # Rooms | Revenue | Average Rate III | MBR | BS |
|---|---|---|---|---|---|---|
| Small Single | | | | | | |
| Executive | | | | | | |
| Director | | | | | | |
| Efficiency | | | | | | |
| Two Room Executive | | | | | | |
| Two Room Diplomat | | | | | | |
| No show Cancelation-R | | | | | | |
| No show Cancelation-C | | | | | | |
| Member Room Night Deficiency | | | | | | |

| | Month Actual | Month Budget | Month Variance to Budget | Year-to-Date Actual | Year-to-Date Budget | Year-to-Date Variance to Budget | Year-to-Date Prior Year | Year-to-Date Variance to Prior Year |
|---|---|---|---|---|---|---|---|---|
| Total Paid Occupancy | | | | | | | | |
| Total Occupancy % | 80.0% | 80.0% | 0.0% | 80.0% | 80.0% | 0.0% | 80.0% | 0.0% |
| ADR | $100.00 | $100.00 | 0.0% | $100.00 | $100.00 | 0.0% | $100.00 | 0.0% |
| RevPAR | $80.00 | $80.00 | 0.0% | $80.00 | $80.00 | 0.0% | $80.00 | 0.0% |
| Total Other Room Revenue | $1,000,000 | $1,000,000 | 0.0% | $1,000,000 | $1,000,000 | 0.0% | $1,000,000 | 0.0% |
| Total Other Revenue | $1,000,000 | $1,000,000 | 0.0% | $1,000,000 | $1,000,000 | 0.0% | $1,000,000 | 0.0% |
| Estimated NOI After Fees/Reserve | $100,000 | $100,000 | 0.0% | $100,000 | $100,000 | 0.0% | $100,000 | 0.0% |
| NOI Margin | 0.0% | 0.0% | | 0.0% | 0.0% | | 0.0% | |

2005 Membership Usage:

| | |
|---|---|
| Founding Members | 100 |
| Global Founding Members | 100 |
| Percentage over last year | 100.0% |
| Associate Members | 100 |
| Global Associate Members | 100 |
| Percentage over last year | 100.0% |
| Affiliate Members | 100 |
| Percentage over last year | 100 |

New Member Summary

| 2005 New Members | 2006 New Members | Member Waitlist |
|---|---|---|
| 1. | 1 | 1. |
| 2 | 2 | 2 |
| 3. | 3. | 3. |

NOTABLE VARIANCES IN MONTH:

| Line Item | | Actual | Budget | Variance to Actual | Prior Year | Variance to Actual | Reasons for Variance |
|---|---|---|---|---|---|---|---|
| Total Rooms Revenue | | | | 0.0% | | 3.0% | The overall increase to budget is attributed to an increase in the number of Affiliate Member usage room |
| Total Other Room Revenue | | | | 0.0% | | 0.0% | |
| Total Other Revenue | | | | 0.0% | | 0.0% | |
| Operating Expenses | | | | 0.0% | | 0.0% | |
| Other | | | | 0.0% | | 0.0% | |
| Other | | | | 0.0% | | 0.0% | |
| Other | | | | 0.0% | | 0.0% | |

OTHER HIGHLIGHTS:

Include comments on membership matters including: new members, change in member status, member shortfalls. Comment on renovation, FF&E reserves, any capital projects.

## CLUB QUARTERS MIDTOWN

SAMPLE MONTHLY/QUARTERLY REVENUE REPORT (NOTE: MONTHLY REPORTS ARE BASED ON ESTIMATED FIGURES, QUARTERLY NUMBERS ARE ACTUAL FIGURES)

| | ACTUAL MONTH 2005 | BUDGET MONTH 2005 | VARIANCE | PRIOR YEAR MONTH 2004 | Variance |
|---|---|---|---|---|---|
| Number of Rooms (1) | 167 | 167 | | 167 | |
| Occupancy | 80.0% | 80.0% | 0.0% | 92.0% | 0.0% |
| Average Rate | $100.00 | $100.00 | 0.0% | $188.00 | 0.0% |
| RevPar | $80.00 | $80.00 | 0.0% | $172.96 | 0.0% |
| **Revenues** | | | | | |
| Gross Hotel revenues (includes telephone, movies, guest laundry, etc) | 1,000,000 | 1,000,000 | 0.0% | 1,000,000 | 0.0% |
| Net lease revenue (independently managed) | 0 | 0 | 0.0% | 0 | 0.0% |
| Gross restaurant revenue (managed by CQ) | 1,000,000 | 1,000,000 | 0.0% | 1,000,000 | 0.0% |
| | | | 0.0% | | 0.0% |
| Gross Revenue - fee base | 2,000,000 | 2,000,000 | 0.0% | 2,000,000 | 0.0% |
| **Expenses** | | | | | |
| Cost of Room Sales (second line on management accounts) | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Restaurant costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Variable Costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Fixed Operating Expenses | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| CQ allocated overhead | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Building Operating Costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Management and License Fee (5.75% of Gross Revenue) | 115,000 | 115,000 | 0.0% | 115,000 | 0.0% |
| Customer List/Network Fee (4% Gross Revenue) | 80,000 | 80,000 | 0.0% | 80,000 | 0.0% |
| Reserve for Replacement (3% Gross Hotel Revenue) | 30,000 | 30,000 | 0.0% | 30,000 | 0.0% |
| Total costs | 825,000 | 825,000 | 0.0% | 825,000 | 0.0% |
| Net Operating Income | 1,175,000 | 1,175,000 | 0.0% | 1,175,000 | 0.0% |
| Incentive Fee | 70,500 | 70,500 | 0.0% | 70,500 | 0.0% |
| Adjusted NOI | 1,104,500 | 1,104,500 | 0.0% | 1,104,500 | 0.0% |
| Number of Keys | 167 | 167 | | 167 | |
| Available Rooms | 60,955 | 60,955 | | 60,955 | |
| Occupied Rooms | 48,764 | 48,764 | | 56,079 | |
| Room Revenues (includes Other Room Revenue) | 4,876,400 | 4,876,400 | | 10,542,777 | |

Apr 14, 2014 17:38 Adam Pozza confidential

Apr 14, 2014 17:38 Adam Pozza confidential

CLUB QUARTERS MIDTOWN

SAMPLE MONTHLY/QUARTERLY REVENUE REPORT (NOTE: MONTHLY REPORTS ARE BASED ON ESTIMATED FIGURES, QUARTERLY NUMBERS ARE ACTUAL FIGURES)

| | ACTUAL YTD 2005 | BUDGET YTD 2005 | VARIANCE | PRIOR YEAR YTD 2004 | Variance |
|---|---|---|---|---|---|
| Number of Rooms (1) | 167 | 167 | | 167 | |
| Occupancy | 80.0% | 80.0% | 0.0% | 92.0% | 0.0% |
| Average Rate | $100.00 | $100.00 | 0.0% | $188.00 | 0.0% |
| RevPar | $80.00 | $80.00 | 0.0% | $172.96 | 0.0% |
| **Revenues** | | | | | |
| Gross Hotel revenues (includes telephone, movies, guest laundry, etc) | 1,000,000 | 1,000,000 | 0.0% | 1,000,000 | 0.0% |
| Net lease revenue (independently managed) | 0 | 0 | 0.0% | 0 | 0.0% |
| Gross restaurant revenue (managed by CQ) | 1,000,000 | 1,000,000 | 0.0% | 1,000,000 | 0.0% |
| | | | 0.0% | | 0.0% |
| Gross Revenue - fee base | 2,000,000 | 2,000,000 | 0.0% | 2,000,000 | 0.0% |
| **Expenses** | | | | | |
| Cost of Room Sales (second line on management accounts) | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Restaurant costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Variable Costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Fixed Operating Expenses | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| CQ allocated overhead | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Building Operating Costs | 100,000 | 100,000 | 0.0% | 100,000 | 0.0% |
| Management and License Fee (5.75% of Gross Revenue) | 115,000 | 115,000 | 0.0% | 115,000 | 0.0% |
| Customer List/Network Fee (4% Gross Revenue) | 80,000 | 80,000 | 0.0% | 80,000 | 0.0% |
| Reserve for Replacement (3% Gross Hotel Revenue) | 30,000 | 30,000 | 0.0% | 30,000 | 0.0% |
| Total costs | 825,000 | 825,000 | 0.0% | 825,000 | 0.0% |
| Net Operating Income | 1,175,000 | 1,175,000 | 0.0% | 1,175,000 | 0.0% |
| Incentive Fee | 70,500 | 70,500 | 0.0% | 70,500 | 0.0% |
| Adjusted NOI | 1,104,500 | 1,104,500 | 0.0% | 1,104,500 | 0.0% |
| Number of Keys | 167 | 167 | | 167 | |
| Available Rooms | 60,955 | 60,955 | | 60,955 | |
| Occupied Rooms | 48,764 | 48,764 | | 56,079 | |
| Room Revenues (includes Other Room Revenue) | 4,876,400 | 4,876,400 | | 10,542,777 | |

Apr 14, 2014 17:38 Adam Pozza confidential

Apr 14, 2014 17:38 Adam Pozza confidential

# MIDTOWN SOUTH ASSOCIATES L.LC

## PROFIT & LOSS ACCOUNT - MANAGEMENT BASIS (all amounts in local currency)

For The 6 Periods Ending July 3, 2005

| | Quarter Current | Quarter Budget | Quarter Prior year | Year to date Current | Year to date Budget | Year to date Prior year | Rate POR year to date Actual | Rate POR year to date Budget | Rate POR year to date Prior year |
|---|---|---|---|---|---|---|---|---|---|
| ***OCCUPANCY*** | | | | | | | | | |
| Paid rooms | 14,727 | 14,355 | 14,085 | 29,340 | 28,391 | 22,830 | 29,340 | 28,391 | 22,830 |
| Occupied rooms | 14,679 | 14,355 | 14,149 | 29,361 | 28,391 | 23,063 | 29,361 | 28,391 | 23,063 |
| ***HOTEL REVENUES*** | | | | | | | | | |
| Gross revenue | 2,527,707 | 2,387,403 | 1,987,786 | 4,579,815 | 4,311,924 | 3,099,551 | 155.98 | 151.88 | 134.39 |
| Cost of sales | 46,470 | 46,580 | 65,068 | 83,994 | 91,573 | 98,895 | 2.86 | 3.23 | 4.29 |
| Net hotel revenues | 2,481,237 | 2,340,823 | 1,922,718 | 4,495,820 | 4,220,351 | 3,000,656 | 153.12 | 148.65 | 130.10 |
| ***HOTEL EXPENSES*** | | | | | | | | | |
| Variable expenses:- | | | | | | | | | |
| Credit card costs | 81,318 | 49,955 | 46,640 | 123,719 | 98,800 | 78,350 | 4.21 | 3.48 | 3.40 |
| Cleaning | 114,059 | 104,935 | 99,957 | 238,736 | 207,539 | 192,347 | 8.08 | 7.31 | 8.34 |
| Laundry | 29,304 | 28,853 | 26,561 | 60,809 | 57,066 | 47,702 | 2.07 | 2.01 | 2.07 |
| Consumables | 10,283 | 11,238 | 5,635 | 22,401 | 22,223 | 14,731 | 0.76 | 0.78 | 0.64 |
| Miscellaneous | 10,088 | 11,816 | 17,740 | 18,220 | 23,370 | 32,363 | 0.62 | 0.82 | 1.40 |
| Utilities | 28,860 | 24,479 | 12,838 | 71,209 | 58,494 | 44,645 | 2.43 | 2.06 | 1.94 |
| Total variable costs | 273,892 | 231,274 | 211,371 | 533,092 | 467,492 | 410,137 | 18.15 | 16.46 | 17.79 |
| Variable margin | 2,207,345 | 2,109,549 | 1,711,347 | 3,962,728 | 3,752,859 | 2,590,518 | 134.97 | 132.19 | 112.31 |
| ***FIXED OPERATING COSTS*** | | | | | | | | | |
| Operating costs:- | | | | | | | | | |
| Security reception | 161,751 | 166,008 | 144,892 | 322,677 | 306,369 | 337,232 | 10.99 | 10.86 | 14.62 |
| Housekeeping supervision | 25,766 | 29,021 | 16,502 | 53,538 | 53,897 | 54,546 | 1.82 | 1.90 | 2.37 |
| Miscellaneous | 24,909 | 28,400 | 41,865 | 57,141 | 58,800 | 71,481 | 1.95 | 2.00 | 3.10 |
| Total operating costs | 212,424 | 223,429 | 203,260 | 433,368 | 419,066 | 463,260 | 14.76 | 14.76 | 20.09 |
| Allocated overhead | 214,275 | 214,273 | 196,524 | 428,543 | 428,547 | 393,052 | 14.60 | 15.09 | 17.04 |
| Total fixed costs | 426,699 | 437,702 | 399,784 | 861,899 | 847,632 | 856,312 | 29.36 | 29.85 | 37.13 |
| ***HOTEL OPERATING INCOME*** | 1,780,648 | 1,671,847 | 1,311,563 | 3,100,829 | 2,905,227 | 1,734,207 | 105.61 | 102.34 | 75.16 |



8/15/2005

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# MIDTOWN SOUTH ASSOCIATES L.LC

PROFIT & LOSS ACCOUNT - MANAGEMENT BASIS (all amounts in local currency)

For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| ***BUILDING OPERATIONS*** | | | | | | | | | |
| Lease income | 38,371 | (31,844) | 2,959 | 158,823 | 40,367 | 104,185 | 5.41 | 1.42 | 4.62 |
| Property taxes | 89,076 | 97,427 | 87,577 | 178,152 | 194,853 | 175,153 | 6.07 | 6.86 | 7.59 |
| Insurance | 18,025 | 18,261 | 19,290 | 36,109 | 36,522 | 38,580 | 1.23 | 1.29 | 1.67 |
| Building operations:- | | | | | | | | | |
| Maintenance payroll | 29,663 | 34,854 | 33,201 | 64,191 | 66,356 | 71,965 | 2.19 | 2.34 | 3.12 |
| Maintenance and repairs | 28,049 | 29,050 | 10,091 | 56,891 | 68,100 | 53,185 | 1.94 | 2.05 | 2.31 |
| Utilities | 15,541 | 13,181 | 27,519 | 38,344 | 31,496 | 44,646 | 1.31 | 1.11 | 1.94 |
| Total building operations | 73,253 | 77,085 | 70,811 | 159,428 | 165,952 | 169,796 | 5.44 | 5.50 | 7.37 |
| Net building cost | 219,724 | 160,929 | 180,636 | 532,511 | 427,694 | 487,715 | 18.15 | 15.07 | 21.15 |
| *NET OPERATING INCOME* | 1,660,921 | 1,510,919 | 1,130,928 | 2,568,318 | 2,477,532 | 1,246,492 | 87.46 | 87.27 | 54.03 |
| *Abnormal costs* | | | | | | | | | |
| Insurance proceeds | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Econominc impact study | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| WTC disaster costs | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Other one off costs | 7,750 | 0 | 0 | 7,750 | 0 | 0 | 0.26 | 0.00 | 0.00 |
| Furnishings | 6,761 | 0 | (321,579) | 34,434 | 0 | 1,603,225 | 1.17 | 0.00 | 69.52 |
| Maintenance | 294,724 | 0 | 0 | 345,985 | 0 | (7,064) | 11.78 | 0.00 | (0.31) |
| Total | 309,235 | 0 | (321,579) | 388,170 | 0 | 1,596,161 | 13.21 | 0.00 | 69.21 |
| *NOI after abnormal costs* | 1,251,687 | 1,510,919 | 1,452,506 | 2,180,148 | 2,477,532 | (349,669) | 74.25 | 87.27 | (15.18) |
| ***CAPITAL COSTS*** | | | | | | | | | |
| Loan interest | 245,349 | 242,550 | 401,225 | 485,160 | 485,100 | 722,685 | 16.52 | 17.09 | 31.34 |
| Bank interest income | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Capital lease interest expense | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Deferred lease interest expense | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Penalty interest | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Building rent | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Depreciation and amortization | 287,194 | 238,219 | 318,445 | 548,267 | 476,439 | 618,500 | 18.67 | 16.78 | 26.82 |
| Cash loss | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Difference on exchange | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Total capital costs | 532,543 | 480,769 | 719,670 | 1,033,426 | 961,539 | 1,341,184 | 35.19 | 33.87 | 58.16 |
| *PRE-TAX INCOME* | 719,144 | 1,030,149 | 732,837 | 1,146,722 | 1,515,994 | (1,690,853) | 39.06 | 53.40 | (73.34) |
| UBT (UK corporation tax) expense | 12,646 | 0 | 18,096 | 3,640 | 0 | 19,996 | 0.12 | 0.00 | 0.87 |
| *POST-TAX INCOME* | 706,498 | 1,030,149 | 714,741 | 1,143,083 | 1,515,994 | (1,710,849) | 38.94 | 53.40 | (74.21) |



8/16/2005

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

AUG. 15. 2005 6:35PM CLUB QUARTERS

## MIDTOWN SOUTH ASSOCIATES L.LC

### Schedule A - Other Hotel Revenues (in local currency)

### For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| Occupancy | 14,679 | 14,355 | 14,149 | 29,361 | 28,391 | 23,063 | 29,361 | 28,391 | 23,063 |
| ***ROOM REVENUE*** | | | | | | | | | |
| Room Revenue - Taxable | 2,372,442 | 2,284,035 | 1,852,933 | 4,288,185 | 4,111,496 | 2,879,253 | 146.05 | 144.82 | 124.84 |
| Room Revenue - Tax Exempt | 0 | 0 | 0 | 0 | 0 | 5 | 0.00 | 0.00 | 0.00 |
| No show revenue | 22,093 | 0 | 15,233 | 37,943 | 0 | 23,139 | 1.29 | 0.00 | 1.00 |
| Budget cushion | 0 | (43,577) | 0 | 0 | (87,154) | 0 | 0.00 | (3.07) | 0.00 |
| Paid room revenue | 2,394,535 | 2,240,458 | 1,868,166 | 4,326,129 | 4,024,342 | 2,902,397 | 147.34 | 141.75 | 125.84 |
| ***OTHER ROOM REVENUE*** | | | | | | | | | |
| Early Check-In Charge | 0 | 0 | 25 | 60 | 0 | 25 | 0.00 | 0.00 | 0.00 |
| Late Check Out Charge | 5,150 | 0 | 6,641 | 10,787 | 0 | 9,153 | 0.37 | 0.00 | 0.40 |
| Additional Occupancy Charge | 54,943 | 64,657 | 34,554 | 91,189 | 124,310 | 54,535 | 3.11 | 4.38 | 2.36 |
| Early Departure Charge | 846 | 0 | 550 | 2,251 | 0 | 1,386 | 0.08 | 0.00 | 0.06 |
| Cancellation Fees | 5,866 | 0 | 6,563 | 16,754 | 0 | 10,031 | 0.57 | 0.00 | 0.43 |
| Membership Dues Taxable | 21,000 | 23,100 | 20,901 | 69,600 | 46,200 | 44,192 | 2.37 | 1.63 | 1.92 |
| Membership Dues Tax Exempt | (12,995) | 0 | (13,331) | (49,892) | 0 | (29,674) | (1.70) | 0.00 | (1.29) |
| Member Commitment Shortfall | 11,738 | 0 | 10,580 | 22,325 | 0 | 17,599 | 0.76 | 0.00 | 0.76 |
| Security Deposits Forfeited | 4,603 | 0 | 0 | 4,603 | 0 | 2,600 | 0.16 | 0.00 | 0.11 |
| Tax return preparation fees | 0 | 0 | 150 | 0 | 0 | 300 | 0.00 | 0.00 | 0.01 |
| Total other room revenue | 91,151 | 87,757 | 66,633 | 167,677 | 170,510 | 110,047 | 5.72 | 6.01 | 4.76 |

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

NO. 0904 P. 2

## MIDTOWN SOUTH ASSOCIATES L.LC

**Schedule A - Other Hotel Revenues (in local currency)**

**For The 6 Periods Ending July 3, 2005**

| | Quarter Current | Quarter Budget | Quarter Prior year | Year to date Current | Year to date Budget | Year to date Prior year | Rate POR year to date Actual | Rate POR year to date Budget | Rate POR year to date Prior year |
|---|---|---|---|---|---|---|---|---|---|
| ***COST OF ROOM REVENUE*** | | | | | | | | | |
| Rebate - NYU | 8,990 | 2,871 | 11,765 | 11,840 | 5,679 | 11,785 | 0.40 | 0.20 | 0.51 |
| Rebate - USMA | 220 | 0 | 320 | 395 | 0 | 470 | 0.01 | 0.00 | 0.02 |
| Rebate - Express Reservations | 0 | 0 | 0 | (1,010) | 0 | (540) | (0.03) | 0.00 | (0.02) |
| Rebate - ClubCorp | 765 | 0 | 510 | 1,165 | 0 | 810 | 0.04 | 0.00 | 0.04 |
| Rebate - Ammonoosuc Travel | 1,118 | 0 | 507 | 1,235 | 0 | 663 | 0.04 | 0.00 | 0.03 |
| Rebate Express Reservation | 4,560 | 0 | 1,640 | 5,670 | 0 | 3,390 | 0.19 | 0.00 | 0.15 |
| Rebate - Expedia | 0 | 0 | (4,989) | 0 | 0 | (3,075) | 0.00 | 0.00 | (0.13) |
| Rebate Sato Travel | 0 | 0 | 54 | 0 | 0 | 54 | 0.00 | 0.00 | 0.00 |
| Rebate CNA Insurance Co. | 21 | 0 | 3 | 24 | 0 | 57 | 0.00 | 0.00 | 0.00 |
| Rebate KPMG | 225 | 0 | 118 | 289 | 0 | (64) | 0.01 | 0.00 | 0.00 |
| Rebate - GSA | 0 | 0 | 21 | 3 | 0 | 21 | 0.00 | 0.00 | 0.00 |
| Rebate - Orbitz | 0 | 0 | 0 | 0 | 0 | 17 | 0.00 | 0.00 | 0.00 |
| Rebate - Grant Thornton | 78 | 0 | 9 | 93 | 0 | 18 | 0.00 | 0.00 | 0.00 |
| Rebate - Association of Graduate | 0 | 0 | 0 | (65) | 0 | (95) | 0.00 | 0.00 | 0.00 |
| Rebate - Brown Brothers Harriman | 160 | 0 | 70 | 270 | 0 | 120 | 0.01 | 0.00 | 0.01 |
| Rebate - Eyal Tessler | 0 | 0 | 440 | 0 | 0 | 770 | 0.00 | 0.00 | 0.03 |
| Rebate - NYU | 0 | 0 | 0 | 0 | 0 | 890 | 0.00 | 0.00 | 0.04 |
| Rebate - Midtown Professional Club | 0 | 0 | 377 | (170) | 0 | 377 | (0.01) | 0.00 | 0.02 |
| Rebate - American Bar Assoc. | 147 | 0 | 119 | 98 | 0 | 119 | 0.00 | 0.00 | 0.01 |
| Rebate - In Any Event | 0 | 0 | 240 | 0 | 0 | 240 | 0.00 | 0.00 | 0.01 |
| Rebate - Federal Premier Lodging Prc | 626 | 0 | 0 | 641 | 0 | 0 | 0.02 | 0.00 | 0.00 |
| Rebate-Fete | 170 | 0 | 0 | 170 | 0 | 0 | 0.01 | 0.00 | 0.00 |
| Rebate-Microtek | 840 | 0 | 0 | 840 | 0 | 0 | 0.03 | 0.00 | 0.00 |
| Rebate-Nancy Eller | 280 | 0 | 0 | 280 | 0 | 0 | 0.01 | 0.00 | 0.00 |
| Government program cost | 0 | 0 | 3,840 | 0 | 0 | 3,880 | 0.00 | 0.00 | 0.17 |
| Unirez fees | 11,213 | 7,740 | 10,211 | 14,107 | 14,759 | 11,473 | 0.48 | 0.52 | 0.50 |
| Uncollected Taxes | (4,544) | 0 | 11,864 | 0 | 0 | 13,333 | 0.00 | 0.00 | 0.58 |
| Total cost of room revenue | 24,869 | 10,611 | 37,139 | 35,894 | 20,438 | 44,712 | 1.21 | 0.72 | 1.97 |

confidential Adam Pozza Apr 14, 2014 17:38

confidential Adam Pozza Apr 14, 2014 17:38

AUG. 15. 2005 6:35PM CLUB QUARTERS NO. 0904 P. 4

confidential Adam Pozza Apr 14, 2014 17:38

**MIDTOWN SOUTH ASSOCIATES L.LC**
Schedule A - Other Hotel Revenues (in local currency)
For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| ***OTHER HOTEL REVENUES (net)*** | | | | | | | | | |
| ***Telephones*** | | | | | | | | | |
| Telephone Calls - Local | 1,066 | 7,233 | 2,365 | 2,669 | 14,305 | 3,856 | 0.09 | 0.50 | 0.17 |
| Tele Calls - Long Dist Taxable | 20,036 | 25,318 | 31,719 | 38,316 | 50,074 | 52,426 | 1.30 | 1.76 | 2.27 |
| Telephone Call Costs | (3,468) | (7,957) | (9,505) | (7,225) | (15,737) | (16,918) | (0.25) | (0.55) | (0.73) |
| Telephone gross profit | 17,633 | 24,594 | 24,579 | 33,761 | 48,642 | 39,366 | 1.14 | 1.71 | 1.71 |
| Other Communication Costs | 229 | 3,617 | 1,954 | 126 | 7,153 | 7,884 | 0.00 | 0.25 | 0.34 |
| Telephone taxes | 0 | 1,390 | 0 | 2,013 | 2,749 | 4,883 | 0.07 | 0.10 | 0.21 |
| Net telephone revenue | 17,404 | 19,587 | 22,625 | 31,621 | 38,740 | 26,598 | 1.07 | 1.36 | 1.16 |
| ***Guest laundry*** | | | | | | | | | |
| Guest Laundry & Valet | 4,830 | 6,944 | 7,600 | 11,406 | 13,734 | 11,064 | 0.39 | 0.48 | 0.48 |
| Guest Laundry & Valet Cost | 3,227 | 5,209 | 5,289 | 7,863 | 10,302 | 7,808 | 0.27 | 0.36 | 0.34 |
| Net guest laundry | 1,603 | 1,735 | 2,311 | 3,543 | 3,432 | 3,256 | 0.12 | 0.12 | 0.14 |
| ***In room movies*** | | | | | | | | | |
| In-Room Movie Sales | 6,913 | 11,574 | 4,339 | 18,612 | 22,891 | 7,109 | 0.63 | 0.81 | 0.31 |
| In-Room Movie Costs | 6,914 | 10,417 | 4,379 | 18,493 | 20,602 | 7,109 | 0.63 | 0.73 | 0.31 |
| Net in room movies | (1) | 1,157 | (40) | 119 | 2,289 | 0 | 0.00 | 0.08 | 0.00 |
| ***Other Income*** | | | | | | | | | |
| Business Center Income | 369 | 289 | 169 | 638 | 572 | 362 | 0.02 | 0.02 | 0.02 |
| Valpak Sales | 965 | 145 | 133 | 1,009 | 286 | 197 | 0.03 | 0.01 | 0.01 |
| Food Delivery | 5,132 | 7,233 | 6,561 | 12,549 | 14,305 | 11,606 | 0.43 | 0.50 | 0.50 |
| Shopper service | 6 | 0 | 0 | 6 | 0 | 0 | 0.00 | 0.00 | 0.00 |
| Other Operating Income | 704 | 452 | 81 | 804 | 905 | 495 | 0.03 | 0.03 | 0.02 |
| Food Delivery Cost Of Sales | (5,720) | (6,076) | (6,751) | (11,774) | (12,017) | (8,641) | (0.40) | (0.42) | (0.37) |
| Miscellaneous Cost Of Sales | 0 | (145) | (32) | 0 | (286) | (55) | 0.00 | (0.01) | 0.00 |
| Rollaway Bed Cost | 0 | (435) | 638 | 0 | (859) | 638 | 0.00 | (0.03) | 0.03 |
| Lobby Newspapers | (44) | (723) | (656) | (606) | (1,430) | (1,523) | (0.02) | (0.05) | (0.07) |
| Net other Income | 1,413 | 740 | 162 | 2,626 | 1,476 | 3,069 | 0.09 | 0.05 | 0.14 |
| ***Net hotel revenue*** | 2,481,237 | 2,340,823 | 1,922,718 | 4,495,820 | 4,220,351 | 3,000,656 | 153.13 | 148.65 | 130.07 |

 8/16/2005

AUG. 15. 2005 6:36PM CLUB QUARTERS NO. 0904 P. 5

confidential
Adam Pozza
Apr 14, 2014 17:38

# MIDTOWN SOUTH ASSOCIATES L.LC

## Schedule B - Variable Costs (in local currency)

### For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| Occupancy | 14,679 | 14,355 | 14,149 | 29,361 | 28,391 | 23,063 | 29,361 | 28,391 | 23,063 |
| ***Credit card costs*** | | | | | | | | | |
| Credit Card Costs | 81,318 | 49,955 | 48,640 | 123,719 | 98,800 | 78,350 | 4.21 | 3.48 | 3.40 |
| Total credit card costs | 81,318 | 49,955 | 48,640 | 123,719 | 98,800 | 78,350 | 4.21 | 3.48 | 3.40 |
| ***Cleaning*** | | | | | | | | | |
| Floor Attendants Payroll | 99,342 | 91,154 | 86,549 | 200,704 | 180,283 | 161,273 | 6.84 | 6.35 | 6.99 |
| Floor Attendants Tax/Benefits | 14,718 | 13,781 | 13,408 | 36,032 | 27,256 | 31,074 | 1.23 | 0.96 | 1.35 |
| Total cleaning costs | 114,059 | 104,935 | 99,957 | 236,736 | 207,539 | 192,347 | 8.07 | 7.31 | 8.34 |
| ***Laundry*** | | | | | | | | | |
| Laundry Costs | 26,679 | 24,834 | 24,747 | 56,998 | 49,117 | 43,877 | 1.91 | 1.73 | 1.90 |
| Dry Cleaning Costs | 1,152 | 1,292 | 1,397 | 2,781 | 2,556 | 2,671 | 0.09 | 0.09 | 0.12 |
| Carpets/Drapes Cleaning | 0 | 287 | 100 | 0 | 567 | 100 | 0.00 | 0.02 | 0.00 |
| Linen Replacement | 1,474 | 2,440 | 317 | 2,029 | 4,826 | 1,054 | 0.07 | 0.17 | 0.05 |
| Total laundry costs | 29,304 | 28,853 | 26,561 | 60,809 | 57,066 | 47,702 | 2.07 | 2.01 | 2.07 |
| ***Consumables*** | | | | | | | | | |
| Cleaning Supplies | 5,309 | 5,063 | 2,032 | 11,665 | 10,014 | 7,003 | 0.40 | 0.35 | 0.30 |
| Bathroom Amenities | 3,612 | 4,594 | 2,537 | 7,950 | 9,086 | 5,318 | 0.27 | 0.32 | 0.23 |
| In-Room Coffee Supplies | 1,343 | 1,579 | 1,067 | 2,786 | 3,123 | 2,410 | 0.09 | 0.11 | 0.10 |
| Total consumables | 10,263 | 11,236 | 5,636 | 22,401 | 22,223 | 14,731 | 0.76 | 0.78 | 0.63 |



8/15/2005

# MIDTOWN SOUTH ASSOCIATES L.LC

**Schedule B - Variable Costs (in local currency)**

**For The 6 Periods Ending July 3, 2005**

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| ***Variable miscellaneous*** | | | | | | | | | |
| Uniform Replacement | 630 | 431 | 0 | 1,047 | 852 | 1,310 | 0.04 | 0.03 | 0.06 |
| Walked Guest Costs | 2,785 | 5,787 | 8,475 | 3,727 | 11,445 | 13,973 | 0.13 | 0.40 | 0.61 |
| V.I.P. Gifts | 1,826 | 1,148 | 1,908 | 3,650 | 2,272 | 3,085 | 0.12 | 0.08 | 0.13 |
| Payroll Processing Fees | 2,232 | 2,010 | 1,762 | 4,348 | 3,975 | 3,377 | 0.15 | 0.14 | 0.15 |
| In-Room Stationery Costs | 847 | 861 | 2,740 | 2,329 | 1,703 | 5,418 | 0.08 | 0.06 | 0.23 |
| Guest Room Supplies | 1,768 | 1,579 | 2,593 | 3,483 | 3,123 | 4,912 | 0.12 | 0.11 | 0.21 |
| Miscellaneous Variable Costs | 0 | 0 | 244 | (365) | 0 | 288 | (0.01) | 0.00 | 0.01 |
| Total miscellaneous | 10,088 | 11,816 | 17,740 | 18,220 | 23,370 | 32,363 | 0.63 | 0.82 | 1.40 |
| ***Variable utilities*** | 28,860 | 24,479 | 12,838 | 71,209 | 58,494 | 44,645 | 2.43 | 2.06 | 1.94 |
| Total variable | 273,892 | 231,274 | 211,371 | 533,092 | 467,492 | 410,137 | 18.17 | 16.46 | 17.78 |

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

AUG. 15. 2005 6:36PM CLUB QUARTERS NO. 0904 P. 7

## MIDTOWN SOUTH ASSOCIATES L.LC
### Schedule C - Fixed Costs (in local currency)
### For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| Occupancy | 14,679 | 14,355 | 14,149 | 29,361 | 28,391 | 23,063 | 29,361 | 28,391 | 23,063 |
| ***Security/reception*** | | | | | | | | | |
| *Member services desk* | | | | | | | | | |
| MSD - Salary Cost | 82,695 | 78,026 | 76,459 | 158,337 | 144,905 | 157,127 | 5.39 | 5.10 | 6.81 |
| MSD - Taxes And Benefits | 12,521 | 12,303 | 10,124 | 28,428 | 22,848 | 28,144 | 0.97 | 0.80 | 1.22 |
| MSD - Other Employee Costs | 156 | 625 | 0 | 711 | 1,250 | 625 | 0.02 | 0.04 | 0.03 |
| Total member services desk | 95,371 | 90,954 | 86,583 | 187,476 | 169,003 | 185,896 | 6.38 | 5.94 | 8.06 |
| *Guest service representatives* | | | | | | | | | |
| GSR - Payroll Cost | 57,718 | 65,264 | 51,051 | 114,624 | 121,205 | 126,887 | 3.90 | 4.27 | 5.50 |
| GSR - Taxes And Benefits | 8,662 | 9,790 | 7,258 | 20,577 | 18,181 | 24,449 | 0.70 | 0.64 | 1.06 |
| Total GSRs | 66,380 | 75,054 | 58,309 | 135,201 | 139,386 | 151,336 | 4.60 | 4.91 | 6.56 |
| Total security/reception | 161,751 | 166,008 | 144,892 | 322,677 | 308,389 | 337,232 | 10.98 | 10.85 | 14.62 |
| ***Housekeeping supervision*** | | | | | | | | | |
| HSK Supervision - Payroll | 22,442 | 25,235 | 15,625 | 45,390 | 46,865 | 45,734 | 1.55 | 1.65 | 1.98 |
| HSK Supervision - Tax/Benefits | 3,323 | 3,786 | 878 | 8,149 | 7,032 | 8,812 | 0.28 | 0.25 | 0.38 |
| Total housekeeping supervision | 25,765 | 29,021 | 16,502 | 53,538 | 53,897 | 54,546 | 1.83 | 1.90 | 2.36 |

confidential Adam Pozza Apr 14, 2014 17:38

confidential Adam Pozza Apr 14, 2014 17:38

 8/15/2005

AUG. 15. 2005 6:36PM CLUB QUARTERS NO. 0904 P. 8

# MIDTOWN SOUTH ASSOCIATES L.LC

## Schedule C - Fixed Costs (in local currency)

### For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| ***Miscellaneous*** | | | | | | | | | |
| Floral And Decorations | 3,464 | 2,500 | 4,491 | 6,364 | 5,000 | 7,098 | 0.22 | 0.18 | 0.31 |
| Stationery And Supplies | 1,721 | 2,500 | 2,503 | 3,060 | 5,000 | 5,448 | 0.10 | 0.18 | 0.24 |
| Cable TV Costs | 3,000 | 3,000 | 5,775 | 6,000 | 6,000 | 10,466 | 0.20 | 0.21 | 0.45 |
| Pms Costs | (4,359) | 2,500 | 0 | 4,359 | 5,000 | (2,113) | 0.15 | 0.18 | (0.09) |
| Travel And Entertainment | 784 | 1,125 | 828 | 1,338 | 2,250 | 914 | 0.05 | 0.08 | 0.04 |
| Employee Meals | 3,189 | 3,150 | 7,805 | 5,582 | 6,300 | 11,464 | 0.19 | 0.22 | 0.50 |
| Club Room Amenities | 1,075 | 1,875 | 345 | 2,675 | 3,750 | 434 | 0.09 | 0.13 | 0.02 |
| Training Costs | 100 | 1,250 | 2,113 | 304 | 2,500 | 2,113 | 0.01 | 0.09 | 0.09 |
| Bank Charges | 0 | 0 | 46 | 0 | 0 | 52 | 0.00 | 0.00 | 0.00 |
| Security Costs | 404 | 625 | 1,316 | 5,276 | 1,250 | 3,908 | 0.18 | 0.04 | 0.17 |
| Miscellaneous Fixed Costs | 52 | 0 | 219 | 630 | 0 | 219 | 0.02 | 0.00 | 0.01 |
| Small Capital Purchases | 2,669 | 7,500 | 17,278 | 7,849 | 15,000 | 28,269 | 0.27 | 0.53 | 1.23 |
| Legal Fees | 8,260 | 0 | 0 | 8,273 | 0 | 138 | 0.28 | 0.00 | 0.01 |
| Other Professional Fees | 0 | 0 | 0 | 0 | 0 | 146 | 0.00 | 0.00 | 0.01 |
| Garbage Removal | 4,548 | 2,375 | (855) | 6,430 | 4,750 | 2,925 | 0.18 | 0.17 | 0.13 |
| Total fixed miscellaneous | 24,909 | 28,400 | 41,865 | 57,141 | 56,800 | 71,481 | 1.94 | 2.01 | 3.12 |
| Total fixed costs, pre abnormal | 212,424 | 223,429 | 203,260 | 433,356 | 419,086 | 463,260 | 14.75 | 14.76 | 20.10 |
| Furnishings | 6,761 | 0 | (321,579) | 34,434 | 0 | 1,603,225 | 1.17 | 0.00 | 69.52 |
| Total, including furnishings | 219,185 | 223,429 | (118,319) | 467,791 | 419,086 | 2,066,485 | 15.92 | 14.76 | 89.62 |

Apr 14, 2014 17:38 Adam Pozza confidential

Apr 14, 2014 17:38 Adam Pozza confidential

confidential
Adam Pozza
Apr 14, 2014 17:38

MIDTOWN SOUTH ASSOCIATES L.LC
Schedule D - Net Building Costs (in local currency)
For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| Occupancy | 14,679 | 14,355 | 14,149 | 29,361 | 28,391 | 23,063 | 29,361 | 28,391 | 23,063 |
| ***Lease Income - restaurant*** | | | | | | | | | |
| Restaurant Rental Income | (26,677) | (94,415) | (27,370) | 23,297 | (84,775) | 24,140 | 0.79 | (2.99) | 1.05 |
| Restaurant Offsetting Costs | (405) | 0 | 5,499 | 9,689 | 0 | 6,626 | 0.33 | 0.00 | 0.29 |
| Net restaurant income | (26,081) | (94,415) | (21,871) | 32,985 | (84,775) | 30,766 | 1.12 | (2.99) | 1.34 |
| ***Lease income - other*** | | | | | | | | | |
| Other Tenant Rental Income | (375) | 0 | (375) | (750) | 0 | (750) | (0.03) | 0.00 | (0.03) |
| Chemist Club receipts | 0 | 0 | (16,000) | 0 | 0 | (16,000) | 0.00 | 0.00 | (0.69) |
| Club overhead allocation | 30,806 | 30,809 | 11,250 | 61,612 | 61,618 | 22,500 | 2.10 | 2.17 | 0.98 |
| Club MSD recovery | 7,500 | 7,500 | (5,500) | 15,000 | 15,000 | 2,000 | 0.51 | 0.53 | 0.09 |
| Club utility recovery | 19,500 | 21,250 | 32,500 | 39,000 | 42,500 | 52,000 | 1.33 | 1.50 | 2.25 |
| Club garbage removal recovery | 5,364 | 1,582 | 1,800 | 7,164 | 3,164 | 11,204 | 0.24 | 0.11 | 0.49 |
| Club other recoveries | 2,657 | 1,430 | 1,155 | 3,812 | 2,861 | 2,465 | 0.13 | 0.10 | 0.11 |
| Net other tenant income | 65,452 | 62,571 | 24,830 | 125,838 | 125,142 | 73,419 | 4.28 | 4.41 | 3.20 |
| Net lease income | 39,371 | (31,844) | 2,959 | 158,823 | 40,367 | 104,185 | 5.40 | 1.42 | 4.54 |
| ***Property taxes*** | | | | | | | | | |
| Real Estate Taxes | 89,076 | 97,427 | 87,577 | 178,152 | 194,853 | 175,153 | 6.07 | 6.86 | 7.59 |
| Total property taxes | 89,076 | 97,427 | 87,577 | 178,152 | 194,853 | 175,153 | 6.07 | 6.86 | 7.59 |
| ***Insurance*** | | | | | | | | | |
| Insurance | 18,025 | 18,261 | 19,290 | 36,109 | 36,522 | 38,580 | 1.23 | 1.29 | 1.67 |
| ***Maintenance payroll*** | | | | | | | | | |
| Maintenance - Hourly Payroll | 10,681 | 11,384 | 8,770 | 21,371 | 22,768 | 21,115 | 0.73 | 0.80 | 0.92 |
| Maintenance - Salary Cost | 15,211 | 18,809 | 20,436 | 33,050 | 34,931 | 38,224 | 1.13 | 1.23 | 1.70 |
| Maintenance - Taxes/Benefits | 3,771 | 4,661 | 3,993 | 9,770 | 8,657 | 11,626 | 0.33 | 0.30 | 0.50 |
| Total maintenance payroll | 29,663 | 34,854 | 33,201 | 64,191 | 66,356 | 71,965 | 2.19 | 2.33 | 3.12 |



8/15/2005

confidential
Adam Pozza
Apr 14, 2014 17:38

AUG. 15. 2005 6:36PM CLUB QUARTERS NO. 0904 P. 10

confidential
Adam Pozza
Apr 14, 2014 17:38

## MIDTOWN SOUTH ASSOCIATES L.LC
### Schedule D - Net Building Costs (in local currency)
### For The 6 Periods Ending July 3, 2005

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| *Maintenance and repairs* | | | | | | | | | |
| Contract Cleaning | 5,515 | 4,375 | 4,797 | 9,864 | 8,750 | 8,668 | 0.34 | 0.31 | 0.38 |
| Painting And Decorating | 476 | 375 | 328 | 694 | 750 | 342 | 0.02 | 0.03 | 0.01 |
| Repair - Drapes, Carpet Etc. | 0 | 468 | 1,546 | 0 | 975 | 1,548 | 0.00 | 0.03 | 0.07 |
| Repair - Furniture | 0 | 188 | 0 | 0 | 375 | 625 | 0.00 | 0.01 | 0.03 |
| Repair - Windows And Glass | 0 | 188 | 0 | 190 | 375 | 1,684 | 0.01 | 0.01 | 0.07 |
| Repair - Floor And Tile | 0 | 188 | 0 | 0 | 375 | 0 | 0.00 | 0.01 | 0.00 |
| Repair - Elevator | 1,056 | 500 | 2,118 | 1,056 | 1,000 | 2,646 | 0.04 | 0.04 | 0.11 |
| Repair - Airconditioning | 7,972 | 2,500 | (11) | 7,226 | 5,000 | 1,721 | 0.25 | 0.18 | 0.07 |
| Repair - Boilers | 4,345 | 1,875 | 663 | 5,323 | 3,750 | 663 | 0.18 | 0.13 | 0.03 |
| Repair - Heating | 5 | 250 | 51 | 1,403 | 500 | 51 | 0.05 | 0.02 | 0.00 |
| Repair - Electrical Equipment | 1,146 | 625 | 0 | 2,165 | 1,250 | 0 | 0.07 | 0.04 | 0.00 |
| Repair - Plumbing | 311 | 625 | (9,296) | 816 | 1,250 | 2,024 | 0.03 | 0.04 | 0.09 |
| Repair - Building Facade | 0 | 375 | 2,209 | 0 | 750 | 3,564 | 0.00 | 0.03 | 0.15 |
| Repair - Roof | 0 | 375 | 0 | 0 | 750 | 0 | 0.00 | 0.03 | 0.00 |
| Repair - Building Other | 0 | 375 | 0 | 0 | 750 | 0 | 0.00 | 0.03 | 0.00 |
| Signs And Notices | 175 | 188 | 0 | 211 | 375 | 0 | 0.01 | 0.01 | 0.00 |
| Locks And Keys | 30 | 376 | 273 | 926 | 750 | 355 | 0.03 | 0.03 | 0.02 |
| Fire Prevention | 650 | 3,450 | 1,104 | 6,628 | 6,900 | 9,763 | 0.23 | 0.24 | 0.42 |
| Health And Safety | 53 | 62 | 191 | 130 | 125 | 191 | 0.00 | 0.00 | 0.01 |
| Pest Control | 597 | 625 | 435 | 1,249 | 1,250 | 1,086 | 0.04 | 0.04 | 0.05 |
| Chemicals And Supplies | 0 | 62 | 386 | 193 | 125 | 386 | 0.01 | 0.00 | 0.02 |
| Loose Tools | 25 | 62 | 0 | 76 | 125 | 0 | 0.00 | 0.00 | 0.00 |
| Bulbs & Light Fittings | 841 | 1,250 | (474) | 1,563 | 2,500 | 968 | 0.05 | 0.09 | 0.04 |
| Engineering Uniforms | 134 | 125 | 91 | 134 | 250 | 91 | 0.00 | 0.01 | 0.00 |
| Tv Replacement/Repair | 0 | 375 | 80 | 0 | 750 | 80 | 0.00 | 0.03 | 0.00 |
| Licenses And Permits | 227 | 1,625 | 1,273 | 2,757 | 3,250 | 1,273 | 0.09 | 0.11 | 0.06 |
| Flags And Flagpoles | 0 | 125 | 60 | 0 | 250 | 1,576 | 0.00 | 0.01 | 0.07 |
| Maint Contracts - Elevators | 4,491 | 4,775 | 2,787 | 8,536 | 9,550 | 6,789 | 0.29 | 0.34 | 0.29 |
| Maint Contracts - Generators | 0 | 450 | 1,156 | 0 | 900 | 1,156 | 0.00 | 0.03 | 0.05 |
| Maint Contracts - Aircon Equip | 0 | 2,200 | 0 | 5,415 | 4,400 | 5,160 | 0.18 | 0.15 | 0.22 |
| Miscellaneous Maintenance Cost | 0 | 0 | 323 | 359 | 0 | 777 | 0.01 | 0.00 | 0.03 |
| Total maintenance and repairs | 28,049 | 29,050 | 10,091 | 56,891 | 58,100 | 53,185 | 1.93 | 2.03 | 2.29 |

AUG. 15. 2005 6:36PM CLUB QUARTERS

**MIDTOWN SOUTH ASSOCIATES L.LC**
**Schedule D - Net Building Costs (in local currency)**
**For The 6 Periods Ending July 3, 2005**

| | Quarter | | | Year to date | | | Rate POR year to date | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current | Budget | Prior year | Current | Budget | Prior year | Actual | Budget | Prior year |
| ***Utilities*** | | | | | | | | | |
| Fixed Electricty Costs | 53,057 | 49,350 | 45,561 | 112,200 | 110,450 | 99,936 | 3.82 | 3.89 | 4.33 |
| Gas | 6,458 | 5,760 | 5,987 | 17,999 | 13,440 | 12,116 | 0.61 | 0.47 | 0.53 |
| Water | 1,445 | 1,620 | 3,131 | 7,057 | 3,440 | 6,192 | 0.24 | 0.12 | 0.27 |
| Sewage | 2,941 | 2,280 | 5,179 | 11,297 | 5,160 | 10,046 | 0.38 | 0.18 | 0.44 |
| | 63,901 | 58,910 | 59,857 | 148,553 | 132,490 | 128,291 | 5.06 | 4.66 | 5.57 |
| Utilities allocated to Club | (19,500) | (21,250) | (19,500) | (39,000) | (42,600) | (39,000) | (1.33) | (1.50) | (1.69) |
| Net utility cost | 44,401 | 37,660 | 40,357 | 109,553 | 89,990 | 89,291 | 3.73 | 3.16 | 3.88 |
| Transfer to variable utilities | (28,860) | (24,479) | (12,838) | (71,209) | (58,494) | (44,645) | (2.43) | (2.06) | (1.94) |
| Net utilities | 15,541 | 13,181 | 27,519 | 38,344 | 31,496 | 44,646 | 1.31 | 1.10 | 1.94 |
| Net building costs, pre abnormal | 219,724 | 160,929 | 180,636 | 532,511 | 427,694 | 487,716 | 18.13 | 15.03 | 21.15 |
| Abnormal maintenance | 294,724 | 0 | 0 | 345,985 | 0 | (7,064) | 11.78 | 0.00 | (0.31) |
| Net building cost, including abnormal | 514,448 | 160,929 | 180,636 | 878,496 | 427,694 | 480,650 | 29.91 | 15.03 | 20.84 |

confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

NO. 0904 P. 11

confidential
Adam Pozza
Apr 14, 2014 17:38

## EXHIBIT D

## SINGLE PURPOSE ENTITY PROVISIONS

1.01 The purpose of Owner is limited solely to (i) owning, holding and leasing the Premises as a first class private hotel and (ii) transacting any and all lawful business that is incident, necessary and appropriate to accomplish the foregoing.

1.02 Notwithstanding any other provision of the Contract to the contrary, Owner shall comply with all of the following requirements:

(a) shall not engage in any business or activity other than those set forth in Section in this Agreement;

(b) shall not acquire or own any assets other than with respect to the Premises and such incidental personal property as may be necessary for the operation of the Premises;

(c) shall preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its formation or organization;

(d) shall not merge or consolidate with any other Person (for purposes of this Exhibit, the term "Person" shall mean an individual, partnership, limited partnership, corporation, limited liability Owner, business trust, joint stock compny, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature);

(e) shall not take any action to dissolve, wind-up, terminate or liquidate in whole or in part; to sell, transfer or otherwise dispose of all or substantially all of its assets; to change its legal structure, transfer, or permit the direct or indirect transfer of, any partnership, membership or other equity interests, as applicable or seek to accomplish any of the foregoing;

(f) shall not: (A) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute; (B) seek or consent to the appointment of a receiver, liquidator or any similar official; or (C) make an assignment for the benefit of creditors;

(g) shall not amend or restate its organizational documents with respect to changing the sole purpose of Owner or the separateness covenants contained in this Agreement;

(h) shall not own any subsidiary or make any investment in, any other Person;

(i) shall not commingle its assets with the assets of any other Person;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(j) shall not incur any debt, secured or unsecured, direct or contingent (including, without limitation, guaranteeing any obligation), other than customary unsecured trade payables incurred in the ordinary course of owning the Premises;

(k) shall maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(l) shall only enter into any contract or agreement with any general partner, member, shareholder, principal or Affiliate of Owner, or any general partner, member, principal or Affiliate thereof, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties (for purposes of this Exhibit, the term "Affiliate" of any Person means (i) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with, such Person; (ii) any other Person who is a director or officer of (1) such Person, (2) any subsidiary of such Person, or (3) any Person described in clause (i) above; or (iii) any corporation, limited liability company or partnership which has as a director any Person described in clause (ii) above);

(m) shall not maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(n) shall not assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of another Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(o) shall not make any loans or advances to any other Person;

(p) shall file its own tax returns s required under federal and state law;

(q) shall hold itself out to the public as a legal entity separate and distinct from any other Person and conduct its business solely in its own name and shall correct any known misunderstanding regarding its separate identity;

(r) shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(s) shall allocate shared expenses (including, without limitation, shared office space) and use separate stationery, invoices and checks;

(t) shall pay (or cause Manager to pay on behalf of Owner from the Owner's funds) its own liabilities (including, without limitation, salaries of its own employees) from its own funds; and


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(u) shall not acquire obligations or securities of its partners, members or shareholders, as applicable.

1.03 Owner shall have at least one member which is an Equity SPE Owner (as such term is defined below) which satisfies the requirements of Equity SPE Owner (as set forth below).

1.04 So long as this Agreement is in effect, Owner shall have at least one managing member (the "Equity SPE Owner") that is a limited liability company which:

a. has had as its sole asset its interest in the Owner;

b. complies in its own right with each of the requirements contained in Section 1.02 above (except that with respect to Section 1.02(k) above, the Equity SPE Owner shall not incur any debt, secured or unsecured, direct or contingent (including, without limitation, guaranteeing any obligation) other than customary unsecured trade payables incurred on the ordinary course of business relating to the ownership of its equity interest in the Owner provided the same do not exceed, in the aggregate, at any time, a maximum amount of $10,000 and are paid within sixty (60) days of the date incurred);

c. shall not engage in any business or activity other than owning an interest in Owner; and

d. shall not acquire or own any assets other than its partnership, membership or other equity interest in Owner; and

e. has an Independent Director. An "Independent Director" shall mean an individual who shall not have been at the time of such individual's initial appointment, and may not have been at any time during the preceding five years, and shall not be at any time while serving as an Independent Director: (a) a shareholder of, or an officer, director, partner or employee of, Owner or Equity SPE Owner or any of their respective shareholders, partners, members, subsidiaries or Affiliates, (b) a customer of, or supplier to, Owner or Equity SPE Owner or any of their respective shareholders, partners, members, subsidiaries or Affiliates, (c) a person or other entity controlling or under common control with any such shareholder, officer, director, partner, member, employee, supplier or customer or (d) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier or customer.

1.05 Notwithstanding any other provision of this Agreement to the contrary, the unanimous consent of all partners/members (including that of the Equity SPE Owner, which will in turn require the vote of an Independent Director) is required for the Owner to:

(a) institute proceedings to be adjudicated bankrupt or insolvent;


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

(b) consent to the institution of bankruptcy or insolvency proceedings against it;

(c) file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy;

(d) seek or consent to the appointment of a receiver, liquidator, conservator, assignee, trustee, sequestrator, custodian or any other similar official of the Owner or a substantial part of its properties;

(e) make any assignment for the benefit of creditors;

(f) admit in writing its inability to pay its debts generally as they become due;

(g) otherwise seek relief under any laws relating to the relief from debts or the protection of debtors generally;

(g) take any action in furtherance of any of the preceding actions;

(h) engage in transactions with affiliates; or

(i) amend the organizational documents of the Owner.

1.06 If there are one or more general partners/managing members of the Owner in addition to the Equity SPE Owner, notwithstanding any other provision of this Contract to the contrary, the Owner shall continue (and not dissolve) for so long as a solvent general partner/managing member exists.

1.07 Notwithstanding any other provision of this Agreement to the contrary, so long as this Agreement or any of the Related Club Quarters Agreements are in effect, no partner/member of Owner may transfer any direct or indirect ownership interest in Owner such that any transferee and/or transferees owns (in the aggregate) more than a 49% interest in Owner without the consent of Manager, and unless such transfer is conditioned upon the delivery of an acceptable Non-Consolidation Opinion (as defined below) to the Seller concerning, as applicable, the Owner, the new transferee and/or their respective owners.

For purposes of this Exhibit, "Non-Consolidation Opinion" shall mean an opinion of counsel to the Owner (reasonably satisfactory to the Seller in form and substance, from counsel reasonably satisfactory to Manager containing assumptions, limitations and qualifications customary for opinions of such type) to the effect that a court of competent jurisdiction in a proceeding under the United States Bankruptcy Code would not consolidate the assets and liabilities of Owner with those of any partner/member or affiliate thereof which became a debtor under the United States Bankruptcy Code, and if applicable to Owner, that any such transfer would not be a fraudulent conveyance under the United States Bankruptcy Code.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

1.08 So long as this Management Agreement or any of the Related Club Quarters Agreements are in effect without the prior written consent of Manager and the unanimous consent of all partners/members (including that of the Entity SPE Owner, which will in turn require the vote of the Independent Director), Owner may not amend, alter, change or repeal paragraphs 1.01, 1.02, 1.03, 1.04, 1.05, 1.06, 1.07 or 1.08 of this Exhibit.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

## EXHIBIT E

## FORM OF SUBORDINATION AND NON-DISTURBANCE AGREEMENT


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS NONDISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made and entered into as of October ___, 2005, by and between Club Quarters Management Company, L.L.C., a Connecticut limited liability company ("Manager"), RCQ Hotel DC, LLC, a Delaware limited liability company ("Owner"), and Lehman Brothers Bank FSB, a federal stock savings bank ("Lender").

## RECITALS:

The parties enter into this Agreement on the basis of the following facts, understandings and intentions:

A. Owner and Manager have entered into that certain Management Agreement dated as of October __, 2005 (the "Management Agreement"). Owner owns the real property and improvements constituting a hotel ("Hotel") and certain retail facilities known as the "Club Quarters Washington, DC" and located on the real property more particularly described in Exhibit A hereto, incorporated herein by this reference, and hereinafter referred to as the "Property". Capitalized terms used herein and not otherwise defined shall have the meaning given them in the Management Agreement.

B. Lender is concurrently herewith making a loan to Owner in the sum of $30,000,000 ("Loan"), secured by a deed of trust from Owner to Lender (the "Mortgage") conveying Owner's interest in the Property. The Mortgage, and all other documents or instruments which now or hereafter secure the obligation of Owner for the repayment of such Loan, are hereinafter referred to as the "Security Instruments".

C. Lender and Manager each desire to obtain the other's agreement that in the event Lender or any successor-in-interest acquires the interest of Owner in the Property for any reason, that Manager's right to operate the Property under the Management Agreement, and the rights, duties and obligations of Manager thereunder, will not be disturbed except pursuant to the terms of the Management Agreement and this Agreement.

D. The parties hereto desire to enter into this Agreement to establish certain rights, safeguards and obligations with respect to their interests in the Property and the Management Agreement to effectuate the foregoing.

NOW, THEREFORE, in consideration of the mutual covenants of the parties herein contained, the parties hereto agree as follows:

1. Lender has reviewed, consents to and acknowledges the Management Agreement, including without limitation Manager's right to extend the Term pursuant to paragraph B of Article 3 of the Management Agreement. The Management Agreement and all of Manager's right, title and interest in and to the Property pursuant to the Management Agreement are and shall remain prior to the lien of the Security Instruments and to any renewals, modifications, replacements, consolidations and extensions thereof.



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

2. In the event of any foreclosure by Lender or any action or proceeding instituted under the mortgage or deed of trust the Manager shall not be named as a defendant in any such foreclosure, action or proceeding and the sale of the Property in any such foreclosure, action or proceeding and the exercise by Lender of any of its rights under the mortgage or deed of trust shall be made subject to all rights of Manager under the Management Agreement.

3. So long as Manager is not in material default (beyond any period expressly given Manager to cure such default in the Management Agreement) in the performance of any of the terms, covenants or conditions of the Management Agreement on Manager's part to be performed, and subject to any express rights of termination set forth in the Management Agreement (all of which shall run in favor of Lender upon any foreclosure), Manager's rights and privileges under the Management Agreement shall not be diminished or interfered with by Lender and Manager's continued right to manage the Property under the Management Agreement shall not be disturbed by Lender during the Term of the Management Agreement.

4. If the interest of Owner in the Property is acquired by Lender (a) following a foreclosure of the Mortgage, or other proceedings brought to enforce the rights of the holder of the Mortgage or any other Security Instrument, or (b) by deed in lieu of foreclosure, or (c) by any other method, the Management Agreement and the rights of Manager thereunder shall continue in full force and effect and shall not be terminated or disturbed, except in accordance with the terms of the Management Agreement and this Agreement. In such event, Manager shall be bound to Lender under all of the terms, covenants and conditions of the Management Agreement for the balance of the Term, as such term may be extended pursuant to the Management Agreement, with the same force and effect as if such Lender were the original Owner under the Management Agreement. Upon such succession by Lender , Manager shall attorn to Lender or as Owner, which attornment shall be effective and self-operative without the execution of any other instruments on the part of any party hereto immediately upon such Lender succeeding to the interest of Owner in the Property; provided, however, that Manager shall continue to receive the fees and other compensation due Manager under the Management Agreement after Lender has succeeded to the interest of Owner in the Property. The respective rights and obligations of Manager and Lender upon attornment hereunder shall, for the then remaining Term of the Management Agreement, and any extensions thereof, be and are the same as now set forth in the Management Agreement and this Agreement, the parties intending for this purpose to incorporate the Management Agreement into this Agreement by reference with the same force and effect as though it were set forth in full herein. Manager or Lender shall, if so requested by the other, within twenty (20) days after Lender succeeds to the interest of Owner under the Management Agreement, execute an instrument to confirm the assumption and attornment hereunder in accordance with the provisions of this Agreement.

5. If Lender succeeds to the interest of Owner in the Property, subject to the provisions of this Section 4, Lender shall be bound to Manager under all of the terms, covenants and conditions of the Management Agreement and Lender shall assume and perform (or cause to be assumed and performed) all the terms, covenants and conditions of the Management Agreement to be performed by the Owner thereunder from and after the date Lender acquires title to the Property. Manager shall, from and after Lender's succession to the interest of Owner, have the same remedies against Lender for the breach of any provision in the Management Agreement that Manager would have had under the Management Agreement against Owner if


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Lender had not succeeded to the interest of Owner, except that Lender shall not be: (i) liable for any act or omission of any prior Owner under the Management Agreement which constitutes a non-monetary default except for any act or omission which (a) constitutes a continuing non-monetary default under the Management Agreement at the time of Lender's succession to the interest of the Owner under the Management Agreement, and (b) of which Lender receives written notice and opportunity to cure as provided in Section 9 hereof, and as to such default Lender shall be subject to all of the rights granted to Manager under the Management Agreement; or (ii) any monetary default of the prior Owner under the Management Agreement, provided, however, any amounts expended by Manager pursuant to the Management Agreement prior to the date the Lender takes possession shall be recoverable from the operation of the Hotel in accordance with the terms of the Management Agreement; or (iii) subject to any offsets or defenses which Manager might have against any prior Owner under the Management Agreement except as provided in subsection (i) or (ii) above; or (iv) bound to any material amendment or modification of the Management Agreement made without Lender's consent (which approval shall not be unreasonably withheld or delayed), but nothing herein contained shall be construed as a waiver by Manager of any rights which Manager may have against any previous Owner. If, upon taking possession of the Hotel by foreclosure, deed in lieu of foreclosure or otherwise, Lender fails to cure any default of the prior Owner to the extent Lender is required to cure such default as provided above, then Manager shall have the right to elect at its option after thirty (30) days' written notice to Lender of such failure, but not later than sixty (60) days after such notice, to either continue to operate the Hotel or terminate the Management Agreement. If Manager does not so elect to cancel and terminate the Management Agreement, then Manager shall be bound to Lender and Lender shall be bound to Manager under all of the terms, covenants and conditions of the Management Agreement, and Manager and Lender, as applicable, shall fully recognize each other as "Manager" and "Owner" respectively, for the balance of the term of the Management Agreement and any extensions or renewals thereof which may be effected in accordance with any provisions in the Management Agreement.

6. In the event that Owner defaults in the performance or observance of any of the terms, conditions or agreements in the Management Agreement, Manager shall give written notice thereof to Lender currently with notice to Owner and Lender shall have the right (but not the obligation) after the receipt of such notice, to cure any such default or breach on behalf of Owner within thirty (30) days following expiration of the applicable period allowed to Owner under the Management Agreement, except that such time periods shall be extended for non-monetary defaults which cannot be cured without Lender being in possession by the time reasonably necessary for Lender to obtain possession of the Property, provided Lender proceeds promptly to attempt to obtain possession of the Property and thereafter prosecutes the cure of such default with diligence and continuity. Failure of Manager to give notice hereunder shall not excuse Owner's default or breach, but Manager shall have no right (to the extent otherwise permitted under the Management Agreement or at law) to terminate the Management Agreement, unless and until notice is given hereunder and the time periods for cure herein specified have expired. As used in this Section 5, the phrase "the time reasonably necessary" shall mean and include both the time necessary to obtain possession of the Property, if Lender elects to do so, including, without limitation thereto, any time during which Lender may be prevented from foreclosing and/or obtaining possession of the Property as a result of bankruptcy proceedings, and the time necessary to correct or cure the condition using reasonable diligence if such condition is determined to exist, but in no event for nonmonetary defaults less than (A)


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

ninety (90) days after the date Lender first obtains possession of the Property, or (B) if the default of Owner is of a nature which cannot be cured within ninety (90) days, then commencement of cure within such ninety (90) day period, and the time necessary diligently thereafter to proceed to complete such cure. Any default of Owner which cannot for any reason outside the control of Lender be cured by Lender takes possession; provided, however, that in no event, and under no circumstances shall a default consisting solely of a failure to pay a sum of money be considered a default which cannot be cured by Lender.

7. Lender hereby acknowledges that, except for any interest to which Lender may succeed through succession to Owner's interest in the Property (whether by foreclosure or otherwise), Lender has no interest in Manager's property which may be constructed, placed, installed or located by Manager on, within or appurtenant to the Property subject only to the applicable terms and conditions of the Management Agreement during the Term of the Management Agreement.

8. This Agreement may not be modified in any manner other than by an agreement in writing signed by the parties hereto, or their respective successors in interest.

9. Any notice, demand, request, consent or communication that any party hereto desires or is required to give to another party hereto shall be in writing and shall either be served personally to the address and on the person specified below, or by facsimile or prepaid, certified, registered or Express Mail, return receipt requested, or nationally recognized overnight courier, addressed as follows:

To Manager: Club Quarters Management Company, LLC
585 Old Stamford Road
New Canaan, CT
Attention: Jonathan D. Horowitz
Facsimile No.: (212) 944-9374

To Owner: Rockwood Capital Corporation
325 Greenwich Avenue
Third Floor
Greenwich, CT 06830
Attention: Peter J. Falco
Facsimile No.: (203) 622-7020

To Lender: c/o Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
Commercial Mortgage Surveillance Group
New York, New York 10022
Attention: Josh Freedman
Facsimile No.: (212) 520-0407

Any party hereto may change its address by notifying the other parties of the change not later than ten (10) days prior to the date such change is to be effected. Notice as provided herein shall


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

be deemed given upon delivery if personally delivered, or if mailed or sent via overnight courier, upon the date of receipt or refusal of attempted delivery thereof shown on the return receipt.

10. If any party hereto brings any action or proceeding against any other party hereto (including, without limitation, any cross-complaint, counterclaim, or third party clause) to enforce or interpret this Agreement or otherwise arising out of this Agreement, the prevailing party in such action or proceeding shall be entitled to its costs and expenses of suit, including, but not limited to, reasonable attorneys' fees, which shall be payable by such other party whether or not such action or proceeding is prosecuted to judgment.

11. Subject to the provisions of the Management Agreement regarding assignments by Manager, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors, heirs and assigns. As used herein, the term "Manager" shall include the original Manager designated herein, and its permitted successors and assigns under the Management Agreement; the term "Lender" shall include the original Lender designated herein and its successors and assigns, including anyone who shall have succeeded to Owner's interest in the Property by, through or under foreclosure of the Mortgage; and the term "foreclosure" shall be deemed to include the acquisition of Owner's estate in the Property by voluntary deed or assignment in lieu of foreclosure; provided, however, the exceptions set forth in (i) - (iv) of paragraph 5 shall not apply to any successor or assign of the initial Lender except through or under a foreclosure sale or transfer to an affiliate of Lender or to a federal or state chartered savings and loan which participates in the loan secured by the Mortgage with the Lender or acquires Lender's interest in the loan secured by the Mortgage and any securitization trust or other financial institution to which all or any portion of the Loan is assigned.

12. This Agreement shall be construed and enforced in accordance with the laws of the District of Columbia.

13. For convenience, the signatures of each of the parties to this Agreement may be executed on separate pages, which when attached to this Agreement shall constitute this as a complete agreement.

14. The Management Agreement will not be rendered subordinate to any mortgage or deed of trust or any charge against the Property without the prior written consent of the Manager and any attempted subordination shall be null and void and of no force and effect.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

"Owner":

RCQ Hotel DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Delaware corporation,
its Sole Member

By: ______________________________
Walter P. Schmidt
Vice President

"Manager":

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.,
a Connecticut limited liability company

By:___________________________
Jonathan D. Horowitz
Vice President and Secretary

"Lender":

LEHMAN BROTHERS BANK FSB,
a federal stock savings bank

By:___________________________
Charlene Thomas
Vice President



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

ACKNOWLEDGMENT OF MANAGER'S SIGNATURE

STATE OF ______________________ )
) ss.
CITY/COUNTY OF _______________ )

Subscribed to and sworn to (or affirmed) before me this ____ day of ___________, 2005 by _______________________personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

________________________

Signature of Notary

My term of office expires: _____________________________

[Insert SEAL]


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

ACKNOWLEDGMENT OF OWNER'S SIGNATURE

STATE OF ______________________ )
) ss.
CITY/COUNTY OF _______________ )

Subscribed to and sworn to (or affirmed) before me this ____ day of ___________, 2005 by _______________________personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

________________________

Signature of Notary

My term of office expires: _____________________________

[Insert SEAL]



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

## ACKNOWLEDGMENT OF LENDER'S SIGNATURE

STATE OF ______________________ )
) ss.
CITY/COUNTY OF _______________ )

Subscribed to and sworn to (or affirmed) before me this ____ day of ___________, 2005 by _______________________ personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

________________________

Signature of Notary

My term of office expires: _____________________________

[Insert SEAL]


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# EXHIBIT A

## PROPERTY DESCRIPTION



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

## EXHIBIT F

## MEMORANDUM OF AGREEMENT

NAME AND ADDRESS OF SELLER: Hill Building Associates, L.L.C., c/o Masterworks Development Corporation, 555 Fifth Avenue, New York, New York, 10017.

NAME AND ADDRESS OF PURCHASER: RCQ Hotel DC, LLC, c/o Rockwood Capital Corporation, 325 Greenwich Avenue, Greenwich, CT 06830.

DESCRIPTION OF PREMISES:

The property situate, lying and being in the District of Columbia, bounded and fully described in Schedule A attached hereto and commonly known as 839 17th Street, N.W., Washington D.C.

DATE OF EXECUTION OF MANAGEMENT AGREEMENT: October 28, 2005.

PARTIES TO MANAGEMENT AGREEMENT: RCQ Hotel DC, LLC and Club Quarters Management Company, L.L.C.

TERM OF MANAGEMENT AGREEMENT: Twenty-five (25) years.

TERM OF OPTION TO RENEW MANAGEMENT AGREEMENT: Ten (10) years.

MANAGEMENT FEES: Management fees are due by Owner to Manager (as defined in the Management Agreement) under the Management Agreement.

TERMINATION FEES: Termination fees are due by Owner to Manager under the Management Agreement.

LIMITATION ON FINANCING: The Management Agreement provides for limitations of the "loan-to-value" ratio of any financing placed against the Premises.

SUBORDINATION: The Management Agreement is superior to all financing against the Premises and all lenders are required to execute a Subordination and Non-Disturbance Agreement with Manager.

This Memorandum is for notice purposes only and does not modify the terms and provisions of the Management Agreement.

**IN WITNESS WHEREOF** the parties hereto have respectively executed this memorandum this 28th day of October, 2005.


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

Hill Building Associates, LLC

By: Farragut Square Associates L.P.,
its managing member

By: Masterworks Development Corporation,
its general partner

By: ______________________________
Ralph M. Bahna
President

RCQ Hotel DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________________
Walter P. Schmidt
Vice President


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

# FIRST AMENDMENT TO MANAGEMENT AGREEMENT

THIS FIRST AMENDMENT TO MANAGEMENT AGREEMENT (this "Amendment"), is made as of August 15, 2008 by and between CLUB QUARTERS MANAGEMENT COMPANY, L.L.C., a Connecticut limited liability company ("Manager"), and RCQ HOTEL DC, LLC, a Delaware limited liability company ("Owner").

## RECITALS

A. Manager and Owner entered into that certain Management Agreement, dated as of October 28, 2005 (the "Management Agreement"), pursuant to which Manager agreed to operate and manage the Premises (as defined in the Management Agreement).

B. Manager and Owner desire to amend the Management Agreement as provided in this Amendment.

NOW, THEREFORE, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Manager and Owner hereby agree as follows:

1. Definitions. All capitalized terms which are used in this Amendment but not defined herein shall have the same meaning ascribed to such terms in the Management Agreement.

2. Property Insurance.

(a) The first sentence of Article 7, Section A of the Management Agreement is hereby deleted in its entirety and replaced with the following:

"Owner shall procure and maintain throughout the Term as a Net Operating Expense insurance insuring the full replacement value of the Club Quarters, its component parts, and all Furniture, Fixtures and Equipment, against damage from risks of all nature customarily insured against in the jurisdiction in which the Club Quarters is located."

(b) Manager and Owner hereby acknowledge and agree that (i) all property insurance costs payable pursuant to Article 7, Section A of the Management Agreement shall be retroactively applied as a Net Operating Expense as of October 28, 2005, and (ii) Manager shall cooperate with Owner to ensure that the property insurance coverage requirements set forth in Article 7, Section A of the Management Agreement will be enforced as of the next renewal period.

3. Effect of this Amendment. Except as amended and/or modified by this Amendment, the Management Agreement is hereby ratified and confirmed and all other terms of the Management Agreement shall remain in full force and effect, unaltered and unchanged by this Amendment. In the event of any conflict between the provisions of this Amendment and the provisions of the Management Agreement, the provisions of this Amendment shall prevail. Whether or not specifically amended by the provisions of this Amendment, all of the terms and provisions of the Management Agreement are hereby amended to the extent necessary to give effect to the purpose and intent of this Amendment.

4. Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles).



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

5. Counterparts; Headings. This Amendment may be signed in any number of counterparts each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Any such counterpart may be executed by facsimile transmission. Headings in this Amendment are for purposes of reference only and shall not limit or affect the meaning of the provisions hereof.

6. Complete Agreement. This Amendment constitutes the entire agreement of the parties with respect to the amendment of the Management Agreement and all prior or contemporaneous agreements or understandings, verbal or written, with respect thereto are hereby superseded and merged herein.

[Signatures on Next Page]


confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

MANAGER:

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.,
a Connecticut limited liability company

By: ______________________
Name: Jon Herowitz
Title: Vice President

OWNER:

RCQ HOTEL DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________
Name: ______________________
Title: ______________________



confidential
Adam Pozza
Apr 14, 2014 17:38

confidential
Adam Pozza
Apr 14, 2014 17:38

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first above written.

MANAGER:

CLUB QUARTERS MANAGEMENT COMPANY, L.L.C.,
a Connecticut limited liability company

By: ______________________
Name: ______________________
Title: ______________________

OWNER:

RCQ HOTEL DC, LLC,
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: [signature]
Name: Peter Falco
Title: Vice President and Secretary

Signature Page

confidential
Adam Pozza
Apr 14, 2014 17:38