# EXHIBIT 4

# SERVICES AGREEMENT

THIS SERVICES AGREEMENT ("Agreement") is made as of October 28, 2005, by and between RCQ Hotel DC, LLC ("Owner"), a Delaware limited liability company having its principal place of business at c/o Rockwood Capital Corporation, Two Embarcadero Center, Suite 2360, San Francisco, California 94111, and Shared Operating Services, L.L.C. ("SOS"), a Delaware limited liability company, with offices at 49 West 45th Street, New York, New York 10036.

## WITNESSETH:

WHEREAS, Owner is the owner of the Premises and the Club Quarters(1);

WHEREAS, SOS is able to provide or obtain from one of its Affiliates the Services and Facilities;

WHEREAS, Owner desires to obtain from SOS or its Affiliates and SOS is willing to provide to Owner the Services and Facilities as are listed on Schedule A hereto pursuant to the terms and subject to the conditions hereof;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties agree as follows:

### Article 1 - Definitions, Terms and References

**Definitions:** In this Agreement and any exhibits, addenda or riders hereto, the following terms shall have the following meaning:

**Accounting Services** shall mean the recording of accounts, preparation of reports, collection of revenues, payment of expenses, procurement of payroll, and the provision of financial services, including the establishment and maintenance of bank accounts, credit card processing, and audits, as are available from time to time from SOS or its Affiliates.

**Affiliate** shall mean any entity owned or controlled by a party hereto, owning or controlling a party hereto or under common ownership with and controlled by a party hereto, with "control" meaning ownership of seventy-five percent (75%) or more of voting interests.

**Agreement** shall mean this Services Agreement, as it may be amended or supplemented from time to time.

**Approval, Approve or Approved** shall mean prior written approval, which approval shall not be unreasonably withheld or delayed.

(1) "Club Quarters" is a registered trademark of Club Quarters Franchise Network, L.L.C., an Affiliate of SOS.

**Club Quarters** shall mean that certain hotel and the restaurants and retail space, if applicable, at the Premises, and all furniture, fixtures, equipment, and inventories therein.

**Commencement Date** shall mean October 28, 2005.

**Computer and Telephone Network** shall mean the computerized operating communications networks available from time to time from SOS or its Affiliates for hotels.

**Customer List/Network Agreement** shall mean that certain Customer List/Network Agreement of even date herewith between Owner and Club Quarters Membership Network, L.L.C., a Delaware limited liability company and an Affiliate of SOS.

**Customer Services** shall mean those services provided by SOS in the areas of customer reservations, new customer solicitation, and support for the retention of existing customers.

**Default** shall mean default under any of the obligations and requirements under this Agreement.

**Event of Default** shall mean the occurrence of any of the events described in Article 8 herein.

**Fiscal Year** shall mean a year which ends on December 31. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 364 days. A partial Fiscal Year shall constitute a separate Fiscal Year with any amounts due under this Agreement being prorated based on the number of days in such partial year.

**Force Majeure** shall mean any and all causes beyond the reasonable control of a party, and such that reasonable foresight and ability on the part of the affected party could not reasonably provide against, including, without limitation, civil unrest or commotion, riots, acts of terrorism (including hijacking, sabotage, bombing, murder, assault and kidnapping) hurricanes, typhoons, tornados, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, disease, epidemics; labor disputes, accidents, mechanical breakdown, shortages or inability to obtain labor, fuel, steam, water, electricity or materials, and acts of God, fire or other casualty, but only to the extent the same cannot be overcome with diligence and commercially reasonable expense.

**Information Technology Services** shall mean such services as are available from time to time from SOS and its Affiliates in connection with the planning, equipping, maintenance and operation of information technology systems for hotels.

**Insurance Services** shall mean assistance in the development of insurance programs, identification of potential insurers and the negotiation of insurance contracts for the Club Quarters, the preparation of claims, and, to the extent practicable, the

consolidation of insurance coverages for multiple hotels for the purpose of obtaining the pricing advantages of such consolidation.

**Legal Support Services** shall mean the consultative legal services as may be available from time to time from the in-house legal staff of SOS and it Affiliates, including, without limitation, the provision of general legal advice and the recommendation of outside legal services.

**License and Royalty Agreement** shall mean that certain License and Royalty Agreement of even date herewith between Owner and Club Quarters Franchise Network, L.L.C., a Delaware limited liability company and an Affiliate of SOS.

**Management Agreement** shall mean that certain Management Agreement of even date herewith between Owner and Club Quarters Management Services, L.L.C., a Delaware limited liability company and an Affiliate of SOS.

**Manager** shall mean Club Quarters Management Services, L.L.C., the manager of the Club Quarters under the Management Agreement.

**Customer List/Networking Agreement** shall mean that certain Customer List/Networking Agreement of even date herewith between Owner and Club Quarters Membership Network, L.L.C., a Delaware limited liability company and Affiliate of SOS.

**Marketing and Sales Services** shall mean the development and implementation of a brand marketing program for the "Club Quarters" brand and the provision of centralized sales services directed principally at members and potential members for multiple hotels within the Club Quarters system of hotels.

**Owner** shall mean RCQ Hotel DC, LLC.

**Premises** shall mean that property at 839 17th Street, N.W., Washington D.C..

**Property Management Services** shall mean building and machinery maintenance support, building refurbishment or alteration support, including architectural, design and renovation planning and supervision services.

**Proportionate Share** for the Club Quarters shall mean the amount determined by applying the percentage resulting from either (a) dividing the occupied rooms of such Club Quarters for any Fiscal Year by the occupied rooms of all participating Club Quarters hotels, including the Club Quarters, for the same Fiscal Year expressed in equivalent single-room occupancy determined on a consistent basis by reference to the Club Quarters System's Revenue Reports for all participating Club Quarters, or (b) dividing the number of planned and available rooms in such Hotel by the total number of planned and available rooms in all participating Club Quarters by reference to the Club Quarters Development Plans or to the Club Quarters System's Revenue Report for all participating Club Quarters; the application of (a) or (b) depends upon the nature of the particular Service and Facility to which a given charge relates.

**Purchasing Services** shall mean the identification of products, services and vendors for the Club Quarters, the negotiation of purchase terms for such products and services, and, to the extent practicable, the consolidation of purchase orders for the purpose of obtaining advantages of high volume purchases.

**Related Club Quarters Agreements** shall mean the Management Agreement, the License and Royalty Agreement and the Customer List/Network Agreement.

**Reservation Services** shall mean the centralized hotel reservation network (computer and telephone) and other reservation services available from time to time from SOS or its Affiliates.

**Services and Facilities** shall mean the Accounting Services, the Computer and Telephone Network, the Information Technology Services, Customer Services, the Reservation Services, the Insurance Services, the Legal Support Services, the Property Management Services, the Purchasing Services, the Tax Services and the Technical Services.

**Services Fee** shall mean the fee to be paid to SOS pursuant to Article 4 hereof.

**SOS** shall mean Shared Operating Services, L.L.C.

**Tax Services** shall mean the consultative tax services as may be available from time to time from the in-house tax staff of SOS and it Affiliates, including, without limitation, the provision of general tax advice and tax return preparation and the recommendation of outside tax services.

**Technical Services** shall mean consultative services as may be available from time to time from SOS or its Affiliates in the areas of hotel planning, design and engineering for new hotels or the renovation or expansion of existing hotels.

**Term** shall have the meaning ascribed to it in Article 3 hereof.

## Article 2 – Services and Facilities

A. **Provision Services and Facilities:** SOS shall provide to the Club Quarters such Services and Facilities as Owner may from time to time request and as SOS may in its sole discretion determine that it or its Affiliates can provide in response to such requests at a price to be agreed by Owner and SOS at the time that SOS agrees to provide such Services and Facilities. The cost of the Services and Facilities to be provided with respect to any Fiscal Year shall be set forth in the Approved Budgets for such Fiscal Year as established by Owner and Manager pursuant to the Management Agreement. Schedule A attached hereto contains a description of the Services and Facilities that are presently available from SOS. SOS shall have the right to update and/or replace Schedule A from time to time as it deems appropriate in its sole discretion, provided that, any such changes

shall not modify Manager's obligations regarding the operation of the Club Quarters under the Management Agreement.

B. **Availability of Services and Facilities: Non-Exclusive Right**: SOS reserves the right (1) to cause persons or entities other than SOS and its Affiliates to provide to the Club Quarters as subcontractors to SOS or its Affiliates any of the Services and Facilities, provided that the Services and Facilities shall be comparable in scope and quality as would be the case if they were provided directly by SOS or its Affiliates, and provided further, that the Services and Facilities shall be paid for at rates and in the manner as if the Services and Facilities were provided directly by SOS, and (2) subject to the restrictions set forth in Article 12(X) of the Management Agreement, to provide and make available, either directly or through its Affiliates, the Services and Facilities to any other persons or entities, including, without limitation, hotels, as it may in its sole discretion decide to provide or make available at any time.

## Article 3 - Term; Termination

A. **Term:** The term of this Agreement (the "Term") shall commence as of the Commencement Date and continue until the expiration or termination of the Management Agreement.

B. **Termination:** This Agreement shall terminate prior to expiration of the Term as follows:

(1) Upon any Event of Default (as such term is defined in Article 6 hereof), immediately upon the election of the non-defaulting party exercised by delivery of written notice to the defaulting party;

(2) Upon the termination of the Management Agreement or any other Related Club Quarters Agreement.

D. **Termination Payment:** In the event this Agreement is terminated due to the occurrence of any of the events listed in this Article 3, in addition to such remedies as may be available to SOS at law or equity, Owner shall pay to SOS any and all amounts owed to SOS up to the date of termination.

E. **Transition Procedures:** Upon the expiration or termination of the Term, for whatever reason, Owner and SOS shall cooperate to accomplish an orderly cessation of the provision of Services and Facilities to the Club Quarters.

## Article 4 – Services Fee

A. **Services Fee.** In consideration for the Services and Facilities to be provided pursuant to Article 2, Section A hereof, Owner shall pay to SOS the Services Fee.

B. **Fee Structure and Payment.** Owner shall pay to SOS from the Consideration Date the Services Fee which shall consist of: (a) one hundred percent (100%) of Owner's Proportionate Share of the total costs to SOS to provide the Services and Facilities to all Club Quarters calculated on a Fiscal Year basis and determined with reference to SOS's estimated costs for the prior Fiscal Year as certified to Owner in a good faith cost estimate from SOS delivered to Owner at the time of the preparation of the annual budget for the Club Quarters for each Fiscal Year, and (b) such additional fees, if any, as shall have been agreed between SOS and Owner. The Services Fee shall be payable quarterly on or prior to the fifteenth (15) day of each February, May, August and November for the respective quarter, based upon such estimate. An adjustment to the Services Fee for each Fiscal Year shall be made after the close of such Fiscal Year by SOS's delivering to Owner within sixty (60) days after the close of such Fiscal Year a statement setting forth the actual costs to SOS for such Fiscal Year to provide the Services and Facilities to all Club Quarters and Owner's Proportionate Share thereof. If such statement indicates that Owner has underpaid the Services Fee based upon SOS's actual costs, then Owner shall pay to SOS the amount of such underpayment within thirty (30) days after the receipt of such statement. If such statement indicates that Owner has overpaid the Services Fee based upon SOS's actual costs, then SOS shall refund to Owner the amount of such overpayment within thirty (30) days after delivering such statement to Owner. Notwithstanding any such payment by Owner or refund by SOS, Owner shall have the right to contest the statement of SOS's actual costs through the arbitration procedures set forth in this Agreement.

## Article 5 - Taxes

A. **Taxes.** SOS shall be responsible for all income taxes imposed by any State of the United States of America or the United States of America upon the receipt of the Services Fee. Owner shall be responsible for payment of value added, goods and services, sales and similar taxes, if any, levied on or deducted from any amounts payable to SOS or its Affiliates pursuant to this Agreement (but not any income taxes payable by SOS or any of its Affiliates to any jurisdiction). The amount of such value added, goods and services, sales or similar taxes shall be payable by Owner to SOS together with the payment to which it relates or as otherwise required by applicable law. To the extent that applicable law requires any such amounts to be paid by Owner directly to a governmental authority, Owner shall pay such amounts promptly and receipts or other proof of such payment shall be provided to SOS promptly upon request.

B. **Cooperation.** Upon request, Owner and SOS shall cooperate in good faith and exercise reasonable efforts to amend this Agreement for tax planning purposes, provided that such amendment does not materially and adversely affect the rights or reduce or increase the obligations of Owner or SOS. The parties shall at their own expense fully cooperate and keep each other fully apprised in the event of a tax audit, examination, investigation or inquiry by any governmental body in connection with any payments made pursuant to this Agreement. Such cooperation shall include, but not be limited to, the retention and protection of all records required to document amounts charged or paid by each party under this Agreement and the prompt production of such records and supporting documentation on request by the other party. Each party shall promptly notify

the other of any such tax audit, examination, investigation or inquiry concerniing the other party of which it may become aware.

## Article 6 - Events of Default, Remedies

A. **Events of Default.** The following constitute Events of Default under this Agreement:

(1) Non-Payment. The failure of either party to pay any sum of money to the other party when due and payable, if such failure is not cured within ten (10) days after written notice specifying such failure is received by the defaulting party from the non-defaulting party.

(2) The failure of either party to perform, keep or fulfill any of the other agreements, covenants, undertakings or obligations or the breach in any material respect of any warranty or representation, set forth in this Agreement or in any document executed in connection herewith, if such failure or breach has or could have a material adverse effect on the operation of the Club Quarters or the rights and duties of either party hereto, if such failure is not cured within thirty (30) days after written notice specifying such failure is received by the defaulting party from the non-defaulting party; provided, however, that if such failure is incapable of cure within such period, and the defaulting party commences to cure such default during such period and thereafter prosecutes such cure to completion with all due diligence (but in no event later than 60 days following delivery of the original notice of default), then no Event of Default shall exist.

(3) Bankruptcy. The filing by a party of a voluntary petition in bankruptcy under Title 11 of the United States Code, or the issuing of any order for relief against such party under Title 11 of the United States Code, or the filing by a party of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors or a party's seeking or consenting to or acquiescing in the appointment of any custodian, trustee, receiver, conservator or liquidator, or the making by a party of any general assignment for the benefit of creditors, or any party's failure generally to pay its debts as such debts become due, or a party's giving of notice to any governmental body of insolvency or pending insolvency or suspension of operations, or the entry by a court of competent jurisdiction of an order, judgment or decree approving a petition filed against a party seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive) from the date of entry thereof (whether or not consecutive).

(4) The occurrence of an "Event of Default" under the Management Agreement or any other Related Club Quarters Agreements.

## Article 7 - Transfer Restrictions

A. **Transfer by Owner.** In the event Owner sells, conveys or transfers its ownership of the Club Quarters or leases all or substantially all of the building which constitutes the Club Quarters as permitted under the Management Agreement and assigns the Management Agreement in connection with such sale, conveyance or other transfer, and if the transferee (or lessee, as the case may be, hereinafter referred to as a "transferee") agrees to be bound by the terms and conditions of this Agreement to the same extent as if such transferee had executed this Agreement with respect to obligations arising from and after the date of the applicable transfer, Owner may assign this Agreement to such transferee or to any entity which is controlled by, which controls or is under common control with such transferee, without the consent or approval of SOS.. Owner shall pay all amounts then owing to SOS under this Agreement at the time of such sale, conveyance, transfer or lease.

B. **Assignment by SOS.** SOS shall have the right to assign its rights and obligations under this Agreement to any Affiliate of SOS or Manager without the consent of Owner to any Affiliate, provided SOS shall continue to be liable hereunder to the same extent as though no assignment had been made. SOS may assign its rights to receive the Services Fee or portions thereof to any person as security for indebtedness. Except as hereinabove provided, neither SOS nor an Affiliate shall assign its rights or obligations under this Agreement without the Approval of Owner.

## Article 8 - Representations and Warranties

A. **Representations and Warranties of Owner.** In order to induce SOS to enter into this Agreement, Owner does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the limited liability company operating agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding-obligation of Owner enforceable in accordance with the terms hereof;

(2) There are no claims, litigation, proceedings or governmental investigation pending, or to the best of such Owner's knowledge, threatened, against or relating to Owner, the properties or business of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of Owner's knowledge, except as has been fully disclosed in writing to SOS; and

(3) Neither the consummation of the actions contemplated by this Agreement on the part of Owner to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the

terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound;

(4) Owner is a single-purpose entity and its only assets are the Premises and all improvements thereat.

B. **Representations and Warranties of SOS.** In order to induce Owner to enter in to this Agreement, SOS does hereby make the following representations and warranties:

(1) The execution of this Agreement is permitted by the Articles of Formation and Operating Agreement of SOS and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of SOS enforceable in accordance with the terms hereof;

(2) There are no claims litigation, proceedings or governmental investigation pending, or to the best of SOS's knowledge, threatened, against or relating to SOS, the properties or business of SOS or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of SOS to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation to the best of SOS's knowledge, except as fully disclosed in writing to Owner; and

(3) Neither the consummation of the actions contemplated by this agreement on the part of SOS to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which SOS is a party or by which it is bound.

## Article 9 - Miscellaneous

A. **Further Assurances.** The parties shall execute and deliver all other appropriate supplemental agreements and other instruments as may be reasonably required without modifying the obligations of the parties hereunder, and take any other action necessary, to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

B. **Waiver.** The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not to be deemed a waiver of such terms and conditions on any future occasion.

C. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

D. **Governing Law.** This Agreement shall be governed by the laws of the District of Columbia without regard to its conflicts of law provisions.

E. **Amendments.** This Agreement may not be modified, amended, surrendered, or changed, except by a written instrument executed by the parties.

F. **Indemnity by SOS.** SOS shall indemnify and hold harmless Owner from and against any losses, liabilities, damages or claims against Owner arising out of (i) any gross negligence or willful misconduct of SOS, its agents, contractors, subcontractors and employees; (ii) any material breach of a covenant, representation or warranty of SOS herein contained.

G. **Indemnity by Owner.** Owner shall indemnify and hold harmless SOS from and against any losses, liabilities, damages or claims against SOS arising out of. (i) any gross negligence or willful misconduct of Owner, its or its agents, contractors, subcontractors and employees; (ii) any material breach of a covenant, representation or warranty of Owner herein contained

H. **Partial Invalidity.** In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by a final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto in which case this Agreement shall be of no force and effect.

I. **No Representation.** In entering into this Agreement, the parties acknowledge that neither Owner nor SOS has made any representations to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Club Quarters, and that Owner and SOS understand that no guarantee is made to the other as to any specific amount of income to be received by SOS or any of the Club Quarters or as to the future financial success of the Club Quarters.

J. **Relationship.** In the performance of this Agreement, SOS shall act solely as an independent contractor.

K. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

L. **Time of the Essence; Force Majeure.** Unless otherwise set forth herein, time is of the essence of this Agreement; provided, however, that time limitations set forth in this Agreement, except with respect to monetary obligations, shall be extended for the period of any delay due to causes beyond the delayed party's control or which cannot be reasonably foreseen or provided against, including without limitation, strikes, governmental regulations or orders, or events of Force Majeure.

M. **Interpretation.** No provisions of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted such provision

N. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement. The parties hereby agree that telecopied or facsimile signatures (or signatures sent as PDF files by email) may be used in place of original signatures on this Agreement.

O. **Consent and Approval.** Except as herein otherwise provided, whenever in this Agreement the Approval of Owner and SOS is required, such Approval shall not be unreasonable withheld or delayed.

P. **Notices.** Any notice, statement or demand required to be given under this Agreement shall be in writing and be, and at the option of the party giving notice, (i) personally delivered, (ii) transmitted by postage prepaid first class mail, (iii) transmitted by facsimile (with confirmation of transmission), or (iv) transmitted by Federal Express or other overnight courier service, addressed to any party to the address below each party's names in the heading to this Agreement, or to such other addresses as SOS or Owner may designate in the manner herein provided. Any such notice shall be deemed to have been given on the date actually received. Owner and SOS each agree that upon giving of any notice, it shall use reasonable efforts to advise-the, other by telephone that a notice has been sent hereunder. Such telephonic advice shall not, however, be a condition to the effectiveness of notice hereunder.

Q. **Confidentiality.** The terms and provisions of this Agreement shall be confidential between Owner and SOS and shall be released only to its officers, employees and investors; provided, however that such information may be made available to other parties only in connection with any court order, to comply with governmental rules and regulations, and as required by any proposed purchaser or mortgagee of all or any portion of Owner's interest in the Club Quarters.

R. **Arbitration:** Any and all disputes arising from this Agreement shall be resolved by binding arbitration as follows: The matter shall be referred for determination to an independently qualified consultant mutually agreed upon by the parties who shall be from nationally recognized consulting firm providing management services to the hotel industry. In the event the parties are unable to agree upon such an arbitrator, then the matter shall be determined by such a consultant selected by a senior partner of a recognized audit firm with experience in providing auditing services to the hotel industry, or, if the parties fail to agree, then either party may require by notice to the other party that such arbitrator be selected or designated by the American Arbitration Association. All arbitration shall be held and finally determined in the State of New York and shall be governed (except for the method of selection of the arbitrator) in accordance with the Commercial Arbitration Rules of the American Arbitration Association (or any successor thereto). Each party shall be responsible for one half of the fees and expenses of the arbitrator. The decision and award of the arbitrator so selected shall be binding upon both Owner and SOS and shall be enforceable in accordance with the applicable laws of the State of New York.

IN WITNESS WHEREOF, Owner and SOS, acting by and through their proper and duly authorized officers or representatives, have each duly executed this Agreement as of the day and year first above written.

OWNER: **RCQ HOTEL DC, LLC,**
a Delaware limited liability company

By: RCQ Hotel DC Sr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: RCQ Hotel DC Jr. Mezz, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood Club Quarters, LLC,
a Delaware limited liability company,
its Sole Member and Manager

By: Rockwood VI REIT, Inc.,
a Maryland corporation,
its Sole Member

By: ______________________
Walter P. Schmidt
Vice President

SOS: **SHARED OPERATING SERVICES, L.L.C.,**
a Delaware limited liability company

By: ______________________
Jonathan D. Horowitz
Vice President and Secretary

# SCHEDULE A

## SERVICES AND FACILITIES

SERVICES AND FACILITIES:

Accounting Services

Computer and Telephone Network

Customer Services

Information Technology Services

Reservation Services

Insurance Services

Legal Support Services

Property Management Services

Purchasing Services

Tax Services

Technical Services