UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

CLUB QUARTERS MANAGEMENT COMPANY, LLC, et al.,

Plaintiffs,

-v-

CQ DC ACQUISITION LLC,

Defendant.

---------------------------------------- X

26cv9393 (DLC)

OPINION AND ORDER

APPEARANCES:

For plaintiffs Club Quarters et al.:
Kathleen Prystowsky
Keith Blackman
Akerman LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10020

For defendant CQ DC Acquisition:
Bryan Mohler
Meghan Hill
Pryor Cashman LLP
7 Times Square
New York, New York 10036

DENISE COTE, District Judge:

Anticipating that its agreements to manage a hotel will be terminated, Club Quarters Management Company, LLC ("Club Quarters Management") and three related entities[1] (collectively, "Club Quarters") have moved for a preliminary injunction against

[1] The three related entities are Club Quarters Franchise Network, LLC, Club Quarters Membership Network, LLC, and Shared Operating Services, LLC.

CQ DC Acquisition, LLC, the owner of the hotel ("Owner"). For the following reasons, the plaintiffs' motion for a preliminary injunction is denied.

**Background**

Club Quarters is a boutique hotel brand with thirteen hotels located in seven cities in the United States as well as in London. Club Quarters operates a "distinctive membership-oriented model" that is principally designed to serve business travelers. It gives its clients access to a network of hotels at negotiated rates. One of these hotels is the Club Quarters Hotel White House in Washington, D.C. ("Hotel"). The Hotel is the only Club Quarters branded hotel in D.C., and it maintains relationships with government employers such as the U.S. Secret Service, the World Bank, and corporate and educational institutions.

Over twenty years ago, on October 28, 2005, the plaintiffs entered into a series of agreements with a prior owner of the Hotel. These agreements brought the Hotel into the Club Quarters community. They included a License and Royalty Agreement, Customer List/Network Agreement, Services Agreement, and a Management Agreement. Each of the agreements is between the Hotel's owner and a different Club Quarters entity. The agreements have an initial twenty-five-year term which will last

through 2030, with the right to extend for another ten years until 2040. The Management Agreement is governed by D.C. law but has a forum selection clause designating the jurisdiction for disputes as a New York State or federal court sitting in the County of New York.

The Management Agreement made Club Quarters responsible "for the management and operation" of the Hotel and all of its facilities and activities "in a manner consistent with the management and operation of Other Club Quarters." Club Quarters determines room rates, prepares an operating plan and budget, determines credit policies, arranges for utility, telephone and other services, causes repairs to be made, and staffs the Hotel with its own employees. Under the suite of agreements, the Hotel is allowed to use the Club Quarters name and trademarks and is also given access to the Club Quarters' customer lists and its customer network.

Each Club Quarters entity is paid a different percentage of the gross revenue of the Hotel in exchange for the rights and services provided under the agreements. Under the Management Agreement, Club Quarters Management receives a base fee of 2.75% of the gross revenue and an incentive fee of 6% of the net operating income.

Each of the agreements contains a cross-termination provision which may be invoked upon the termination of the Management Agreement. The Management Agreement may be terminated before the end of the thirty-year term if a defined Event of Default occurs. An Event of Default may include a party's failure to fulfill obligations under the Management Agreement or the documents executed in connection with it, "if such failure or breach has or could have a material adverse effect on the operation of the Club Quarters or the rights and duties of either party." The non-defaulting party must specify the failure constituting the Event of Default in a written notice to the defaulting party and afford the defaulting party the opportunity to cure. If the Manager is the defaulting party, the Owner is required to pay the Manager any accrued amounts that remain unpaid. After receiving a notice of default, a party has thirty days to cure the Event of Default. The Event of Default arises only if the defaulting party fails to cure the specified breach within that period. If the defaulting party commences to cure a default that is impossible to cure during the thirty-day period and prosecutes the cure "with all due diligence (but in no event later than 60 days following delivery of the original notice of default)", then the Event of Default shall not exist.

Defendant CQ DC Acquisition ("Owner") purchased the Hotel in July 2016 and was assigned all right, title and interest in and to the agreements between the previous owner and the Club Quarters entities. Business at the Hotel was adversely affected by the pandemic in 2020, the Government shut-down in 2025, and the DOGE reductions in the federal government workforce in 2025.

Club Quarters has advised the Owner of capital projects which it believes are "necessary" to keep the Hotel in compliance with Club Quarters' standards and to preserve its competitiveness in the D.C. market. Club Quarters has taken the position that the Owner's refusal to make necessary investments has put the Hotel at a "significant competitive disadvantage". In October 2025, Club Quarters submitted a proposed annual operating plan to the Owner, which the Owner rejected. After their negotiations failed, Club Quarter commenced an arbitration on April 10, 2026 ("Arbitration"), seeking a declaration that the Owner had unreasonably withheld approval of the plan.

On September 22, 2026, the Owner served Club Quarters with a notice of default ("Notice") declaring Club Quarters Management in default under several provisions of the Management Agreement. CQ DC Acquisition claims that Club Quarters failed to "maintain the proprietary business concept and proprietary formulae" because it failed to meet its obligation to: use

commercially reasonable efforts to enhance the profitability and value of the Hotel; oversee the "Membership Network"; and comply with the policies, systems, procedures, and protocol of a Club Quarters and with the Club Quarters Standards.

The Notice states that Club Quarters Management has thirty days to cure the defaults by increasing the number of Club Quarters-branded hotels, growing the customer network and customer lists, operating the Hotel in line with Club Quarters standards, or compensating the Owner for all damages caused by the breaches in an amount of over $2 million. The Notice warns that upon a failure to cure, the Owner may elect to terminate the Management Agreement and related agreements.

On October 27, 2026, four days before the end of the cure period, Club Quarters filed this action and moved for a temporary restraining order ("TRO") and a preliminary injunction. The complaint requests a declaratory judgment that Club Quarters is not in default and that the Notice is unenforceable. The complaint brings claims for breach of the implied covenant of good faith and fair dealing, breach of contract, and specific performance.

In its motion for injunctive relief, Club Quarters seeks two types of relief. It seeks to toll the cure period for the Notice and, pending the resolution of this action, to enjoin the

termination of the Management Agreement and the related agreements on any of the grounds specified in the Notice.

Alongside its brief in support of a TRO and a preliminary injunction, Club Quarters submitted a declaration from John Paul Nichols, the Chief Executive Officer of Club Quarters Management. Nichols characterizes the D.C. Hotel as a critical node in the Club Quarters network and states that the D.C. Hotel "cannot readily be replaced with another similarly situated property." Nichols also states that the termination of the Management Agreement would "disrupt longstanding customer and membership relationships, and damage Club Quarters' goodwill, reputation, brand, and ability to attract or retain members and hotel owners."

At a conference on October 29, the Owner agreed to extend the time to cure the default to November 15 and the TRO was denied. The owner subsequently extended the cure period to November 30. At a November 6 conference, the parties agreed to bifurcate the preliminary injunction proceedings to first address whether Club Quarters has established that termination of the Management Agreement by the Owner would cause it irreparable harm. The bifurcation has the advantage of allowing the parties and the Court to promptly address the defendant's principal argument in opposition to the motion, to wit, that an

injunction is unavailable to prevent the termination of a personal services contract. It also avoids the need for discovery regarding the merits of the Notice. After the Owner indicated that it did not need to cross-examine Nichols or provide its own witness because there were no facts in dispute that affected a determination regarding irreparable harm, the Court set a briefing schedule which allowed the parties' papers to be fully submitted on November 13 and oral argument to be held on November 18.

The Owner opposed the motion for a preliminary injunction on November 11 and submitted a declaration from Nathalie Abinader, the Vice President of Asset Management for the asset manager of the Hotel. The declaration discusses the various agreements and alleges that Club Quarters has "pivot[ed] its business away from the cultivation of the Club Quarters brand." With its reply on November 13, Club Quarters submitted a second declaration from Nichols and filed a motion to strike the November 11 affidavit from Abinader. On November 16, the Owner opposed the motion to strike.

Oral argument was heard on the matter on November 18. The motion to strike the Abinader declaration was denied. For the reasons set forth below, the motion by Club Quarters for a preliminary injunction is now denied on the ground that it has

failed to show the existence of irreparable harm in the absence of an injunction.

**Discussion**

"A preliminary injunction is 'an extraordinary remedy' that courts may only award upon a clear showing that the plaintiff is entitled to such relief." Nat'l Ass'n for Gun Rts. v. Lamont, 153 F.4th 213, 228 (2d Cir. 2025) (citation omitted). To establish that they are entitled to a preliminary injunction, plaintiffs must show that

> (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) issuing an injunction is in the public interest.

Id.

Irreparable harm is the "the single most important prerequisite for the issuance of a preliminary injunction." Gov't Emps. Ins. Co. v. Patel, 166 F.4th 280, 291 (2d Cir. 2026) (citation omitted). To demonstrate irreparable harm, a plaintiff must show that it "will suffer an injury that is neither remote nor speculative, but actual and imminent." Nat'l Inst. of Fam. & Life Advocs. v. James, 160 F.4th 360, 379 (2d Cir. 2025) (citation omitted). When "there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." State

Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C., 120 F.4th 59, 80 (2d Cir. 2024) (citation omitted). Monetary compensation "need only be 'adequate' for preliminary relief to be unwarranted, not perfect." Daileader v. Certain Underwriters at Lloyds London Syndicate 1861, 96 F.4th 351, 358 (2d Cir. 2024).

For a preliminary injunction in aid of arbitration, a district court may issue a preliminary injunction "to preserve the status quo pending arbitration." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 894–95 (2d Cir. 2015). "The standard for such an injunction is the same as for preliminary injunctions generally." Id. at 895.

A hotel management agreement is a "classic example of a personal services contract that may not be enforced by injunction." Marriott Int'l, Inc. v. Eden Roc, LLLP, 962 N.Y.S.2d 111, 112 (N.Y. App. Div. 1st Dep't 2013).[2] Management contracts that involve "day-to-day discretionary decision making" are personal services contracts, the performance of which "cannot be judicially compelled." Woolley v. Embassy Suites, Inc., 278 Cal. Rptr. 719, 728 (Ct. App. 1991). A

[2] As noted, the Management Agreement is governed by D.C. law. The parties rely, however, on decisions applying the law of a multitude of jurisdictions. They do not suggest that the law they cite differs from the law that governs within Washington, D.C.

property owner may not be "forcibly partnered with an operator it does not want to manage its property." FHR TB v. TB Isle Resort, 865 F. Supp. 2d 1172, 1179 (S.D. Fla. 2011) (applying New York law).

The plaintiffs have failed to show that the termination of the Management Agreement by CQ DC Acquisition will result in irreparable harm to Club Quarters. The Management Agreement is a personal services contract that can be terminated by the Owner of the Hotel. If the termination of the parties' contract is wrongful, money damages are available and quantifiable to compensate Club Quarters adequately.

The plaintiffs do not contest that the Management Agreement is a personal services agreement. They argue instead that this case presents an exception to the general rule prohibiting preliminary injunctions from being issued to prevent the termination of hotel management relationships. Club Quarters argues that it will suffer irreparable harm from the termination of the Management Agreement and the related agreements with the Hotel's Owner.

First, it argues that the termination of the Management Agreement will irreparably harm the Club Quarters brand and its line of business, making it impossible to calculate damages with reasonable certainty. According to Club Quarters, an award of

damages will not be able to repair the impact on customer relationships and on its goodwill. This argument fails.

The cases on which Club Quarters relies to support this argument are inapposite and demonstrate that what it seeks here is exceptional. Club Quarters relies on cases in which the plaintiff's entire business is threatened, for example, by the termination of a franchise agreement that puts the plaintiff-franchisee out of business. See, e.g., JTH Tax, LLC v. Agnant, 62 F.4th 658, 668 (2d Cir. 2023) (loss of franchise); Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of distributorship). Club Quarters has not shown that its agreements with the Owner are "essential to the life" of its business. Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 38 (2d Cir. 1995).

At oral argument, Club Quarters stressed that a loss of a hotel in D.C. will irreparably damage its goodwill by leading to a loss of customers. Club Quarters has not presented sufficient evidence to support a finding of such damage. In any event, any loss that may exist can be adequately addressed through an award of damages. The two cases on which it relied at oral argument in support of its argument that a loss of customers cannot be compensated through a damages award are inapposite.

In Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 908 (2d Cir. 1990), the news service United Press International was threatened with the loss of its only source of foreign news pictures. Finding that it had "few competitors" in the United States and that the loss of the flow of pictures "even briefly threatens a wire service company's continued viability," the Court of Appeals reversed the denial of a preliminary injunction. Id. at 905, 908.

Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 445 (2d Cir. 1977), provides even less support for Club Quarters. The plaintiff in Jacobson was a distributor of acoustical ceiling systems for the largest manufacturer of those products. Id. at 440. Threatened with the termination of its distributorship, it argued that it needed access to the defendant's products to remain competitive and succeeded in obtaining a preliminary injunction against the termination of its distributorship. Id. That injury to its entire business has no parallel here.

The plaintiffs next argue that the Hotel is irreplaceable because it is the only Club Quarters hotel in Washington, D.C. and is anchored by relationships with the U.S. Secret Service, the World Bank, and other institutions. Again, this argument does not demonstrate that the plaintiffs will suffer an

irreparable injury. The impact from the loss of this property to the plaintiffs' brand should be calculable based on the Hotel's financial performance and the parties' agreements, which set forth the percentage of fees to be paid to the plaintiffs. When a business has "an established presence or long history of operations in the geographic area", a court can extrapolate damages. JTH Tax, LLC, 62 F.4th at 668. Put another way, a "long history of operation" of a hotel allows a party "to calculate money damages for any loss of goodwill." Dexter v. Cuomo, 663 F.3d 59, 62 (2d Cir. 2011).

While the loss of a hotel in the D.C. market may be significant to Club Quarters, the plaintiffs have not demonstrated that it would cause it irreparable injury. The plaintiffs describe themselves as a well-known and reputable brand with locations in London and major cities in the United States. Indeed, Club Quarters' argument regarding the potential injury to its brand is undercut by its forceful and lengthy description of the defendant's wrongdoing over the entire period it has owned the Hotel. Club Quarters accuses the Owner of refusing for years to make necessary improvements to the Hotel and of letting the Hotel fall into disrepair. Club Quarters contends that that disrepair has negatively impacted not only the Hotel's business but also the Club Quarters brand.

Club Quarters relies on Monument Realty LLC v. Wash. Metro. Area Transit. Auth., 540 F. Supp. 2d 66 (D.D.C. 2008), to support its argument about the unique location of the Hotel. While the court described the real property at issue there -- a bus garage in Washington, D.C. -- as unique, the case is inapposite. In Monument Realty the plaintiffs sued a government entity over alleged errors in a procurement process. Id. That entirely different context provides no basis to find that Club Quarters has established irreparable harm to its hotel management business.

Next, Club Quarters relies on the cross-termination provisions in the suite of agreements between the parties to justify its request for injunctive relief. Because the termination of the Management Agreement would result in the termination of the License and Royalty Agreement and the Customer List/Network Agreement, the plaintiffs contend that those harms are also properly considered here. Club Quarters has not identified any separate harm from the termination of those agreements, however, that cannot be compensated through an award of damages. The cases on which Club Quarters relies do not suggest otherwise; they arise in the context of terminating licensing or franchise agreements. See, e.g., LaGuardia Associates v. Holiday Hospitality Franchising, Inc., 92

F. Supp. 2d 119 (E.D.N.Y. 2000) (franchise agreement); CPTS Hotel Lessee LLC v. Holiday Hospitality Franchising LLC, 98 N.Y.S.3d 18 (N.Y. App. Div. 1st Dep't 2019) (license agreement).

Club Quarters next argues that the Court should only toll the cure period and need not enjoin the termination of the agreements. The plaintiffs' motion, however, requested an injunction with respect to both the cure period and the termination of the agreements. This made sense since the two issues are intertwined. The purpose of the request to toll the cure period is the prevention of the termination. Therefore, a modification of the motion to request only that the cure period be tolled does not relieve Club Quarters of its burden to show that it would be irreparably injured by the termination of the Management Agreement.

Lastly, the plaintiffs argue that an injunction is necessary to preserve the dispute resolution process in the ongoing Arbitration between the parties. It argues that the termination of the Management Agreement would render the Arbitration meaningless. That may or may not be so. If the Owner does terminate the Management Agreement, the arbitration decision on the 2026 budget issue may inform the calculation of any damages awarded to the plaintiffs should they prove the termination breached the parties' agreements. For the reasons

already explained, however, Club Quarters has not shown that it will be irreparably harmed if the Owner is permitted to terminate the Management Agreement. That failure applies with equal force to the extent its request is for an injunction in aid of the Arbitration.

**Conclusion**

The plaintiffs' October 27 motion for a preliminary injunction is denied.

Dated: New York, New York
November 20, 2026

DENISE COTE
United States District Judge